## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO: 1:23-cv-21512**

**LIDIA NOEMI ZALAZAR, an individual;**

   **Plaintiff,**

     **v.**

**CAPITAL FORCE LLC, a Delaware limited
liability company; CAPITAL FORCE F1 LLC,
a Delaware limited liability company; MATIAS
COSTANTINI, an individual; JUAN CRUZ
TALIA BROWN, an individual; JONATHAN
CULLEY, an individual.**

   **Defendants.**

_____/

## COMPLAINT

The above-captioned Plaintiff files this Complaint, and sues the above-captioned Defendants in this matter, and in support thereof, states as follows:

### I. THE PARTIES

1.    Plaintiff, Lidia Noemi Zalazar ("Mrs. Zalazar" or "Zalazar") resides in the country of Argentina. Mrs. Zalazar invested in excess of $150,000.00 of her life savings in Capital Force LLC and Capital Force F1 LLC Notes.

2.    Defendant Capital Force LLC ("Capital Force") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Capital Force is subject to personal jurisdiction in Florida because it operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

3.     Defendant Capital Force F1 LLC ("Capital Force F1") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Capital Force F1 is subject to personal jurisdiction in Florida because it operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

4.     Defendant Matias Costantini ("Costantini") resides in Miami-Dade County, Florida, and is otherwise *sui juris.* Costantini is the founding partner/member, manager and current President of the Capital Force Group, including Vehicle Solutions CF, Capital Force and Capital Force F1. As President and founding partner/member Costantini exercises significant control over the Company operations. From its inception in or around late 2017 through the present, Costantini was Capital Force's ultimate decision-maker. Costantini is a licensed securities agent and investment advisor and has worked in such capacity since working for Merrill Lynch in 1998, thereafter at UBS Financial Services and lastly at Insigneo Securities until late 2018. Costantini on his LinkedIn profile lists himself as the President of the Capital Force Group of companies, Wharton School of Business graduate and previous First Vice President with UBS Financial Services.

5.     Defendant Juan Cruz Talia Brown ("Brown") resides in Miami-Dade County, Florida, and is otherwise *sui juris*. According to Capital Force's web page, Brown is the founding partner and current Vice-President of Capital Force Group including Vehicle Solutions CF, Capital Force and Capital Force F1. Brown's responsibilities cover a broad area of Capital Force's corporate structure, financial operations, liaisons with investors and exercises significant control over Company operations.

6.      Defendant Jonathan Culley ("Culley") resides in Miami-Dade County, Florida, and is otherwise *sui juris*. Culley is one of the founding partners and Chief Financial Officer of Capital Force Group including Vehicle Solutions CF, Capital Force and Capital Force F1. Culley's responsibilities cover a broad area of Capital Force's corporate structure, financial operations, liaisons with investors, preparing financial reports for investors' review and exercising significant control over Company operations.

## II. JURISDICTION

7.      This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship amongst the parties.

9.      The Court has personal jurisdiction over Defendants Costantini, Brown and Culley because they are residents of the Southern District of Florida. The Court also has personal jurisdiction over each Defendant under Florida's long-arm statute because they have all conducted continuous and systematic business in the State of Florida and are therefore subject to general jurisdiction pursuant to Florida's Long-Arm Statute §48.193.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendants can be found or transact business in this District. Also, Defendants Capital Force and Capital Force F1 maintain their headquarters in Miami, Florida, which is situated in this District. Venue is also proper because many of the acts and conduct that

constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails and interstate telephone communications.

### III. INTRODUCTION

12.     Plaintiff Lidia Noemi Zalazar ("Zalazar") is one of over 150 victims of a fraudulent scheme masterminded by a web of individuals, who enticed victims with baseless promises of a high-return, safe and fully collateralized investment opportunity in the form of an unregistered fraudulent securities offering. This Ponzi-like scheme was orchestrated by Defendants Matias Costantini ("Costantini"), Juan Cruz Talia Brown ("Talia-Brown"), and Jonathan Culley ("Culley") (collectively the "Individual Defendants" or "Bad Actors") individually through the unlawful use of business entities controlled by them. Defendants' fraudulent schemes also involved a cabal of entities and individuals, which include Alberto San Miguel ("San Miguel"), Jessica Malvicino ("Malvicino"), Vehicle Solutions Corp. ("VSC"), attorney Jennifer Snyder and her law firm Snyder International Law Group P.A. (the "Relevant Entities and Individuals").

13.     From at least 2017 and through October of 2022, the Bad Actors preyed primarily on unsuspecting investors and raised over $35,000,000.00 through an unregistered fraudulent securities offering, providing investors with promissory notes to fund its business of buying and servicing subprime and non-prime automobile retail installment loans/contracts (in the form of Retail Installment Sales Contracts ("RISC") or ("Car Loans) and obtaining titles to the automobiles and the related and attendant documents and obligations.

14.     The Bad Actors further perpetuated their fraudulent scheme using an interconnected web of affiliated entities operating as limited liability companies formed in Delaware, with their principal offices in Miami-Dade County Florida, soliciting investors and transacting business in Florida. In marketing presentations, email correspondence, and when speaking with investors and third-parties, the Bad Actors would commonly refer to these entities as "Capital Force Group." A diligent search does not find Capital Force Group to be a legally formed entity. The interconnected web of affiliated entities included:

- Vehicle Solutions CF, LLC ("Vehicle Solutions CF");
- Vehicle Solutions Corp. ("VSC");
- Capital Force F1, LLC ("Capital Force F1");
- Capital Force, LLC ("Capital Force");
- Vehicle Solutions Finance LLC ("VSF");
- Vehicle Solutions USA, LLC ("VS USA");
- VSC Auto Finance LLC ("VSC Finance"); and
- Capital Force F5, LLC ("Capital Force F5") - (collectively the "Affiliated Companies" or "Capital Force Companies").

15.     As set forth herein, Defendants Costantini, Talia-Brown and Culley in their own self-interests and on behalf of Defendants Capital Force F1 and Capital Force, made various untrue statements of material facts and omitted to state other material facts which, had those facts been disclosed, would have revealed the fraud being committed by Defendants.

16.     Costantini, Talia-Brown, Culley and Capital Force Companies tricked investors (including Plaintiff) into thinking their investment would be used exclusively to fund Car Loans and lied by representing that their money was safe and secure.

17.     In reality, the Capital Force Companies used investors' money for purposes other than purchasing/financing Car Loans, never had sufficient collateral in Car Loans to secure the investments, and investors' ability to receive the promised returns and repayment of principal was

dependent on Capital Force Companies' ability to continue to raise new investor money and convince existing investors to extend the term of their investment agreements.

18.      Each Affiliated Company served as a conduit for the unauthorized receipt and distribution of investors' funds, business operations, and to make Ponzi-like distributions to investors, where the investments made by newer investors paid off Capital Force Companies' earlier investors.

19.      At all times relevant to these allegations, Defendants Costantini, Talia-Brown and Culley, in their own self-interests and on behalf of Defendants Capital Force F1, Capital Force, and other Affiliated Companies, concealed material facts regarding the Capital Force Group's precarious financial situation in order to convince existing investors (including Plaintiff) to renew their existing investments, thus deferring the Capital Force Companies from needing to repay investors their principal investments, in order to keep the Ponzi scheme afloat.

20.       From at least January 2017 until October 2022, the Bad Actors misappropriated and pillaged investor funds for their personal pleasure to certain family members, to fund other business ventures unrelated to Car Loans, and other activities with no apparent legitimate business purpose.

21.      Investors who were interested in participating in the investment scheme were instructed by Costantini, Talia-Brown and Culley to wire investment funds to Snyder International Law Group, P.A. 's trust account. Snyder Law International Law Group P.A. is an Aventura, Florida based law firm. Jennifer Snyder is a Florida attorney and is the managing partner at Snyder Law (Jennifer Snyder and Snyder Law International Law Group P.A. collectively "Snyder Law").

