UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-21512-CIV-ALTONAGA/Damian

**LIDIA NOEMI ZALAZAR**,

    Plaintiff,
v.

**CAPITAL FORCE LLC**, *et al.*,

    Defendants.
_____/

## **ORDER**

**THIS CAUSE** came before the Court on Defendants, Matias Costantini, Juan Cruz Talia Brown, and Jonathan Culley (together, the "Defendants" or "Individual Defendants[']") Motion to Dismiss [ECF No. 25], filed on May 23, 2023.[1]  Plaintiff, Lidia Noemi Zalazar filed a Response [ECF No. 41], to which Defendants filed a Reply [ECF No. 43].  The Court has considered the Complaint [ECF No. 1], the parties' written submissions, and applicable law.

### I. BACKGROUND

This case arises from Plaintiff's alleged loss of money in fraudulent security investments. Plaintiff accuses Defendants of running a Ponzi scheme, during which Defendants continually influenced her "to inject capital into [Defendants'] coffers and provide[d] a false sense of security so that she would not demand return of her entire investment."  (Compl. ¶ 112 (alterations added)). Plaintiff now sues to recover the allegedly fraudulent investments.  (*See generally id.*).

---

[1] The Complaint [ECF No. 1] asserts claims against these three Defendants, as well as two limited liability companies: Capital Force LLC, and Capital Force F1 LLC (the "Corporate Defendants").  The Corporate Defendants have not responded to the Complaint or otherwise appeared in this action and are in default. (*See* Clerk's Entry of Default [ECF No. 28]).

Plaintiff, a resident of Argentina, invested more than $150,000 of her life savings in the the Corporate Defendants. (*See id.* ¶ 1). Both Corporate Defendants, along with non-party Vehicle Solutions CF, were part of "the Capital Force Group" and based in Miami, Florida. (*Id.* ¶¶ 2–4). The three Individual Defendants are Miami-Dade County, Florida residents who co-founded and held leadership positions in the Capital Force Group — Costantini as President, Talia Brown as Vice President, and Culley as Chief Financial Officer. (*See id.* ¶¶ 4–6). Together, the Individual Defendants oversaw the Capital Force Group's finances and general operations. (*See id.*).

Plaintiff alleges that this "business" provided cover for Defendants' fraud. (*See generally id.*). According to Plaintiff, Defendants ran a scheme with "baseless promises of a high-return, safe and fully collateralized investment opportunity in the form of an unregistered fraudulent securities offering." (*Id.* ¶ 12). The scheme operated by Defendants' provision of "investors with promissory notes to fund [the] business of buying and servicing subprime and non-prime automobile retail installment loans/contracts [] and obtaining titles to the automobiles and the related and attendant documents and obligations." (*Id.* ¶ 13 (alterations added)). The scheme was coordinated through Defendants' deceitful use of their business entities, and targeted "unsuspecting investors" from which Defendants allegedly accrued over $35,000,000. (*Id.* ¶¶ 12–13).

Plaintiff's involvement began when her daughter — by invitation of Costantini and Talia Brown — attended a presentation given by the Capital Force Group in Miami in January 2018. (*See id.* ¶ 65).[2] During this investor presentation, Costantini, who "carefully curated his persona as an uber successful banker and scion of one of the most powerful and wealthy families in Argentina" (*id.* ¶ 23), provided information regarding the Capital Force Group's finances and

---

[2] "Because of [Plaintiff's] age and limited command of the English language, her business affairs were handled with the assistance of her [] daughter Carolina Marini[.]" (*Id.* ¶ 61 (alterations added)).

structure, as well as the safeguards in place to protect Plaintiff's potential investment. (*See id.* ¶¶ 65–66; *see generally id.*, Ex. A, Promotional Materials [ECF No. 1-6]).

Marini "relayed Costantini's representations and assurances" regarding this investment opportunity to Plaintiff. (Compl. ¶ 66). Following the meeting, Marini followed up with Costantini for further information, and the two exchanged additional emails regarding the investment and potential payout. (*See id.* ¶ 67). "Induced by Costantini's [statements], [Marini] and Costantini" then "coordinated a [] meeting" between Costantini and Plaintiff, so that "any follow up questions concerning the investment opportunity" could be answered. (*Id.* ¶ 68 (alterations added)).