22.     Snyder Law was tasked under the instructions of Costantini, Talia-Brown and Culley to receive investors' funds in its Florida Bar regulated trust account, and to make distributions to certain Capital Force Companies.

23.     Costantini, Talia-Brown and Culley also provided assistance to investors before they signed their Notes. Costantini and Talia-Brown would provide investors with Snyder Law's bank account information, address, and telephone number to facilitate investors' wire transfers. Thereafter, Costantini and Talia-Brown would provide investors' name and contact information to Snyder Law, and instruct Snyder Law to prepare legal documents in the form of promissory notes, security agreements, and pledge agreements (collectively the "Notes").

24.     Snyder Law's Trust account served as the conduit for receipt of investor funds. Investor funds were then disbursed to affiliated entities within the Capital Force Group further to instructions provided to Snyder Law by either Costantini, Talia-Brown, or Culley.

25.     Notwithstanding the use of the numerous Affiliated Companies, the Bad Actors routinely used the general moniker "Capital Force Group" when referring to any one of the Affiliated Companies, or group of Affiliated Companies and when soliciting funds from investors. Investors were led to believe that companies such as Vehicle Solutions CF, Capital Force and Capital Force F1, were companies managed, owned or operated by and through "Capital Force" without disclosing whether or not "Capital Force" was a separate and/or distinguishable legal entity.[1]

26.     Investors were further told, and presented with written material, including information represented in Capital Force Group's LinkedIn page, that VSC had a partnership with

---

[1] For purposes of this Complaint "Capital Force Group" and "Capital Force Companies" shall be one and the same.

Capital Force, wherein VSC would be the originator and initial underwriter of Car Loans that would then be transferred to Capital Force Group, which in turn would make up the collateral securing investor funds.

27.     Prospective investors would often meet with Costantini and Talia-Brown at Capital Force Group's plush office at the Four Seasons on Brickell Avenue, followed by opulent lunches in restaurants such as Cipriani on Brickell.

28.     As a veteran international investment advisor at UBS Securities, Costantini carefully curated his persona as an uber successful banker and scion of one of the most powerful and wealthy families in Argentina. Costantini's persona complemented Capital Force's veneer of safety and was critical to luring investors into the scheme.

29.     From at least 2017 through 2021, Costantini, San Miguel, Talia-Brown and Culley made key misrepresentations and omissions to investors, promising investors a high-return, low-risk investment, which was further included in written promotional material that their investment (*e.g.,* the promissory notes) were "125% asset backed" and falsely touted that the notes were an extremely secure investment capable of generating reliable investment returns of 12% per annum. Costantini, San Miguel, Talia-Brown and Culley knew that the promissory notes were at no time 125% asset backed.

30.     Moreover, Costantini and Talia-Brown, falsely represented that they would use investors' money solely to fund Capital Force, which would in turn purchase Car Loans from Vehicle Solutions Corp ("VSC") portfolio of recently acquired Car Loans.[2] The Bad Actors referred to VSC as "a vanguard company in the automobile financing services industry..." (the

_____

[2] Vehicle Solutions Corp is owned and operated by Alberto San Miguel.

"Promotional Material") Attached hereto as (Exhibit "A"). Capital Force Group's marketing material contained the following graphic regarding the operational flow of investor funds:



31.     In reality, the notes were never endorsed in favor of investors as depicted in Capital Force Group's operational flowchart.

32.     The Bad Actors' promotional material also represented that Capital Force Group had a strict loan selection purchase process, with strict underwriting criteria, which examines the condition of each automobile, borrower's financials, and would throughout the life of each Car Loan monitor its performance to assure that the investors collateral would never hold a non-performing Car Loan.

33.     The promotional material falsely assured investors that Capital Force Group would conduct audits of VSC's operation and underwriting process and retain the physical notes and title for each automobile as collateral securing the investors' investment.

34.     Costantini and Talia-Brown also met personally with numerous investors to close the deal, or spoke with them on the phone, by WhatsApp, or by email. In meetings at Capital Force Group's office at the Four Seasons Tower, Costantini and Talia-Brown described Capital Force

Group's Car Loan business and showed investors the Company's website, its financial and operational flowcharts, and Car Loan monitoring systems. At these meetings, Costantini and Talia-Brown re-assured investors that their investment would be safe, secure, and fully collateralized.

35.     As part of the scheme, the Bad Actors further touted that in addition to Capital Force Group's profitability and capital reserves, they were able to offer investors added security by providing a "double guarantee" by having Capital Group hold both the note and physical title to each automobile.

36.     Capital Force's website further elaborated "Capital Force has a lien on every title, complete access to a monitoring system, and GPS's of every vehicles [sic] held as collateral. Any loan within recourse is more than 60 days past due would be replaced for a brand-new loan that is current on its payment."

37.     Costantini and Talia-Brown represented to investors in meetings that Capital Force's Car Loan business was extremely profitable and expanding, claiming to one investor that Capital Force had a $50 million Car Loan portfolio with a default rate of less than 5% , which they represented was due to their meticulous due diligence and monitoring policy.

38.     Costantini and Brown also represented to investors that their principal and interest payments were safe, guaranteed, and protected by the profit Capital Force Group generated from high interest rates (in excess of 20%) Capital Force Group charged Car Loan borrowers.[3]

39.     The truth was far different. In reality, the Company used substantial investor funds for purposes other than to purchase and finance the Car Loans, including paying the Company's operating expenses, investor repayments, distributions to Costantini, Brown and Culley, and other

---

[3] Costantini and Talia-Brown represented that Capital Force Group had in excess of 3 million in profit in 2018 after payment of its operating expenses and payment to its investors.

unrelated high-risk business ventures and funding Costantini's vice, vanity and lavish lifestyle, such as luxury vacations to St. Barth, Geneva, Switzerland, ski trips to Vail, Colorado, high end boats (Boston Whaler 37' Conquest) and exotic luxury cars (*e.g.,* Ferrari GTC4 Lusso and a Porsche 911 Carrera 4S).[4]

40.     Because investor funds were the sole source of Capital Force's money, the Company necessarily had to use investor funds to pay the Company's operating expenses.

**i. The Scheme Unravels.**

41.     The scheme unraveled during the month of June 2020, when the Capital Force team (Costantini, Talia-Brown and Culley), advised investors that as a result of COVID-19 (the "Pandemic"), Capital Force was now subject to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole." (the "June Letter") *See* Capital Force Letter June 29, 2020 (Exhibit "B").

42.     The June Letter stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors were falsely assured that the Pandemic has not stopped the Company from continuing to have positive and stable returns.

43.     Again, the truth was far different. By July 2020, the proceeds Capital Force generated from the Car Loans were not sufficient to cover the principal and interest payments due to investors on the Notes.

---

[4] On or around May 2021, Capital Force, LLC funded the purchase of an equity interest in a partnership between Shahab Karmely's KAR Properties and Edgardo Defortuna'a Fortune International Group, in a securities offering to raise $21,000,000.00 and acquire 81 units at Reach and Rise condominiums at Brickell City Centre in Miami.

**ii. The Chilean Fund Investment and Diversion of Loan Collateral.**

44. Notwithstanding its attempt to attribute its financial woes on the Pandemic which affected the U.S. during the early months of 2020 - Capital Force was as of early February 2019, already facing severe financial hardship because of its inability to deliver the returns promised to investors without a steady stream of funds from new investors. Notwithstanding its financial predicament, Capital Force continued to solicit and raise funds from other investors in a failed attempt to cover shortfalls.