In July 2018, Plaintiff, Marini, Costantini, and Talia Brown met in Miami. (*See id.* ¶ 69). Costantini attempted to further persuade Plaintiff by informing her that his uncle had also invested a significant amount of money with the Capital Force Group. (*See id.* ¶ 70). To assure Plaintiff of the safety of her potential investment, Costantini made numerous representations, including that her investment would be used to purchase car loans which were audited and underwritten by the Capital Force Group prior to being acquired. (*See id.* ¶ 72). Costantini clarified that the cars served as collateral and the value of the car loans would always be more than 125% of the investment (*see id.*) — even though he, and all Defendants, "knew that the promissory notes were at no time 125% asset backed" (*id.* ¶ 29).

Before the July 2018 meeting, Plaintiff received the draft investment documents — a security agreement, special limited power of attorney, and promissory note — from Talia Brown and Costantini. (*See id.* ¶ 74). These documents were prepared by Snyder International Law Group P.A, a Miami-based law firm. (*See id.* ¶¶ 71, 74). Following the representations by

Costantini and Talia Brown, including at the June 2018 meeting, on August 28, 2018, Plaintiff wired $100,000 to Snyder's trust account. (*See id*. ¶ 94).

The day after making this transfer, Plaintiff executed a corresponding Security Agreement, Power of Attorney, and Promissory Note (the "securities"). (*See id*. ¶ 95).[3] On April 22, 2019, Plaintiff wired an additional $50,000 to Snyder's trust account. (*See id*. ¶ 96). Once again, the day after, Plaintiff executed the corresponding Security Agreement, Power of Attorney, and Promissory Note to memorialize her "[i]nvestment[.]" (*Id*. ¶ 97 (alterations added)). The transaction documents state they "become effective when [] signed by the Debtor" — in this case, Defendants. (*E.g.*, The Securities 9 (alterations added)).[4]

In early 2020, the COVID-19 pandemic swept across the globe. (*See* Compl. ¶¶ 98–101). Despite the initial promises of "reliable returns of 12% per annum" (*id*. ¶ 29 (alteration added)), Plaintiff and Marini began to worry about the safety of Plaintiff's investments and exchanged messages between themselves, as well as with Talia Brown and Costantini, regarding the Capital Force Group's performance and ability to weather the pandemic. (*See id*. ¶¶ 102–05). To help further assuage investors' fears, Defendants issued a letter in June 2020, warning of the "deep impact" COVID-19 had on the "automotive financing industry[;]" but they still "falsely assured that [COVID-19] ha[d] not stopped [the Capital Force Group] from continuing to have positive and stable returns." (*Id*. ¶¶ 41–42 (alterations added; citations omitted); *see also id.*, Ex. B, June 29, 2020 Letter [ECF No. 1-7]).

---

[3] Executed versions of the securities are attached to the Complaint. (*See generally* Compl., Ex. F, The Securities [ECF No. 1-11]).

[4] The Court relies on the pagination generated by the Case Management/Electronic Case Files system, which appears in the header on all filings.

Convinced by these assurances, Plaintiff wired another $20,000.00 to Snyder's trust account on November 13, 2020. (*See id.* ¶ 106). During the second and third weeks of June 2021, Talia Brown again reassured Plaintiff the investments were performing "extremely well post COVID-19[,] . . . were performing better than ever . . . [, and] that this was a better time than ever to make another investment." (*Id.* ¶ 108 (alterations added)). Relying on these assurances, Plaintiff agreed to invest an additional $50,000. (*See id.*). On July 2, 2021, Plaintiff wired the $50,000 directly to the Capital Force Group, "as directed by Talia [] Brown." (*Id.* ¶ 110 (alteration added)). Following the transfer, Plaintiff executed another Security Agreement, Power of Attorney, and Promissory Note, as did Talia Brown as manager for Capital Force F1, LLC. (*See id.* ¶ 111; The Securities 22–26).