45. In or around July 2018, Costantini, Talia-Brown and Culley, with the assistance of their company attorney Jennifer Snyder, formed Capital Force F5, LLC, a Delaware limited liability company ("Capital Force F5"). Capital Force F5 was formed as a clean slate to solicit and launch a new Car Loan investment opportunity with a Chilean mutual fund.

46. Costantini, Talia-Brown and Culley were at the forefront of Capital Force F5, and at all times relevant to these allegations managed and controlled Capital Force F5's business operations.

47. The relationship with the Chilean mutual fund commenced sometime in early 2018. From 2018 and through 2019, Capital Force F5, LLC, obtained in excess of $15 million from LarrainVial Asset Management ("LarrainVial") a Chilean mutual fund, and its affiliated sister company LatinAmerica, Activa SpA ("Activa"), to fund its business in the acquisition and servicing of prime, sub-prime, and non-prime automobile retail installment loan/contracts. Accordingly, LarrainVial formed Fondo De Inversion Privado Activa Deuda Automotriz USD, a Chilean Fund as the investment entity (the "Chilean Fund").

48. The Chilean Funds secured their investment funds with Capital Force F5's assets and receivables, by filing a State of Florida Uniform Commercial Code Financing Statement Form

filed on November 28, 2018, in the Florida Secured Transaction Registry. *See* UCC Financing Statement (Exhibit "C").

49.     On or about February 2019, Capital Force F5 negotiated with the Chilean Fund to provide a second round of funding. As a condition precedent to funding, the Chilean Fund required additional security, collateral and personal guarantees from Costantini and Talia-Brown.

50.     Costantini and Talia-Brown instructed attorney Jennifer Snyder to pledge additional collateral in favor of the Chilean Fund in the form of a security interest, to those same Car Loans previously pledged by Vehicle Solutions CF to investors prior to the February 2019 Chilean Fund transaction. *See* Florida Uniform Commercial Code Financing Statement Form filed by Snyder Law on February 5, 2019, in the Florida Secured Transaction Registry, identifying Vehicle Solutions CF as the Debtor and the Chilean Fund as the Secured Party - UCC Financing Statement (Exhibit "D").

51.      Capital Force, Costantini, and Talia-Brown did not disclose to those investors of Vehicle Solutions CF that the collateral (Car Loans) securing their Notes was later pledged to secure the Chilean Fund's investment. As a result, the collateral securing the Notes was further diluted to the detriment of the existing Vehicle Solutions CF investors.

52.     Following in the trajectory of Capital Force's demise, on or about January 2020, Capital Force F5 inevitably fell upon financial difficulties resulting in the default of its payment and loan-to-value ratio obligations with the Chilean Fund.

**iii.   Capital Force F5 Is Unable to Pay the Chilean Fund Vehicle Solutions CF Pledges Investor Car Loans to the Chilean Fund to Cover Capital Force F5 Loan Default.**

53.     Consequently, the Chilean Fund declared a default and threatened to initiate collection proceedings against Capital Force Group, Capital Force F5, Vehicle Solutions Corp, Vehicle Solutions CF, Costantini and Talia-Brown.

54.     With an imminent $15 million lawsuit, Costantini and Talia-Brown scrambled to negotiate with the Chilean Fund to avert a lawsuit against Capital Force F5, Vehicle Solutions Corp, Vehicle Solutions CF, and more importantly against Costantini and Talia-Brown personally.

55.     Further to settlement negotiations between Costantini, Talia-Brown and the Chilean Fund's Automotive Credit Manager, Gabriela Nallar – Costantini and Talia-Brown agreed to provide the Chilean Fund with additional collateral to comply with Capital Force F5's loan-to-value ratio; more specifically, an additional pledge of 749 Car Loans from Vehicle Solutions CF and VSC worth in excess of $8 Million (the "749 Car Loans") (Florida Secured Transaction Registry dated June 10, 2020 – Exhibit "E").[5] At the time of obtaining the additional pledge of 749 Car Loans, the Chilean Fund had knowledge that the 749 Car Loans had been previously pledged in favor of prior investors.

56.     Most if not all the 749 Car Loans pledged to the Chilean Fund on June 10, 2020, were within the portfolio of Car Loans previously pledged to investors as collateral for their investment. This caused investors collateral to be further diluted, from an already under collateralized investment.

57.     Adding insult to grave injury, Costantini, Talia-Brown and Culley's June Letter to investors kept the investors in the dark by not disclosing that 749 Car Loans securing loans from Vehicle Solutions CF, had been re-pledged and a security interest had been perfected to the Chilean Fund. Instead, Costantini, Talia-Brown and Culley's June Letter to investors, stated:

> "But not everything is bad news. Despite the hardship, during these past two months, the proper strategic decisions were put into action aiming at stabilizing the situation, allowing the business to generate positive returns of an average of 8%. We trust to be going in the right direction for overcoming this recession."

---

[5] Capital Force F5 had assured the Chilean Fund that its funds were guaranteed by Car Loans having a loan-to-value ratio in excess of 125% of its outstanding loan principal.

58.     Once again, the truth was far different. In reality, the Bad Actors had transferred $8 Million in Car Loans from Vehicle Solutions CF to guarantee performance of the subsequent transaction between Capital Force F5 and the Chilean Fund.

### IV. PLAINTIFF ZALAZAR – SPECIFIC FACTUAL ALLEGATIONS.

59.     Plaintiff Lidia Noemi Zalazar, (the "Plaintiff" or "Zalazar") is a 70-year-old housewife and first heard about the Capital Force investment opportunity through mutual acquaintances. One such acquaintance had a longstanding professional relationship with Costantini, going back to Costantini's days as an investment advisor at UBS Financial Services. Being from Argentina, Mrs. Zalazar recognized Matias Costantini's surname, and knew of Costantini's father (Rodolfo Costantini) and uncle's (Eduardo Costantini) reputation of being savvy and successful Argentine businessmen. To Zalazar, the "Costantini" name immediately conveyed an impression of trust and legitimacy.

60.     Zalazar was not a sophisticated investor and consequently did not have an understanding of financial markets, products and the risks associated with Capital Force Group's investment opportunity. Likewise, Zalazar was not an "accredited investor" further to the criteria set forth by the Securities Exchange Commission (SEC).

61.     Because of Mrs. Zalazar's age and limited command of the English language, her business affairs were handled with the assistance of her 43-year-old daughter Carolina Marini ("Carolina").

62.     The securities/investments offered to Zalazar by Capital Force Group, Costantini and Talia-Brown, were not registered with the Florida Office of Financial Regulation or the Securities Exchange Commission.

63.     From at least August 2018 through the present (the "Investment Period"), Plaintiff Zalazar invested in excess of $220,000.00 through Capital Force Companies/Capital Force Group, and specifically with its affiliated entities Capital Force F1 and Capital Force.[6]

64.     As set forth herein, during the Investment Period, Defendants Costantini and Talia-Brown in their own self-interests and on behalf of Defendants Capital Force F1 and Capital Force made various untrue statements of material facts and omitted to state other material facts which, had those facts been disclosed, would have revealed the fraud being committed by Defendants.

65.     On or about January 2018, Carolina was invited by Costantini and Talia-Brown to attend a Capital Force Group investor presentation at its office located at the Four Seasons office building, 1441 Brickell Avenue, Suite 1018, Miami, Florida 33131 (the "January 2018 Meeting"). During the investor presentation, Carolina met with Costantini. Carolina introduced herself as Zalazar's daughter and indicated that her mother was interested in investing with Capital Force. During this meeting, Carolina further indicated that she would be assisting Mrs. Zalazar with the investment process and that the money being invested was her mother's life savings.

66.     At this meeting, Costantini showed Carolina the Company's website, its financial and operational flowcharts, Car Loan monitoring systems and repeatedly assured Carolina that her mother's investment would be safe. Costantini further touted Capital Force's profitability and capital reserves, they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan. Carolina relayed Costantini's representations and assurances to Mrs. Zalazar.