Defendants' June 2021 statements — like those before — were lies. (*See* Compl. ¶ 112). According to Plaintiff, the statements "regarding [the] Capital Force Group's financial status were false and concealed that [the] Capital Force Group was seriously undercapitalized as a result of repeatedly cannibalizing [the investments] by pledging them to [other investors] and obtain[ing] liquidity in order to pay [the] Capital Force Group business expenses and distributions to Costantini, Talia-Brown and Culley." (*Id.* (alterations added)). In other words, Defendants were running a Ponzi scheme. (*See id.*).

Ultimately, the pool of money ran out, and Plaintiff received two letters on April 4, 2022: one from Capital Force F1, and the other from Vehicle Solutions CF. (*See id.* ¶ 114). The letters stated that the Capital Force Group could not continue operations with its current revenue and income stream, and so the company would implement a liquidation plan to benefit creditors. (*See id.*). Plaintiff allegedly lost more than $150,000 to this fraudulent scheme. (*See id.* ¶ 125). In her Complaint, she asserts seven claims for relief. (*See id.* ¶¶ 116–80).

In Count I, Plaintiff accuses Costantini, Talia Brown, and the Corporate Defendants of violating Section 10(b) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. section 78j(b), and the corresponding regulation at Rule 10b-5, 15 C.F.R. section 240.10b-5. (*See id.* ¶¶ 116–27). In Count II, Plaintiff states a violation of Section 20(a) of the Exchange Act, 15 U.S.C. section 78t(a), against all three Individual Defendants. (*See id.* ¶¶ 128–34). Count III alleges — against all Corporate and Individual Defendants — a claim for a violation of the Florida Securities and Investor Protection Act, Florida Statute section 517.011. (*See id.* ¶¶ 135–43). Count IV asserts a claim against Costantini and Talia Brown for the sale of unregistered securities, in violation of Florida Statute section 517.07. (*See id.* ¶¶ 144–51). At Count V, Plaintiff accuses Costantini of fraudulent misrepresentation. (*See id.* ¶¶ 152–59). Counts VI and VII state claims of breach of the promissory notes and security agreements against the Corporate Defendants. (*See id.* ¶¶ 160–80).[5]

Defendants moves to dismiss Counts I through IV for failure to state claims for relief; Counts I through V for failing to satisfy Rule 9(b)'s heightened pleading requirements; and Counts I through IV for constituting a shotgun pleading. (*See generally* Mot.).

## II.  LEGAL STANDARDS

### A.     Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading withstands a motion to dismiss if it alleges "factual content that allows the court to draw the reasonable inference that the defendant

---

[5] In the Complaint, "Count VII" is incorrectly labeled as a second "Count VI." (*See* Compl. 41–43).

is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). A complaint's "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

### B. Federal Rule of Civil Procedure 9(b)

"Claims that sound in fraud must comply not only with the plausibility standard articulated in *Twombly* and *Iqbal*, but also the heightened pleading requirements of Rule 9(b)." *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875 (11th Cir. 2023) (citation omitted). As the Eleventh Circuit has recently explained,

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id.* 875–76 (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

### III. DISCUSSION

Defendants ask the Court to dismiss Counts I through IV with prejudice, arguing that Plaintiff has not — and cannot — allege the securities were purchased in Florida. (*See* Mot. 13–19). Defendants further argue that Counts I through V should be dismissed for failing to comply with Rule 9(b)'s heightened pleading requirements (*see id.* 21–24), or that at least Counts I through IV should be dismissed as an improper shotgun pleading. (*See id.* 24–26). Plaintiff disagrees on each point, arguing that her Complaint adequately alleges domestic transactions of the securities, pleads fraud with sufficient particularity, and is not a shotgun pleading. (*See generally* Resp.). The Court agrees with Plaintiff in all respects.

A. **Plaintiff sufficiently alleges domestic transactions occurred.**

1. *Federal Law*

Defendants first ask the Court to dismiss Counts I and II for failure to state claims for relief. (*See* Mot. 13). According to Defendants, both claims "should be dismissed with prejudice because Sections 10(b) and 20(a) of the Exchange Act do not apply extraterritorially[,] and the Complaint and attached exhibits demonstrate that the sale occurred outside of the United States." (Mot. 13 (alteration added; emphasis omitted)).[6] Plaintiff insists she plausibly alleges the securities were purchased in the United States and not abroad. (*See* Resp. 8–13). Plaintiff has the better argument.