---

[6] Plaintiff Zalazar requested a withdrawal of her principal investment and on April 2020, was refunded $40,000.00 and on November 2020, was refunded $30,000.00.

67.     On January 29, 2018, Carolina on behalf of her mother, Mrs. Zalazar, sent Costantini an email requesting documentation with respect to the investment, and asked whether the income generated from the investment would be classified as interest, dividends, or capital gains. On January 29, 2018, Costantini responded: "This [investment] is the same as a bond which pays interest. You have the option to reinvest since it operates like a fund, which does not make distributions. Maybe it's more convenient from a tax perspective but if you need cash flow for expenses you can opt to receive interest. I will send you the presentation" (referring to the investment presentation).

68.     Induced by Costantini's investment presentation, Carolina and Costantini coordinated a subsequent meeting so that Costantini could meet Mrs. Zalazar to answer any follow up questions concerning the investment opportunity.

**i.  Zalazar Meets with Costantini and Talia-Brown in Miami.**

69.     On or about July 2018, Mrs. Zalazar along with her daughter Carolina, personally met with Costantini and Talia-Brown at Capital Force's office at the Four Seasons office building, 1441 Brickell Avenue, Suite 1018, Miami, Florida 33131 (the "July 2018 Meeting"). During that meeting which lasted approximately two hours, Costantini showed Zalazar the Company's website, its financial and operational flowcharts, Car Loan monitoring systems and repeatedly assured Zalazar that investing with Capital Force was safe, secured and guaranteed. Much like Costantini's previous presentations to other investors Costantini highlighted Capital Force's profitability (which he claimed exceeded $3 million after operational expenses) and capital reserves, and they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

70.     Costantini further sought to entice Zalazar by stating that his uncle Eduardo Costantini had done his own due diligence and invested a substantial amount of money with Capital Force. Eduardo Costantini is a real estate developer and businessman and is among seven Argentines listed on "Forbes Rich List of Billionaires." Costantini's statement concerning his uncle's participation was intended to deliver the message that if Eduardo Costantini vetted the investment, that should be good enough for you.

71.     To falsely reassure Zalazar of the investment's legitimacy, Costantini assured Zalazar that two renowned Miami-based law firms, including the prestigious firm Snyder International Law Group, had vetted the investment to provide guarantees and transparency. *See* https://www.linkedin.com/company/capital-force/about/ (last visited March 1, 2023).

72.     Concerned that she was investing her life's savings, Zalazar specifically asked Costantini at the July 2018 Meeting whether the investment was safe. Costantini responded:  "The **world has to collapse** for your investment to go bad – the cars are the collateral, plus we have a fund with monetary reserves in the unlikely event that there are any shortfalls – **the value of the car loans will always exceed 125% of your investment** – **it's virtually impossible** for you to lose your money." Moreover, Costantini assured Zalazar that her money would be used solely to purchase Car Loans and that the Car Loans were audited and underwritten by Capital Force prior to being acquired and at all times held in Capital Force's custody and control.[7]

73.     Costantini's statements were false. In fact, investors' funds, including Mrs. Zalazar's investment was used to partially offset Capital Force's operating expenses (including a $1,000,000.00 annual salary to Costantini, and approximately $350,000.00 to Talia-Brown and $350,000.00 to Culley), and the balance was used to finance VSC's acquisition of Car Loans. The

---

[7] Underwriting a car loan refers to the process of evaluating the creditworthiness of a borrower, the value of the car being financed and determining whether they are eligible for acquisition within a loan portfolio.

Car Loans were haphazardly held by either VSC, Vehicle Solutions CF, Capital Force and Capital Force F1. At no time material to these allegations was Mrs. Zalazar told that the collateral securing her investment would be commingled with other investors' collateral and by companies other than Capital Force F1. To the contrary, Zalazar was specifically told by Costantini that her collateral (the Car Loans) was segregated and each Car Loan individually accounted for in Capital Force Group's ledgers and in ledgers reviewed by Snyder Law.

74.     As a matter of fact, prior to the July 2018 Meeting, Costantini and Talia-Brown had provided Mrs. Zalazar with draft of the investment documents which include – a Security Agreement (the "Security Agreement"), Special Limited Power of Attorney (the "Power of Attorney") and Secured Fixed Interest Only Promissory Note (the "Promissory Note") (collectively the "Investment Agreements"). The Investment Agreements were prepared by Jennifer Snyder, Esq., managing and founding partner at Snyder International Law Group P.A., further to instructions provided by Costantini and Talia-Brown.

75.     Contained within the language and terms of the Investment Agreement, were additional representations which along with Costantini's presentation during the July 2018 Meeting, were relied upon by Mrs. Zalazar in her decision to make her investment. More specifically, the Security Agreement contains the following provision:

- "A.  Debtor is in the business of purchasing subprime auto car loans, which are secured by the borrower's automobile. The security interest granted to the Secured Party [in this case Mrs. Zalazar] in the Collateral shall be the pledge of the security of Debtor's loans [referring to Capital Force F1] to said subprime borrowers, which are the title to the automobiles wherein the lender on the title is the Debtor and that Debtor is the lawful owner of such Collateral and has good right to pledge, sell, assign, transfer and create a security interest in the same."

- "D.  The Collateral will not be disposed of by the Debtor unless replaced by Collateral of equal value. Secured Party acknowledges the nature of subprime auto loans is such that the loans that make up the Collateral may be repaid and therefore, the Collateral may often be replaced by loans of equal value."

76.     During the same meeting, Costantini assured Mrs. Zalazar that she would be a secured creditor and have a security interest in specific Car Loans, in which the value of the Car Loans would at all times exceed 125% of the invested funds. Moreover, Costantini assured Mr. Zalazar that Capital Force was extremely conservative, since the 125% ratio Car Loan to investment was actually higher, because the collateral (the value of each automobile) never exceeded 80% of the value of the Car Loan.

77.     Costantini provided Mrs. Zalazar with an explanation on the benefit of being a secured creditor (which he referred to as a Secured Party), Costantini referred to the language contained in the previously provided Security Agreement which stated:

- "C.  The Collateral shall continue to be free from any **superior** and prior pledges, liens, encumbrances and security interests in the same, and the Debtor [referring to Capital Force F1] will warrant and, at the **Secured Party's** request, defend the same from all claims and demands of all persons whatsoever."

78.     Costantini went on to simplify the explanation with respect to the significance of being a "Secured Party" by use of a hypothetical investment transaction. Costantini explained to Mrs. Zalazar that: If one invested $100,000.00, that would be enough to invest in approximately 10 Car Loans. These 10 Car Loans, now in the investor's portfolio, would show up in their system as Car Loans belonging to that investor. If a Car Loan defaulted, which seldom happened, we [referring to Capital Force] would replace the defaulting Car Loan with a new Car Loan where the borrower is current with its payments. If a Car Loan was sold, we would immediately replace that Car Loan with a new Car Loan. Costantini assured Mrs. Zalazar that as a secured creditor, she would, at all times, have specific Car Loans in her portfolio as a Secured Party. Costantini assured her that in the worst-case scenario, their lawyer [Jennifer Snyder] had prepared a Power of Attorney in the investor's favor, which gives the investor the right to come and take possession of

automobile certificates of title in each investor's designated portfolio, sell them on their own, or continue to receive payment on the Car Loans.  Costantini assured Mrs. Zalazar that as a Secured Party, her investment would be safe and protected. He further assured her that her Car Loans are not part of the other Car Loans which belonged to other investors. Each investor, including Mrs. Zalazar, would always have specific identifiable automobile certificates of title and Car Loans securing their investment. Costantini assured Mrs. Zalazar that is how the business worked, which was why he repeatedly assured her that her investment was absolutely safe.