---

[6] While both Counts assert violations of different sections of the Exchange Act, the Court focuses its discussion on Section 10(b) — as do the parties. (*See* Mot. 13–17; Resp. 8–13). This is because "Section 20(a) is not a freestanding claim but rather" requires a primary violation of the securities laws to be "pleaded with legal sufficiency." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635–36 (11th Cir. 2010) (citations omitted). Put another way: "no [Section] 20(a) claim can lie without first establishing a successful [Section] 10(b) claim." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1294 n.9 (11th Cir. 2011) (alterations added; citation omitted).

Defendants move to dismiss Count II only on the ground that Plaintiff fails to establish a violation of Section 10(b). Because Plaintiff plausibly alleges this violation in Count II, Defendants' Section 20(a) "argument" fails.

To start, Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission (the "SEC")] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (alterations added). The SEC has promulgated further rules under Rule 10b-5. *See* 15 C.F.R. § 240.10b-5.

While there are multiple elements necessary to establish violations of Section 10(b) and Rule 10b-5, Defendants challenge only one: whether Plaintiff "allege[s] that there was a domestic transaction." (Mot. 14 (alteration added; citation omitted)).[7] Alleging a domestic transaction is necessary because Section 10(b) and Rule 10b-5 do not apply extraterritorially — that is, to a securities transaction that occurs outside the United States. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255–65 (2010). The parties agree the securities were not listed on a domestic exchange; they only dispute whether the securities were purchased or sold in Florida, as Plaintiff contends, or somewhere else — presumably Argentina, although Defendants do not explicitly identify the foreign country where they believe the transactions may have otherwise occurred. (*Compare* Mot. 17 *with* Resp. 13).

In determining whether a transaction is domestic, courts apply a "transactional test" that looks to "whether the purchase or sale [of the security] is made in the United States, or involves a security listed on a domestic exchange[.]" *Morrison*, 561 U.S. at 269–70 (alterations added); *see also Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011) (applying *Morrison*). The Supreme Court has not further defined "what it

---

[7] Defendants note their "dispute" as to whether the promissory notes "are even 'securities'" under the Exchange Act or Florida law" and "specifically preserve this argument." (Mot. 14 n.2). Defendants do not otherwise develop the argument, instead focusing exclusively on the extraterritoriality issue. (*See generally id.*).

means for a purchase or sale to occur in the United States[,]" *Acerra v. Trulieve Cannabis Corp.*, No. 20-cv-186, 2021 WL 1269919, at *3 (N.D. Fla. Mar. 18, 2021) (alteration added), although the Eleventh Circuit has noted it is sufficient to allege that a transaction was closed, such that "title to the shares was transferred" domestically, *Quail Cruises*, 645 F.3d at 1310 (footnote call number omitted)).

The Second Circuit, referencing *Quail Cruises*, has provided further color, explaining that "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012). The Third and Ninth Circuits have adopted and applied this formulation, as have courts in this District. *See United States v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015); *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018); *Quantum Cap., LLC v. Banco de los Trabajadores*, No. 14-cv-23193, 2015 WL 12259226, at *12 (S.D. Fla. Dec. 22, 2015); *SEC v. Berbel*, No. 17-23572-Civ, 2018 WL 1135659, at *3 (S.D. Fla. Feb. 27, 2018). Put another way: "territoriality under *Morrison* turns on 'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security." *Georgiou*, 777 F.3d at 136 (quotation marks and citation omitted). "[P]laintiff must plead facts concerning the formation of contracts to buy or sell securities, the placement of purchase orders, the passing of titles, or exchanges of money, within the United States." *Acerra*, 2021 WL 1269919, at *3 (alteration added; citations omitted)).

Defendants argue that Plaintiff fails to meet her burden, because "the Complaint includes nearly no information about the actual purchase and sale of the 'securities.'" (Mot. 15). Admittedly, the Complaint does not contain a specific, succinct allegation as to where the transactions occurred. (*See generally* Compl.). But to say the Complaint contains "no

information" (Mot. 15) about the location of the transaction is hyperbole. Plaintiff provides a detailed breakdown of when, where, and how she purchased the securities. (*See* Resp. 11–13).