79.     Costantini's explanations and assurances were further bolstered by quoting American author, equities analyst, and Bloomberg columnist Barry Rithotz, who said, "Because our autos are such a lifeline to our financial lives, people will pay their monthly loan bill over almost any other bill. Prolonged court delays are rare. In many cases, the repo man is virtual-technology that can remotely render the car useless." [This statement was also contained in written promotional material provided to Mrs. Zalazar during the same meeting]. Costantini went on to say that Capital Force has that kind of virtual technology, along with GAP insurance if the automobile is damaged – along with GPS on all its vehicles.

**ii.     Capital Force Group Had Poor Controls and Severely Inadequate Risk Management/Underwriting Procedures – in Stark Contrast to Costantini's Representations that It Was a Mature, Risk-Free Company with a Seasoned Management Team.**

80.     In marketing material provided to Zalazar during the July 2018 Meeting, further emphasized, "...there is an effective risk management under a strict VSC and CF (referring to Capital Force) underwriting policy."

81.     In the same marketing material, Capital Force Group further emphasizes having a management team with more than 20 years of experience in auto financing.

82.     Zalazar has now come to know, that contrary to Costantini's representations, Capital Force did not audit nor underwrite the Car Loans, nor did it have a mechanism to assure that the Car Loans being acquired complied with Capital Force's underwriting requirement.

83.     From its inception, Capital Force Group had poor controls and fundamentally deficient risk management/underwriting procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Capital Force, Capital Force F1, Vehicle Solutions CF, Defendant San Miguel's company VSC and principals Costantini, Brown and Culley. This reality was a sharp contrast to Costantini's representations made to Mrs. Zalazar and to other investors – a mature company that managed funds and risk in a conservative, risk free, and rigorous manner.

84.     Mrs. Zalazar has now come to discover that Capital Force Group's management team, which consisted of Costantini, Talia-Brown and Culley, did not have 20 years of experience in auto financing. As a matter of fact, at the time of making her investment, Costantini, Brown and Culley (the management team) each had less than two years in the auto financing business – with most of that time spent being "rainmakers" (i.e., soliciting investors) and very little time actually conducting auto financing transactions.

85.     Capital Force Group's management team did not have the training experience and know-how to implement and administrate the strict risk management and underwriting procedures which Costantini and Talia-Brown represented to be an integral component of mitigating investment risk. Costantini and Talia-Brown knew that Capital Force Group's management team did not have the requisite experience and much less 20 years of experience in the auto financing industry.

86.     Costantini's representations that Capital Force Group was profitable and that the Car Loans securing Zalazar's investment were safe, secured and guaranteed, were false.  In reality, the proceeds that Capital Force generated from its Car Loans were woefully insufficient to cover principal and interest payments to investors. Capital Force Group's profitability was further compromised by having to pay Costantini's $1,000,000.00 salary, and reimbursement of business, entertainment and international travel expenses unrelated to Capital Force Group's business.

87.     Because Costantini was at the highest level of corporate governance, supervised all aspects of Capital Force Group's operations, made financial decisions and projections and had access to the accounting, Costantini knew or was extremely reckless in not knowing that Capital Force Group (including Capital Force F1 and Capital Force) was not profitable and that the Car Loans were not safe, secured and guaranteed.

88.     At the time of making her investment, Zalazar was not aware, and neither Costantini nor anyone at Capital Force disclosed that Capital Force pooled all investor funds together in its bank accounts, and once Zalazar gave her money to Capital Force, she lost all control over how Capital Force used her funds. Zalazar was completely dependent on Capital Force to make a successful Car Loan to achieve her returns. Zalazar did not have any say in the Car Loan portfolio, who Capital Force loaned money to, which Car Loans it purchased, or Capital Force's collection efforts. The success of Zalazar's investment therefore was inextricably tied to the success of Capital Force's Car Loan business and other efforts by the Bad Actors and Capital Force to generate revenue. Zalazar provided the funds and received returns – Capital Force managed and controlled the business and finance operations purportedly used to generate those returns.

89.     Costantini further assured Zalazar that Snyder International Law Group would provide its professional services with preparing the requisite loan agreements necessary to secure

her investment. Zalazar relied on Costantini's representations when agreeing to deposit her investment funds into Snyder Law's escrow account.

90.     These false and misleading misstatements and omissions of material information altered the total mix of information that Mrs. Zalazar found relevant in determining whether to invest her life's savings in the Capital Force Group investment.

91.     But for these false and misleading misstatements and material omissions, Mrs. Zalazar's decision to invest in Capital Force Group and via its related affiliate Capital Force F1, would have been different.

92.     Defendant Costantini knew at the time of the July 2018 Meeting with Mrs. Zalazar, from his position as the Founder, President and Manager of the Capital Force Group, or recklessly disregarded the fact, that his statements were false and misleading and omitted material information because:[8]

    a.  Capital Force Group did not have a strict underwriting policy not effective risk management, nor did it thoroughly examine the car status and buyer background related to credit and income (as represented in the written promotional material presented to Mrs. Zalazar at the July 18 Meeting);

    b.  Capital Force Group was not profitable and was making payments to investors by selling the Car Loans and consequently diluting Zalazar's collateral;

    c.  Few if any automobiles securing the Car Loans had a GPS installed to monitor the collateral at all times;

    d.  That many of the Car Loans exceeded the fair market value of automobiles securing each Car Loan;

---

[8] Costantini was likewise Founder, President and Manager of Capital Force F1 and Capital Force.

e.  That the value of the Car Loans securing Mrs. Zalazar's investment was less than 70% (and not 125%) of her investment to Car Loan ratio. In other words, Mrs. Zalazar's investment was under collateralized by 30% from the time of making her investment and at one point in late 2021 was under collateralized by more than 70%.

f.  That Mrs. Zalazar was never a Secured Party and that there was never an identifiable certificate of title and/or Car Loans securing her investment – to the contrary, all the Car Loans were pooled together, commingled and dispersed among Capital Force, Vehicle Solutions CF, Capital Force F1 and VSC. Mrs. Zalazar was shocked when she discovered from reviewing Capital Force F1's Petition For Assignment For The Benefit Of Creditors (filed on October 24, 2022) that she was not a Secured Party, but instead an unsecured creditor;

g.  That Mrs. Zalazar's investment was not used exclusively to purchase Car Loans, but was instead in part used to pay Capital Force Group operating expenses, Car Loan payments to other pre-existing investors, and distributions to Costantini, Talia-Brown and Culley;

h.  That Capital Force Group's management team (which consisted of Costantini, Talia-Brown and Culley) did not have 20 years of experience in the auto finance industry;

i.  Mrs. Zalazar further discovered that Capital Force F1 securitized Capital Force F1 Car Loans sometime in May of 2020, with Agora Data, Inc. and Westlake Financial Portfolio Management (affiliated with Westlake Financial Services) to further deplete the already compromised Car Loan equity. At time of filing On October 24,

2022, based on Schedule B of Capital Force F1's Petition For Assignment For The Benefit Of Creditors, the Car Loans have a Residual Loan Balance of $800,000.00 and owe creditors/investors $16,206,317.65.

93.     Capital Force Group and Individual Defendants had a common interest in making misleading misstatements and concealing these facts. Had Mrs. Zalazar known of these material misleading misstatements and material omissions, Mrs. Zalazar would not have deposited her funds into Snyder International Law Group's trust account, Defendants' fraud would not have succeeded, and neither Capital Force Group nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants Costantini, Talia-Brown, and Culley, by and through Capital Force F1 therefore worked together to perpetuate and conceal fraud, all the while inciting it with critical reports of success, profitability, cutting edge risk controls, and dressing of legitimacy and security.

### iii. Mrs. Zalazar Executes the Investment Documents

94.     On August 28, 2018 Mrs. Zalazar was provided with wire instruction to Snyder International Law Group P.A. Trust Account and wired the sum of $100,000.00.