To start, the investments were solicited by Defendants in Miami. Plaintiff and Marini met with Costantini and Talia Brown in Defendants' headquarters in Miami to discuss Plaintiff's potential investment in the Capital Force Group. (*See* Compl. ¶ 69). The actual securities — the promissory notes and security agreements for each of Plaintiff's investments — were prepared in Miami. (*See id.* ¶ 74). They were then executed by Plaintiff. (*See id.* ¶¶ 95, 97; The Securities 6, 10, 16, 20, 26). For at least two of the investment transactions, Plaintiff executed the documents electronically. (*See* The Securities 6, 10, 16, 20).

Plaintiff wired her investments to the escrow account of a Miami law firm (*see* Compl. ¶¶ 94, 96, 106); along with an additional sum wired directly to one of the Corporate Defendants, a domestic entity (*see id.* ¶ 110). The documents, already signed by Plaintiff, were executed by Defendants (The Securities 6, 10, 16, 20; *see also* Resp. 11–13); and the Miami law firm would release Plaintiff's investment to the Corporate Defendants (*see* Promotional Materials 9 (outlining flow of funds between Plaintiff and Defendants)), at which point it appears the transactions were consummated in Miami, *see Quail Cruises*, 645 F.3d at 1310 (quoting *Closing*, Black's Law Dictionary 291 (9th ed. 2009)).

Even if the described events were not enough, the Security Agreements signed by the parties expressly state the agreements "shall become effective when [] signed by the Debtor" — in this case, Defendants. (*See, e.g.*, The Securities 9 (alteration added)). Put another way: the very documents the U.S.-based Defendants provided to memorialize the transactions establish that the transactions were not complete until Defendants' own signatures appeared on the documents. (*See id.*). This only further affirms the inference that domestic transactions occurred. *See Quail*

*Cruises*, 645 F.3d at 1310 ("Indeed, the purchase and sale agreement confirms that it was not until this domestic closing that title to the shares was transferred to [the plaintiff]." (footnote call number omitted; alteration added)); *Goldstein v. Firer*, No. 20-cv-23402, 2022 WL 18704836, at *3 (S.D. Fla. May 2, 2022) ("Indeed, the operating agreement . . . substantiates that [the transaction was final] upon the execution of that document[,]" and the transaction was thus completed in Florida. (alterations added; citations omitted)); *SEC v. Yin Nan Michael Wang*, No. 13-07553, 2015 WL 12656906, at *11 (C.D. Cal. Aug. 18, 2015) (explaining that documents' language and domestic receipt of funds "demonstrate that the sale of the securities to the investors did not close until the subscription agreements were accepted by the [defendants] in the United States and the notes were signed by [the defendant]" (alterations added)).  In sum, there are sufficient facts alleged to support the reasonable inference that the securities were purchased and sold in the United States.  *See Brooks*, 116 F.3d at 1369.

Defendants' arguments to the contrary do not persuade.  Defendants insist dismissal is warranted because "Plaintiff does not allege that she was in the United States or Florida on this date or on any of the dates alleged to correspond to her execution of other promissory notes, security agreements, or other 'investment' documents." (Mot. 16 (citation omitted)).  There is no requirement that Plaintiff be physically present in the United States for a transaction to be consummated in the United States.  *See Berbel*, 2018 WL 1135659, at *3 (explaining that Spanish resident engaged in domestic transaction); *see also Morrison*, 561 U.S. at 268 (noting that Section 10(b) is concerned with the "location of the *transaction*" rather than the location of the parties to it (emphasis in original)).

Next, Defendants point to a provision in the promissory notes requiring Plaintiff to file documentation with the Internal Revenue Service certifying that she "is not a citizen or resident of

the United States[.]" (Mot. 16 (alteration added (quoting The Securities 5)). Defendants also point to Plaintiff's allegation of Argentinian residency. (*See id.*; Compl. ¶ 1). According to Defendants, these serve to render the transactions extraterritorial because they evince Plaintiff's "waiver of United States law to take advantage of her Argentine residency and gain an economic benefit to avoid tax responsibility." (Mot. 16). Defendants overread the import of this specific provision and of Plaintiff's residency.