95.     On August 29, 2018, Mrs. Zalazar executed the Security Agreement, Power of Attorney and Promissory Note (the "First Investment").

96.     On April 22, 2019, Mrs. Zalazar wired an additional $50,000.00 to the Snyder International Law Group P.A. Trust Account.

97.     On April 23, 2019, Mrs. Zalazar executed the Security Agreement, Power of Attorney and Promissory Note, which was subsequently executed by Talia-Brown as Manager for Capital Force F1 on August 12, 2019 (the "Second Investment").

### iv. The Lies Continue - Capital Force Falsely Assures Mrs. Zalazar the COVID-19 Pandemic Will Not and Has Not Affected Capital Force's Financial Condition.

98.     January 9, 2020: WHO announces mysterious Coronavirus-Related pneumonia in Wuhan, China.

99.     February 3, 2020: U.S. declares public health emergency.

100.    February 25, 2020: the U.S. Centers for Disease Control and Prevention ("CDC") says that COVID-19 is heading toward pandemic status.

101.    March 13, 2020: the United States declares the novel coronavirus a national emergency.

102.    Concerned that the Pandemic may affect her mother's investment, Carolina sent Talia-Brown a WhatsApp in Spanish on February 6, 2020, asking whether Mrs. Zalazar's investment was at risk with everything going on with.

The following is a translated excerpt of the WhatsApp message:

Question: Carolina - "Hey. All smooth sailing with the investments, no? Nothing at risk with anything?

Response: Talia-Brown – "Yes luckily all good, with a lot of work"

103.    During the first week of March 2020, Carolina called Costantini and left him a message that she was concerned with the recent news concerning COVID-19 and asked whether this could affect her mother's investment. Carolina further informed Costantini that Mrs. Zalazar was concerned with how the Pandemic was affecting the World economy and that her mother wished to have the investment principal repaid immediately. Talia-Brown once again falsely assured Carolina, that Capital Force was doing well and that Zalazar's investment was safe, fully collateralized with performing Car Loans. Shortly thereafter, Costantini left a 2.21-minute telephonic message with a detailed explanation stating the following:

The Coronavirus has affected the markets, but oil prices went down that is good for us and our car loan borrowers, this is good for us [Capital Force] because savings

in gas prices to our car loan borrowers gives them more money to pay on their car loan payments. Spoke to a friend of mine that is a doctor and she says the Coronavirus is a "bleff" (an untrue deception), 12,000 die in the U.S. every month from influenza, that 4,000 people have died worldwide, is not a serious situation.

In our case, we are not affected because we are not loaning money for luxury goods, people need cars to go to work, the people that borrow from us are accustomed to living in a crisis. In the case of **Capital Force is not affected** by this – this is our analysis of the situation.

We decided to lower interest payments to our investors from 12% to 9% to safeguard investors' capital. A 9% return is a very good rate of return on such a safe investment.  The Company **is doing well, and will continue to do well**, we are lowering the rate to continue to assure the financial wellbeing of the Company.

104.    Based upon Costantini's assurances that Capital Force was financially healthy, fully collateralized with performing Car Loans (exceeding 125% of her investment) and unaffected by COVID-19 and/or an economic recession, Mrs. Zalazar advised Costantini that she would continue to participate in the investment and not withdraw her funds.

105.    Moreover, on July 2, 2020, Carolina contacted Talia-Brown by WhatsApp once again asking for assurances that her mother's investment was safe. Talia-Brown continued to pontificate that Capital Force continued to be financially healthy. Specifically, Talia-Brown responded via the following WhatsApp:



Translation: "Hello Caro how are you? The Company **is doing well and is stable** – the 2nd and 3rd trimester we are going to pay 6% of the annual interest rate. We expect to be able to pay another point (1%) on top of that. Everything we did was to protect the investor's capital while still being able to pay the highest possible returns. We are very glad and comforted to have a Company that during the year of the pandemic to have paid between 7%-8% return on investments"

106.    On November 13, 2020, Mrs. Zalazar (through Zamincop Sociedad Anonima) wired an additional $20,000.00 to the Snyder International Law Group P.A. Trust Account, which for reasons unknown was held in Snyder International Law Group P.A.'s Trust Account until February 25, 2021, and thereafter wired to Capital Force F1.

107.    On February 18, 2021, Talia-Brown as Manager for Capital Force F1 (the "Third Investment") executed a Security Agreement, Power of Attorney and Promissory Note (the "Third Investment").

108.    On two occasions during the second and third week of June 2021, Talia-Brown contacted Mrs. Zalazar via a WhatsApp call to report that Capital Force Group was doing extremely well post COVID-19, and that the Car Loans were performing better than ever because borrowers were cash rich from Federal Stimulus payments. Talia-Brown advised Mrs. Zalazar that this was a better time than ever to make another investment. Relying on Talia-Brown's assurances, Mrs. Zalazar agreed to invest an additional $50,000.00.

109.    During that same time (the second and third week of June 2021) Carolina was also seeking information regarding Capital Force Group's financial well-being, and was able to speak with Costantini, who also assured Carolina that her mother's investment continued to be safe and adequately capitalized with performing Car Loans exceeding 125% loan to value. Costantini attributed this to an increase in the price of cars post COVID-19.

110.    On July 2, 2021 Talia-Brown sent Mrs. Zalazar a WhatsApp message containing instructions to pay Capital Force directly, along with Capital Force's banking information. Mrs. Zalazar wired the sum of $50,000.00 shortly thereafter directly to Capital Force as directed by Talia-Brown.

111.    On July 20, 2021 Talia-Brown as Manager for Capital Force, LLC (the "Fourth Investment") executed a Security Agreement, Power of Attorney and Promissory Note (the "Third Investment").

112.    Costantini's and Talia-Brown's statements in June of 2021 to Mrs. Zalazar and Carolina regarding Capital Force Group's financial status were false and concealed that Capital Force Group was seriously undercapitalized as a result of repeatedly cannibalizing Car Loans by pledging them to Agora Data and Westlake Financial and obtain liquidity in order to pay Capital Force Group business expenses and distributions to Costantini, Talia-Brown and Culley. Using the

blueprint of a Ponzi Scheme, these statements were intended to influence Mrs. Zalazar to continue to inject capital into Capital Force Group's coffers and provide a false sense of security so that she would not demand return of her entire investment.

113.    Costantini and Talia-Brown knew or should have known that their representations concerning Capital Force Group's financial well-being were false. Moreover, Costantini and Talia-Brown knew on July 2, 2021, that Capital Force did not have the ability to repay Mrs. Zalazar's investment and much less repay the new investment sum of $50,000.00.

**v.  The Ultimate Collapse**

114.    On April 4, 2022, Phillip M. Hudson III, Esq., a Partner with the law firm of Duane Morris sent Mrs. Zalazar a letter on behalf of Capital Force F1 and a second letter on behalf of Vehicle Solutions CF, advising Mrs. Zalazar and assumably other investors that the Company does not have the ability to continue operations given its current revenue and income stream – and that it intends to implement an orderly liquidation for the benefit of creditors (the "Duane Morris Insolvency Letter"). Accordingly, on October 24, 2022 petitions for Assignments for the Benefit of Creditors were filed on behalf of Capital Force F1, Capital Force, and Vehicle Solutions CF (the "ABC Petitions").[9]

115.    Now that the proverbial "jig is up" by the filing for insolvency – the ABC Petitions have unfoiled the true extent of Defendants' fraudulent scheme, *inter alia*, that Capital Force F1 and Capital Force were during Zalazar's Investment Period critically undercapitalized,

---

[9] In re: Capital Force F1 LLC  Miami-Dade County Circuit Court. Case No. 2022-020390-CA-01 (43); In re: Capital Force LLC Miami-Dade County Circuit Court. Case No. 2022-020389-CA-01 (43) and, In re: Vehicle Solutions CF LLC Miami-Dade County Circuit Court. Case No. 2022-020388-CA-01 (43)

undercollateralized, that she was never a secured party, and fraught with non-performing Car Loans, many of which resulted in worthless repossessed automobiles.[10]

More specifically:

- <u>Capital Force F1's ABC Petition confirms the following as of October 2022.</u>

a. Current amount outstanding to sixty-two (62) investors - $16,206,317.65;

b. Total estimated liquidation value of automobile loans/titles - $1,000,000.00;

c. Car Loans Securitized and Pledged to Agora Data and collected by Westlake Financial – Principal Balance $2,909,000. Residual Loan balance - $800,000.00;

d. Available Cash and Bank Accounts - $23,105.28;

e. Other than the $1,000,000.00 in repossessed automobiles, there is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing Zalazar's investment.