For one thing, it is not at all clear that Plaintiff has waived the applicability of U.S. law — the promissory notes expressly state they "shall be governed by and construed in accordance with the laws of the State of Florida[.]" (The Securities 4 (alteration added)). Regardless, Plaintiff's citizenship and residency are not dispositive as to whether a transaction was domestic; there is no requirement that an individual be a U.S. citizen to enjoy the protections of Section 10(b). *See Absolute*, 677 F.3d at 69 (explaining that "a purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States" (alteration adopted; quotation marks and citation omitted)); *see also Yin Nan Michael Wang*, 2015 WL 12656906, at *10 (explaining that *Morrison* was satisfied even though "the buyers of the securities were foreign nationals").

At bottom, Defendants' best — if perhaps the only — fact that the transactions may not have occurred in the United States is that Plaintiff resides in Argentina. (*See* Compl. ¶ 1). This hardly serves to overcome the otherwise much stronger inference that the transactions occurred in the United States. *See Brooks*, 116 F.3d at 1369. The Court will not dismiss Counts I and II based on extraterritoriality under *Morrison*.

13

   2.   *State Law*

Defendants next urge the Court to dismiss Counts III and IV. Count III asserts a claim against all Defendants for violating the Florida Securities and Investor Protection Act ("FSIPA"), Florida Statute section 517.011; Count IV asserts a claim against Costantini and Talia Brown for the sale of unregistered securities, in violation of Florida Statute section 517.211. (*See* Compl. ¶¶ 135–51).[8] Once again, Defendants' challenge to both claims is narrow; Defendants argue that both claims — just like the claims in Counts I and II — should be dismissed because Plaintiff fails to allege "that the transaction at issue occurred in Florida and not extraterritorially." (Mot. 17 (citations omitted)); *see also Allen v. Oakbrook Sec. Corp.*, 763 So. 2d 1099, 1101 (Fla. 4th DCA 1999) (explaining that Florida's securities laws do not apply to securities transactions which "occurred entirely in other states").

Having already determined — with respect to Counts I and II — that Plaintiff has plausibly alleged the securities transactions at issue occurred in Miami, the Court will not dismiss Counts III and IV for a failure to allege that the transactions occurred in Florida. Certainly, Counts III and IV rest on even stronger footing that Counts I and II, because Florida securities laws require only that "part of the sale [] occur in Florida [for] the FSIPA [to] appl[y]." *Goldstein v. Firer*, No. 20-cv-23402, 2022 WL 17343638, at *5 (S.D. Fla. Nov. 16, 2022) (alterations added; citation omitted). And [i]n determining whether the sale occurred within Florida, courts look to various

---

[8] While Count IV's title states that the claim is asserted "[a]gainst all Defendants Costantini and Talia []Brown[,]" (Compl. 39 (alterations added)), "[t]he Court addresses . . . claims in view of the violations alleged in each count and not by the title to each count in the Complaint[,]" *Paraohao v. Bankers Club, Inc.*, 225 F. Supp. 2d 1353, 1358, n.4 (S.D. Fla. 2002) (alterations added). Here — despite the allegation that the claim is "against all Defendants for violations of [Section] 517 of the [FSIPA] arising from the sale of unregistered securities in the state of Florida" (Compl. ¶ 45 (alterations added)) — the additional allegations against Costantini and Talia Brown, as well as the specific demand for relief made against them, make clear that Count IV is asserted only against the two of them and not the remaining Defendants (*see id.* ¶ 150; *id.* 40).

aspects of the sale[.]" *Id.* (alterations added; citation omitted). As described, numerous portions of the transactions occurred in Florida. (*See, e.g.*, Compl. ¶¶ 69–79 (describing meeting where Costantini and Talia Brown solicited Plaintiff's investment).

Consequently, Plaintiff has plausibly alleged a violation of Florida's securities laws. *See HCM High Yield Opportunity Fund, LP v. Skandinaviska Enskilda Banken AB*, No. 99-1350-Civ, 2001 WL 36186526, at *22 (S.D. Fla. Dec. 14, 2001) (applying the FSIPA where bonds were issued by a corporation in Florida, the offering memorandum was sent to Florida, and the purchase occurred in Florida).