- <u>Capital Force's ABC Petition confirms the following as of October 2022.</u>

a. Current amount outstanding to forty (40) investors - $9,060,296.42;

b. Total estimated liquidation value of automobile loans/titles - None;

c. Car Loans Securitized and Pledged - None;

d. Available Cash and Bank Accounts - $8,481.83;

e. Multiple (apparently unsecured) loans to Vehicle Solutions Corporation (Alberto San Miguel and Jessica Malvecino's Company) - $9,252,283.05.

f. There is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing Zalazar's investment.

---

[10] Capital Force F1 ABC Petition refers to loan balances and financial through 8/31/22. The corresponding financials and Car Loan ledgers contain data through late 2021. There is no data provided for 2022.

## COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (Against Capital Force, Capital Force F1, Costantini and Talia-Brown)

116.    Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

117.    This is a claim for multiple violations against Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown under Section 10(b) of the Exchange Act and Rule 10b-(5) promulgated thereunder.

118.    Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown, directly and/or indirectly, by the use, means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as fraud or deceit.

119.    Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown, were each a direct, necessary and substantial participant in the common course of conduct alleged herein.

120.    As detailed herein, Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown,  each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Capital Force Group marketing material and other information delivered to Mrs. Zalazar; (b) providing Mrs. Zalazar with false information concerning Capital Force Group's profitability; (c) failing to disclose that Capital Force and

Capital Force F1 were grossly undercapitalized and that Mrs. Zalazar's investment was at no time secured by Car Loans exceeding 125% of her investment, and (d) falsely stating that Capital Force Group had a strict Car Loan underwriting policy and effective risk management systems.

121.    At the time of said misrepresentations and omissions, Mrs. Zalazar was ignorant of their falsity and had no reason to believe that Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown's statements were not true. Had Mrs. Zalazar known of the true operating and financial of Capital Force Group (including Capital Force and Capital Force F1) and of its other problems *inter alia*, Car Loan deficiencies, undercapitalization, that her investment was not secured by adequate collateral, that she was not a "secured party" – she would not have invested and/or otherwise wired funds for the benefit of Capital Force and Capital Force F1.

122.    The truth about the extent and severity of the deterioration of Capital Force Group's financial and operating condition, and the inadequacy of its internal controls, became apparent to a few investors within the Costantini circle by June 2020 (including the Chilean Fund and Costantini family members).[11] These investors within Costantini's inner sanctum realized that Capital Force Group was sinking and sinking fast. Investors including the Chilean Fund and Costantini family members quietly and expeditiously demanded return of their investments. As a result, and to maintain the status quo within Costantini's inner sanctum - Capital Force Group, Costantini and Talia-Brown undertook a plan during the course of late 2020 to liquidate Vehicle Solution CF, Capital Force F1 and Capital Force Car Loans to repay those investors, further diluting the Car Loan collateral and severely crippling the already foundering situation.

---

[11] Unbeknownst to Zalazar at the time, Costantini had foreshadowed Capital Force Group's eventual demise by telling certain investors within Costantini's inner sanctum that Capital Force Group was having liquidity issues in part because VSC and Alberto San Miguel were failing to deliver Car Loans on a timely basis to collateralize the investors' money.

Information with respect to the preferential payments and further dilution of the already undercapitalized investment was not disclosed to Zalazar at the time of making her Third Investment during February 2021, and Fourth Investment during July 2021.

123.    Had those facts been disclosed to Zalazar, Zalazar would have discovered that her existing investment was undercapitalized, and in turn would not have proceeded with being induced to make her Third and Fourth Investment.

124.    As a direct and proximate result of Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown and Culley's fraudulent scheme to raise over $35,000,000.00 with excessive leverage, inexperienced management and poor and/or nonexistent underwriting and risk management – finally caused Capital Force Group (including Vehicle Solutions CF, Capital Force and Capital Force F1) to collapse and file Assignments for Benefit of Creditors on October 24, 2022.

125.    As a result of Costantini's and Talia-Brown's lies on how Mrs. Zalazar's funds would be and were invested and how successful and safe they would be (i.e., secured by 125% investment to collateral ratio) – lies documented by Costantini, Talia-Brown and others in hundreds if not thousands of emails, WhatsApp messages and false account documents to other investors – Mrs. Zalazar has lost the totality of the outstanding sum of her investment which now exceeds $150,000.00.

126.    Prior to Duane Morris's Insolvency Letter of April 2022, Mrs. Zalazar reasonably believed from Costantini and Talia-Brown's representations, that her investment was safe since it was adequately secured by valuable Car Loans. Shortly after receipt of the Insolvency Letter, Carolina in desperation contacted Costantini via WhatsApp to obtain additional information and asked if Mrs. Zalazar could recover her investment by selling her Car Loans (i.e., the Collateral).

Costantini responded: We don't know exactly, because the Car Loans are not liquid (in other words now confessing that – the Car Loans are not a financial asset that can be converted to cash).

127.    By virtue of the foregoing, Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiff demands judgment against Defendants Capital Force, Capital Force F1, Costantini and Talia-Brown jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against Costantini, Talia-Brown and Culley)

128.    Plaintiff restates and incorporate by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

129.    The Defendants Costantini, Talia-Brown and Culley acted as controlling persons of Capital Force and Capital Force F1 within the meaning of § 20(a) of the Exchange Act. By reason of their high-level positions with the Capital Force and Capital Force F1, their ownership of equity in Capital Force and Capital Force F1, their participation in the drafting, approving and executing of investor security agreements, Capital Force Group's promotional material, financial reports to investors, drafting electronic communications to Zalazar and other deceptive documents provided to Mrs. Zalazar, dissemination of other false and inaccurate statements to the investing public, and their participation in the fraudulent schemes and acts described herein, Defendants Costantini, Talia-Brown and Culley had the power and authority to control and cause the Capital

Force Group of companies, including but not limited to Capital Force and Capital Force F1 to engage in the wrongful conduct complained of herein.

130.    By reason of such conduct, the Defendants named herein are liable to Mrs. Zalazar pursuant to §20(a) of the Exchange Act.

131.    Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

132.    Despite personal knowledge of the fundamentally deteriorated condition of Capital Force Group throughout the Investment Period, and the solicitation of investment funds through false and deceptive statements (*inter alia* – that the investments were safe, secure and collateralized with Car Loans valued 125% in excess of the investment amount), Costantini, Talia-Brown and Culley were motivated to conceal such circumstances from Mrs. Zalazar and the investing public, while they concurrently were seeking infusion of critically-needed capital.

133.    Because of their positions, their ability to exercise actual operational control, power and influence with respect to the Capital Force Group of companies, including Capital Force and Capital Force F1's course of conduct, including the fraudulent schemes and acts described herein, Costantini, Talia-Brown and Culley were, during the course of the Investment Period, and at the time of wrongs alleged herein, controlling persons of the Capital Force Group of companies, Capital Force and Capital Force F1 within the meaning of Section 20(a) of the Exchange Act.