### B. Plaintiff has satisfied Rule 9(b).

Defendants' next attack is directed to Counts I through V, collectively. (*See* Mot. 21–24). Again, Counts I and II assert violations of federal securities law; Counts III and IV assert violations of Florida securities law; and Count V asserts a claim of fraudulent misrepresentation against only Costantini. (*See* Compl. ¶¶ 116–59). While different elements are required for each of Plaintiff's claims, Defendants' challenge is narrow: Defendants challenge whether Plaintiff has satisfied the heightened pleading standards for fraud under Rule 9(b), which requires that fraud be plead "with particularity[.]" Fed. R. Civ. P. 9(b) (alteration added).[9] Plaintiff asserts that "the Complaint clearly sets forth in meticulous detail and with sufficient particularity" the circumstances giving rise to fraud. (Resp. 17). The Court agrees with Plaintiff.

Plaintiff's Complaint is replete with specific allegations of "the who, what, when where, and how" of the alleged fraud. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir.

---

[9] It is well-settled law — and Plaintiff does not dispute — that the claims asserted in Counts I through V, including the claims arising under securities laws, are fraud claims subject to Rule 9(b)'s heightened pleading requirements. (*See* Resp. 13–17); *Thompson*, 610 F.3d at 633 (applying Rule 9(b)'s requirements to federal securities claims); *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011) (applying Rule 9(b)'s requirements to state securities claims).

2006) (citation omitted). Take Plaintiff's allegations regarding her initial "investment." Plaintiff and Defendants met on January 18, 2018 at the Capital Force Group's office in the Four Seasons office building in Miami. (*See* Compl. ¶ 65). There, Defendants made numerous alleged misrepresentations to Plaintiff, including statements regarding the Capital Force Group's profitability, capital reserves, and the safety of the investment. (*See id.* ¶¶ 66, 73).

Following the meeting, on January 29, 2018, Costantini provided the Promotional Materials, which were replete with further misrepresentations, in order to assuage Plaintiff's concerns and obtain her investment. (*See id.* ¶ 67; *see generally* Promotional Materials). "Induced by" these misrepresentations, Plaintiff again met with Defendants in July 2018, where they "sought to entice" Plaintiff into investing, after which Plaintiff finally did invest, beginning in August 2018. (Compl. ¶¶ 68, 70, 95). Defendants then allegedly used Plaintiff's investments to line their own pockets. (*See id.* ¶ 39). The Court agrees with Plaintiff that "[i]t is difficult to imagine what more detail [Plaintiff] could have included to satisfy" Defendants. (Resp. 16 (alterations added)).

In the face of these specific allegations, Defendants' remaining arguments for dismissal of the other Counts under Rule 9(b) fall short. For example, Defendants insist that Count II does not satisfy Rule 9(b) because Plaintiff "fails to delineate which [D]efendant had what authority or control[.]" (Mot. 22 (alterations added)). For one thing, such allegations are elements of a Section 20(a) claim, not a pleading requirement of Rule 9(b). (*Compare Young*, 57 F.4th at 875 (outlining Rule 9(b) requirements) *with Thompson*, 610 F.3d at 635–36 (outlining Section 20(a) requirements)). Regardless, this dispute misses the mark — Plaintiff *does* allege facts concerning "control." (*See, e.g.*, Compl. ¶ 129).

Next, with respect to Counts III and IV, Defendants revive their unsuccessful argument that Plaintiff "fail[s] to[] allege that the alleged sale occurred in Florida[.]" (Mot. 23 (alterations

16

added; citation omitted)). Defendants then turn to Count V, arguing that it fails to "identify[] specific statements and/or omissions Plaintiff relied on to her detriment and what benefit Costantini received therefrom." (Mot. 24 (alteration added)). Again, this is not true. (*See, e.g.*, Compl. ¶ 39 ("In reality, [Defendants] used substantial investor funds for purposes other than to purchase and finance the Car Loans, including . . . distributions to Costantini, [Talia] Brown and Culley, and other unrelated high-risk business ventures and funding Costantini's vice, vanity and lavish lifestyle[.]" (alterations added; footnote call number omitted)).