134.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of the Capital Force Group of companies, including Capital Force and Capital Force F1 are liable to Mrs. Zalazar for her damages pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands judgment against Defendants Costantini, Talia-Brown

and Culley, jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT III**

**VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT**
**(Against all Defendants)**

135.    Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

136.    This is a claim for multiple violations against all Defendants under Florida Securities and Investor Protection Act ("FSIPA"), Section 517.011 et. seq.

137.    The Promissory Notes constitute a "security" pursuant to Section 517.021(21)(a) Florida Statutes, because it is a note, evidence of indebtedness, and/or an investment contract.

138.    The Promissory Notes constitutes an "investment contract" for the enterprise and was led to expect profits derived solely from the efforts of the promotor or third party, namely Capital Force Group.

139.    As set forth herein, the Defendants implemented a plan and undertook unlawful acts to defraud investors, such as Plaintiff, in connection with the sale securities.

140.    Plaintiff was in fact defrauded, upon investing and delivering funds to Snyder Law, relying upon information communicated through Capital Force Group's representatives, who used false and misleading statements and omissions of fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

141.    Further, Florida Statutes 517.301 declares that it is unlawful for a person to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material

fact, make any false, fictitious, or fraudulent statement or representation.

142.    As a result, the Bad Actors orchestrated an investment scheme with the intent to deceive and defraud Plaintiff, by among other acts, misrepresenting the Bad Actors' business model and projected profits to Plaintiff, which Defendants knew to be fraudulent.

143.    As a direct and proximate result of Defendants' untrue statements and material omissions and their reasonable reliance thereupon, Plaintiff has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff demands judgment against all Defendants, jointly and severally, for compensatory damages, attorneys' fees pursuant to Fla.Stat. §517.211(6), and costs, interest, and such further relief as this Court deems just and proper.

<u>**COUNT IV**</u>

**SALE OF UNREGISTERED SECURITIES**
**(Against all Defendants Costantini and Talia-Brown)**

144.    Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

145.    This is a claim against all Defendants for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida. The offers of investing in Capital Force and Capital Force F1 through the Car Loan scheme, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

146.    Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

147.    The Promissory Notes are securities as defined in Section 517.021(21), Florida Statutes.

148.    The Promissory Notes are not exempt from registration under the Act.

149.    Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

150.    Defendants Costantini and Talia-Brown were managers, and through affiliated entities, equity owners of Capital Force Group and Capital Force F1, and personally participated in and/or aided in the sale of the Promissory Note investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

151.    Pursuant to section 517.211, Florida Statutes, Plaintiff is entitled to rescission and actual damages together with interest therein.

WHEREFORE, Plaintiff demands judgment against Defendants Costantini and Talia-Brown for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT V

### FRAUDULENT MISREPRESENTATION IN CONNECTION WITH OFFERING THE PROMISSORY NOTE
### (Against Costantini)

152.    Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

153.    This is a claim for fraudulent misrepresentation pursuant to Florida common law.

154.    As fully detailed in the allegations incorporated herein, Costantini made untrue statements of fact to Plaintiff Zalazar and omitted other material facts necessary to make their affirmative statements not misleading.

155.     In so doing, Costantini acted deliberately and with the intent to deceive, manipulate and defraud Zalazar, and made the subject misrepresentations and material omissions with the intent that Zalazar rely on said representations and material omissions.

156.     The untrue statements of fact and material misrepresentations in question are set forth herein.

157.     Zalazar reasonably relied to her detriment on the representations and omissions, but for which Plaintiff Zalazar would never have invested in Capital Force F1 and Capital Force or agreed to enter into the respective Promissory Notes.

158.     Defendant Costantini's actions were intentional, wanton, malicious, and made with the intent to injure Plaintiff Zalazar or with reckless disregard for Zalazar's lawful rights.

159.     As a direct and proximate result of Costantini's untrue statements and material omissions and Zalazar's reasonable reliance thereupon, Zalazar suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff Zalazar demands judgment against Defendant Costantini for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT VI

**BREACH OF THE PROMISSORY NOTES
AND SECURITY AGREEMENTS
(In the Alternative)
(Against Capital Force F1 LLC)**

160.     Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

161.    This is an action for breach of contract against Capital Force F1 for violating its obligations under the Promissory Notes and Security Agreements. *See* Exhibit "F."

162.    The Promissory Notes and Security Agreements constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

163.    The Promissory Notes obligate Capital Force F1 to pay interest bearing a rate of 10-12% per annum, payable monthly.

164.    On the dates applicable to due date for payment of interest, Capital Force F1 was contractually obligated to repay said interest.

165.    Despite the fact that Plaintiff has fully complied with her obligations under the Promissory Notes by loaning Capital Force F1 the monies corresponding to Plaintiff, Capital Force F1 has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

166.    Capital Force F1 has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Notes – arising from Capital Force F1's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

167.    Capital Force F1 has breached its corresponding obligations under the terms of the Security Agreements by disposing of Zalazar's Collateral and not replacing the Collateral with Collateral of equal value.

168.    As a result of Capital Force F1's breaches of the Promissory Notes and Security Agreements, Plaintiff has suffered pecuniary damages.

169.    Pursuant to the terms of Promissory Notes and Security Agreements, Plaintiff is

entitled to an award of attorneys' fees and costs incurred as a result of Capital Force F1's breaches of the Promissory Notes.

WHEREFORE, Plaintiff demands judgment against Defendant Capital Force F1 for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

### COUNT VI

**BREACH OF THE PROMISSORY NOTE**
**AND SECURITY AGREEMENT**
**(In the Alternative)**
**(Against Capital Force LLC)**

171.    Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1-115 of the Complaint, as though fully set forth herein.

172.    This is an action for breach of contract against Capital Force for violating its obligations under the Promissory Note and Security Agreement.

173.    The Promissory Note and Security Agreement constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

174.    The Promissory Notes obligate Capital Force to pay interest bearing a rate of 10-12% per annum, payable monthly.

175.    On the dates applicable to due date for payment of interest, Capital Force was contractually obligated to repay said interest.

176.    Despite the fact that Plaintiff has fully complied with her obligations under the Promissory Notes by loaning Capital Force the monies corresponding to Plaintiff, Capital Force has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

177.    Capital Force has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Note – arising from Capital Force's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

178.    Capital Force has breached its corresponding obligations under the terms of the Security Agreement by disposing of Zalazar's Collateral and not replacing the Collateral with Collateral of equal value.

179.    As a result of Capital Force breaches of the Promissory Note and Security Agreement, Plaintiff has suffered pecuniary damages.

180.    Pursuant to the terms of Promissory Note and Security Agreement, Plaintiff is entitled to an award of attorneys' fees and costs incurred as a result of Capital Force breaches of the Promissory Note and Security Agreement.

WHEREFORE, Plaintiff demands judgment against Defendant Capital Force for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

DATED: April 21, 2023

**VAZQUEZ & ASSOCIATES**
*Counsel for Plaintiff*
1111 Brickell Avenue
Suite 1550
Miami, Florida 33131
Telephone: (305) 371.8064
Facsimile: (305) 371.4967
By: Gerardo A. Vazquez
Gerardo A. Vazquez, Esq.
Florida Bar No. 0006904
E-Mail: gv@gvazquez.com
Ralph Longo IV, Esq.
Florida Bar No. 124169
E-Mail: rl@gvazquez.com
Safa Chowdhury, Esq.
Florida Bar No. 1033004
E-Mail: sc@gvazquez.com
Steven Herzberg, Esq.
Florida Bar No. 111541
E-Mail: sh@gvazquez.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of April 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: Gerardo A. Vazquez
Gerardo A. Vazquez, Esq.
Florida Bar No. 0006904
E-Mail: gv@gvazquez.com