Finally, Defendants briefly argue that "incorporation by reference of hundreds of previous paragraphs is insufficient to state a claim with the requisite particularity for fraud." (Mot. 24 (citing *Plunkett v. Poyner*, No. 08-60953-Civ, 2009 WL 5176542, at *4 (S.D. Fla. Dec. 22, 2009)). But the Federal Rules expressly allow incorporation. *See* Fed. R. Civ. P. 10(c). And the pleading in *Plunkett* — which asserted a civil RICO claim despite "simply list[ing] eight activities by which 'Defendants carried out the scheme'" — is unlike the Complaint here, which, as the Court has already described, provides a specific, detailed breakdown of the alleged fraud. 2009 WL 5176542, at *4 (alteration added; footnote call number omitted); (*see generally* Compl.).

At bottom, Plaintiff has met the particularity requirements for her claims of fraud in Counts I through V.

## C. The Complaint is not a shotgun pleading.

Finally, Defendants argue that Counts I through IV should be dismissed as a shotgun pleading. (*See* Mot. 24–26). Defendants accuse Plaintiff of "commingling multiple [D]efendants without identifying which specific [D]efendant is purportedly responsible for the alleged acts giving rise to the claims" across these four Counts. (*Id.* 25 (alterations added)). Once again, Defendants' arguments fail to persuade.

The Eleventh Circuit has "identified four rough types" of shotgun pleadings. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). Of those, only one is potentially relevant here: a pleading that is "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323 (footnote call number omitted); (*see* Mot. 25).

To support their shotgun-pleading argument, Defendants narrowly read each Count to focus only on that Count's specific allegations — and using that limited reading, it might indeed seem that the Counts are lacking some necessary factual allegations to better distinguish between Defendants. (*See* Mot. 25–26; Compl. ¶¶ 116–51). Of course, construing the Complaint in this manner requires the reader to ignore that each Count incorporates by reference the Complaint's general factual allegations. (*See* Compl. ¶¶ 116, 128, 135, 144). The Court has already explained Plaintiff is well within her rights to plead by reference, *see* Fed. R. Civ. P. 10(c) — to say nothing of the fact that each individual Count states which Defendants the Count is asserted against (*see, e.g.*, Compl. ¶¶ 116–27 (asserting Count I against the Corporate Defendants and Costantini and Talia Brown; *id.* ¶¶ 128–33 (asserting Count II against the three Individual Defendants)).

When reading the generally applicable factual allegations *in tandem* with the specific allegations within each Count, the Court cannot say that the Complaint is a shotgun pleading. As already described, the factual allegations adequately state which Defendants committed the specific acts and misrepresentations for which Plaintiff seeks to hold them liable. (*See generally* Compl.); *see also SEC v. City of Mia., Fla.*, 988 F. Supp. 2d 1343, 1354 (S.D. Fla. 2013) (explaining that the "general allegations support each claim for relief and identify the relevant events, misrepresentations, and omissions advanced by [Plaintiff][,]" and [n]either the Court nor

18

Defendants have to sift through the allegations to see which ones support the cause of action purportedly stated" (alterations added; citations omitted)). For example, Defendants complain that Count II alleges "no facts against Culley whatsoever[.]" (Mot. 25 (alteration added; citation omitted); *see* Compl. ¶¶ 128–34). But Count II incorporates specific allegations regarding misrepresentations made by Culley, such as in a June 2020 letter Defendants sent to investors. (*See* Compl. ¶¶ 41–43, 128; *see generally* June 29, 2020 Letter).

At bottom, Defendants' narrow view of these Counts is not a good-faith reading of the Complaint, and the Complaint is not the type of shotgun pleading condemned by the Eleventh Circuit. *See Weiland*, 792 F.3d at 1321–23 (describing categories of shotgun pleadings). The Complaint gives "[D]efendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323 (alteration added; footnote call number omitted).

### IV. CONCLUSION

In sum, Plaintiff has adequately alleged that the transactions to sell and purchase the securities occurred in Florida, and she had satisfied Rule 9(b)'s heightened pleading standards. Further, the Complaint is not a shotgun pleading. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss **[ECF No. 25]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 26th day of June, 2023.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:   counsel of record