UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-21512-CIV-ALTONAGA/Damian

**LIDIA NOEMI ZALAZAR**,

    Plaintiff,
v.

**CAPITAL FORCE LLC**, *et al.*,

    Defendants.
_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendants, Matias Costantini, Juan Cruz Talia Brown, and Jonathan Culley's (together, "Defendants[']" or "Individual Defendants[']") Motion to Dismiss, filed on August 25, 2023.[1] Plaintiff, Tzutomo Ltd., filed a Response [ECF No. 72],[2] to which Defendants filed a Reply [ECF No. 75]. The Court has considered the Complaint,[3] the parties' written submissions, and applicable law. For the following reasons, the Motion is denied.

**I. BACKGROUND**

This case arises from Plaintiff's loss of money in allegedly fraudulent security investments. Plaintiff accuses Defendants of running a "Ponzi-like scheme" that "enticed victims in [the] United

---

[1] Defendants filed the Motion in one of the consolidated cases. *See Tzutomo Ltd. v. Costantini*, No. 23-22683-Civ, Mot. to Dismiss [ECF No. 9] filed Aug. 25, 2023 (S.D. Fla. 2023). That case and its pending Motion were consolidated with the first-filed action — the captioned case — by a September 5, 2023 Order [ECF No. 66]. In that Order, the Court instructed the parties that all filings in these cases were to be made in the captioned case only, and "the Court's disposition of" this Motion would "be effective as to all consolidated actions." (Sept. 5, 2023 Order 2). Counsel for the parties are the same in the consolidated cases.

[2] Unless otherwise specified, references to a filing's "ECF Number" refer to the docket entry in case number 23-21512-Civ.

[3] The Complaint was filed in *Tzutomo Ltd. v. Costantini*, No. 23-22683-Civ, Compl. [ECF No. 1] filed July 18, 2023 (S.D. Fla. 2023).

States and from foreign countries with baseless promises of a high-return, safe and fully collateralized investment opportunity in the form of an unregistered fraudulent securities offering." (Compl. ¶¶ 11–12 (alteration added; footnote call number omitted)). The Court is familiar with the alleged scheme and has already denied one motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6). (*See generally* June 26, 2023 Order [ECF No. 46]). Consequently, the Court only reviews the allegations necessary for resolving the present Motion.

Plaintiff, a British Virgin Islands company, invested two million dollars with Defendant, Capital Force F1 LLC ("Capital Force"). (Compl. ¶ 1).[4] The three Individual Defendants are Florida residents who co-founded and held leadership positions in Capital Force — Costantini as President, Talia Brown as Vice President, and Culley as Chief Financial Officer. (*See id.* ¶¶ 3–5). Together, the Individual Defendants oversaw Capital Force's finances and general operations. (*See id.*). Non-party, Marcel Montefiore is, and continues to be, Plaintiff's authorized agent and beneficial owner; Plaintiff "was used by [] Montefiore to enter into the investment transaction with Capital Force[.]" (*Id.* ¶ 1 & n.1 (alterations added)).

Plaintiff, via Montefiore, fell victim to Defendants' scheme, along with over 150 other investors across the United States and foreign countries. (*See id.* ¶ 11). Defendants targeted unsophisticated investors like Plaintiff who were unfamiliar with financial markets (*see id.* ¶¶ 11, 55) and identified these potential investors "through word-of-mouth, referrals . . . and through relationships with members of the Argentine American community" (*id.* ¶ 18 (alteration added)). The investors sought to participate in Defendants' promised opportunity of safe, secure investments, which would reliably generate "investment returns of 12% per annum." (*Id.* ¶ 35).

---

[4] Capital Force was served a copy of the Complaint in Case No. 23-22683-CIV on October 13, 2023. (*See* Certificate of Service [ECF No. 102]). Capital Force was previously served a copy of the Complaint [ECF No. 1] in case number 23-21512 (*see* [ECF No. 26]) and is in default with respect to that pleading (*see* [ECF No. 28]).

In Plaintiff's case, it was looking for a safe investment for Montefiore's "life savings[.]" (*Id.* ¶ 92 (alteration added)).

The investment opportunity was in Defendants' "business of buying and servicing subprime and non-prime automobile retail installment loans/contracts (in the form of Retail Installment Sales Contracts ("RISC") or ("Car Loans["))] and obtaining titles to the automobiles and the related and attendant documents and obligations." (*Id.* ¶ 14 (alteration added)). To invest, Defendants "provid[ed] investors with promissory notes and other security documents[.]" (*Id.* (alterations added)). Plaintiff signed two such notes here. (*See id.*, Ex. D, Sept. 13, 2019 Note [ECF No. 1-4]; *id.*, Ex. E, Dec. 19, 2019 Note [ECF No. 1-5] (together, the "Notes")).[5]

Defendants told investors their money would "solely [] fund Capital Force[.]" (*Id.* ¶ 36 (alterations added)). In fact, "the sole source of Capital Force's money" consisted of investor funds raised from the notes; and so the funds were used "to pay [Capital Force]'s operating expenses" (*id.* ¶ 45 (alteration added)), including Individual Defendants' salaries (*see id.* ¶ 70). Per the terms of the Notes and Defendants' solicitations, Plaintiff invested in the form of a loan to Capital Force. (*See, e.g.*, *id.* ¶¶ 27–33 (describing investment process); *see generally* Notes). From there, Defendants had complete control of the sourcing, originating, and managing of the portfolio of car loans being funded by the investment (*see* Compl. ¶ 52), and then would pass back to the investor — Plaintiff — their "fixed annual return on a monthly basis" (*id.*, Ex. A, Promotional Materials [ECF No. 1-1] 9).

Defendants promised Plaintiff it "would have the collateral to every car loan that was being purchased with [its] investment funds" (*id.* ¶ 51 (alteration added)), but this was a "false and misleading" statement (*id.* ¶ 53). As it now turns out, Plaintiff "was never a secured party" and

---

[5] These exhibits were filed with the Complaint in case number 23-22683-Civ.

never had "an identifiable certificate of title" or car loans "securing" the investment. (*Id.* ¶ 94). Rather, all car loans were pooled together, commingled, and dispersed among Capital Force and its affiliated companies." (Resp. 15; *see also* Compl. ¶ 117).

Further, rather than running the successful car-loan business that was promised, Defendants "used investors' money for purposes other than purchasing/financing [c]ar [l]oans and never had sufficient collateral . . . to secure the investments." (Compl. ¶ 24 (alterations added)). According to Plaintiff, Defendants "misappropriated and pillaged investor funds for their personal pleasure, made payments to certain family members, and used investors' monies to fund other business ventures . . . and other activities with no apparent legitimate business purpose." (*Id.* ¶ 26 (alteration added)). Despite Defendants' sale of securities to Plaintiff, Plaintiff now knows that "[n]o registration statement was filed or in effect with" the relevant federal or Florida authorities "with respect to the securities Defendants offered and sold[.]" (*Id.* ¶¶ 15–16 (alterations added)).

Ultimately, the pool of money ran out. Defendants' scheme (and business) collapsed. "[P]etitions for Assignments for the Benefit of Creditors" have since been "filed on behalf of Capital Force[.]" (*Id.* ¶ 116 (alterations added)). Plaintiff lost more than two million dollars to this fraudulent scheme. (*See id.* ¶ 128).

In its Complaint, Plaintiff asserts six claims for relief. (*See id.* ¶¶ 118–72). In Count I, Plaintiff accuses the Individual Defendants and Capital Force of violating Section 10(b) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. section 78j(b), and the corresponding regulation at Rule 10b-5, 15 C.F.R. section 240.10b-5. (*See id.* ¶¶ 118–30). In Count II, Plaintiff states a violation of Section 20(a) of the Exchange Act, 15 U.S.C. section 78t(a), against the Individual Defendants. (*See id.* ¶¶ 131–37). In Count III, Plaintiff alleges — against the Individual Defendants and Capital Force — a claim for a violation of the Florida Securities and

Investor Protection Act, Florida Statute section 517.011.  (*See id.* ¶¶ 138–46).  In Count IV, Plaintiff asserts a claim against all four Defendants for the sale of unregistered securities, in violation of Florida Statute section 517.07.  (*See id.* ¶¶ 147–54).  At Count V, Plaintiff accuses Costantini of fraudulent misrepresentation.  (*See id.* ¶¶ 155–62).  In Count VI, Plaintiff states a claim of breach of the promissory notes and security agreements against Capital Force.  (*See id.* ¶¶ 163–72).

Defendants move to dismiss Counts I through IV for failure to state claims for relief and Count IV as barred by the statute of limitations.  (*See generally* Mot.).

## II.  LEGAL STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A pleading withstands a motion to dismiss if it alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  A complaint's "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  When considering a motion to dismiss, a court must construe

the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

### III. DISCUSSION

Defendants ask the Court to dismiss Counts I through IV with prejudice, arguing that Plaintiff fails to state claims for relief because it has not demonstrated that the Notes are securities — and thus subject to federal and state securities laws. (*See* Mot. 8–15).[6] Defendants further argue that Count IV should be dismissed as untimely. (*See id.* 19–20).[7] Plaintiff disagrees on each point.

#### A. **The Notes are Securities.**

Defendants first argue that Counts I through IV fail to state claims for relief. (*See* Mot. 8–15). While there are multiple elements necessary to assert a claim under each Count, Defendants' challenge is narrow. According to Defendants, all four claims "should be dismissed with prejudice because the [] Notes are not 'securities[.]'" (*Id.* 8 (alterations added); *see id.* 15).

Of course, "[i]n order to state a [securities] claim under [federal or Florida law], a plaintiff must allege the existence of a 'security.'" (Mot. 8 (alterations added)); *see, e.g.*, *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309, 1322 (S.D. Fla. 2021) ("To reach the issue of an alleged violation of" securities laws, "the transaction at hand must involve a 'security' as defined in the" law. (citations omitted)). Plaintiff argues that it plausibly alleges the

---

[6] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[7] Defendants also argue that Counts I through IV should be dismissed because federal and state securities laws do not apply extraterritorially, and Plaintiff fails to allege that the Notes were purchased domestically. (*See* Mot. 15–19). As Defendants recognize (*see* Reply 8), the Court has already rejected this argument (*see* June 26, 2023 Order 8–15).

Notes are "securities" for purposes of federal and Florida law (*see* Resp. 9–17) under application of the Supreme Court's tests in both *Reves v. Ernst & Young*, 494 U.S. 56 (1990), and *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946). Plaintiff is correct that under *Reves*, the Notes are "securities." The Court explains.[8]

Federal law "define[s] security to mean 'any note.'" *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1335 (S.D. Fla. 2018) (alteration added; citations omitted); *see* 15 U.S.C. § 78c(a)(10). Florida law similarly includes "[a] note" among a long list of examples of securities. Fla. Stat. § 517.021(22)(a) (alteration added). Further, "'[t]he definition of 'security' under the Florida statute is the same as that under federal law, so [courts] look to federal law' in determining whether an instrument is a security." *Honig*, 339 F. Supp. 3d at 1335 (alterations added; other alterations adopted; quoting *Phillips v. Kaplus*, 764 F.2d 807, 814–15 n.8 (11th Cir. 1985)).

At first glance, the inclusion of "any note" in the definition of a security seems to indicate that the Notes are, in fact, securities. *See* 15 U.S.C. § 78c(a)(10). Nonetheless, "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting" federal securities laws. *Reves*, 494 U.S. at 63 (footnote call number omitted). To determine whether a "note" is a security — or falls into certain enumerated categories of "notes" which are not "securities[,]" *id.*

---

[8] Because the Notes are securities under *Reves*, the Court need not consider Plaintiff's arguments under *Howey*. In any case, *Howey* is inapposite. In *Reves*, the Supreme Court explicitly rejected the application of "the *Howey* test to notes[,]" because "*Howey* provides a mechanism for determining whether an instrument is an 'investment contract.'" *Reves*, 494 U.S. at 64 (alteration added). While both a "note" and an "investment contract" may be a "security" under federal securities law, they are analyzed under different tests; applying "a test designed for an entirely different variety of instrument 'would make the [] enumeration of many types of instruments superfluous,' [] and would be inconsistent with Congress' intent to regulate the entire body of instruments sold as investments[.] *Id.* (alterations added; quoting *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985); other citation omitted). Plaintiff makes no attempt to explain why the Supreme Court's instructions in *Reves* do not prevent application of the *Howey* test to the Notes here. (*See generally* Resp.).

at 65 (alteration added) — courts apply the four-part "family resemblance" test, otherwise known as the *Reves* test, *id.* at 64–65; *see also Honig*, 339 F. Supp. 3d at 1335.  Under the *Reves* test, "[a] note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance . . . to one of the enumerated categories of" notes which are not securities.  *Reves*, 494 U.S. at 67 (alterations added).[9]

First, courts must "examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it."  *Id.* at 66.  "Second, [courts] examine the 'plan of distribution' of the instrument, to determine whether it is an instrument in which there is 'common trading for speculation or investment[.]'"  *Id.* (alterations added; citations omitted).  Third, courts "examine the reasonable expectations of the investing public[.]"  *Id.* (alteration added).  Finally, courts "examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of" federal securities laws unnecessary.  *Id.* at 67 (citation omitted).

1.    Reves *Factor One.*

Under the first factor, courts examine the motivation of the parties to the transaction.  *See Id.* at 66.  "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'"  *Id.*  "Conversely, 'the note is less sensibly described as a security' 'if the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose.'"  *Honig*, 339 F. Supp. 3d at 1335 (alterations adopted;

---

[9] Because the definition of a "security" is the same under federal and Florida law, the *Reves* test is used to determine whether notes are securities under Florida law.  *See, e.g.*, *Hosner v. State*, 353 So. 3d 74, 75 (Fla. 2d DCA 2022) (collecting cases).

quoting *Reves*, 494 U.S. at 66). Stated simply: if the intention of the seller is primarily "'to invest for profit[,]'" the note is likely a security. *Reves*, 494 U.S. at 66 (alteration added; quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851 (1975)).

While the parties spill much ink over the first *Reves* factor (*see* Mot. 11–12; Resp. 11–12), the conclusion here is straightforward. Plaintiff plainly alleges Defendants' purpose for selling the Notes, which was "to raise money for the general use of a business enterprise or to finance substantial investments[.]" *Reves*, 494 U.S. at 66 (alteration added). According to Plaintiff, Individual Defendants "represented that they would use investors' money solely to fund Capital Force," which was itself solely in the business of obtaining and originating the car loans; those car loans would then provide Plaintiff the profit from its investment. (Compl. ¶ 36). And "[b]ecause investor funds were the sole source of Capital Force's money, the Company necessarily had to use investor funds to pay the Company's operating expenses." (*Id.* ¶ 45 (alteration added); *see also id.* ¶ 70 (explaining that the Notes were sold to obtain money to "offset Capital Force's operating expenses (including [Defendants' salaries])" (alteration added))). In other words, Defendants "sold the [N]otes to fuel [their] [] business and enrich" themselves. *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1325 (alterations added).

Similarly, Plaintiff alleges its own purpose for buying the Notes and investing with Defendants: to "invest [Montefiore's] life's savings" (Compl. ¶ 92 (alteration added)), in "extremely safe and secure investments, capable of generating reliable investment returns of 12% per annum" (*id.* ¶ 35). Plaintiff's "primary motivation" — if not the only motivation — was the "rate of return that [Defendants] offered[,]" and "[t]here is no indication that the investor [N]oteholders received any other benefits from the transaction." *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1325 (alterations added; citation omitted); (*see, e.g.*, Compl. ¶ 62 (explaining

9

that "Capital Force" and not the investor would "hold both the note and physical title to each automobile subject to the Car Loan")).

In short, the Notes "were used to finance substantial [] purchases[;] . . . [t]he buyers received a high fixed interest rate on the notes, thus receiving a large return on their investment[;] . . . [and] [t]he buyers received no other benefit from investing" with Defendants. *Sec. & Exch. Comm'n v. Levin*, No. 1:12-cv-21917, 2014 WL 11878357, at *9 (S.D. Fla. Oct. 6, 2014) (alterations added; citations omitted). "Thus, from both sides, 'the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction.'" *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1325 (quoting *Reves*, 494 U.S. at 68).

Defendants offer no persuasive rebuttal to the conclusion that the Notes were intended to act as investments in a security, rather than as a commercial or consumer transaction. First — and perhaps most tellingly — Defendants offer no plausible alternative explanation for their own motives in entering the transaction. (*See generally* Mot.; Reply). Relying on *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51 (2d Cir. 1992), Defendants argue the Notes were simply used to "increase [Defendants'] lines of credit . . . while diversifying [their] risk" (Mot. 11–12 (alterations added; quoting *Banco Espanol de Credito*, 973 F.2d at 55)), but Defendants misinterpret *Banco Espanol de Credito*.

In *Banco Espanol de Credito*, the defendant "made a series of short-term loans to" one of its institutional customers. 973 F.2d at 53. The defendant then sold those loans in the short-term to other institutional investors, allowing the defendant "to spread its risk, while at the same time allowing a purchaser with excess cash to earn a higher return than that available on comparable money market instruments." *Id.* Compare that to the Notes here, which comprised the entirety of

10

Defendants' funding (*see* Compl. ¶ 45); were allegedly purchased by "unsuspecting" (*id.* ¶ 14) and "not [] sophisticated" (*id.* ¶ 55 (alteration added)) investors; and were meant for sizeable, safe, long-term investment (*see, e.g.*, *id.* ¶ 11).

Similarly, Defendants' assertion that they offered the Notes for an "inherently commercial purpose" rings hollow. (Mot. 12). Likely, Defendants mean to analogize the Notes here to the exemptions discussed in *Reves* for those notes "exchanged to facilitate the purchase and sale of a minor asset or consumer good[.]" 494 U.S. at 66 (alteration added; citations omitted). But there is no "indication" in the Complaint "that the [N]otes even identified the" individuals taking out the alleged car loans, "or that the [N]oteholders had any contact with them or the ability to assess the soundness of their [loans] as in the traditional context of a loan secured by the assets of a [minor asset or consumer good]." *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1325 (alterations added); (*see generally* Notes). Rather, investors "relied on [Defendants'] entrepreneurial efforts managing the portfolio of [] loans and ensuring the noteholders would receive their return on investment." *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1325 (alterations added); (*see also* Compl. ¶ 52 (describing Defendants' complete control over the car loan process)).

Next, Defendants insist that because Plaintiff's motivation "was to enter into this transaction as a lender to lend money" in exchange for "fixed-rate return[s] of interest[,]" that necessarily means "Plaintiff was not interested in a formulaic profit or share of profits analysis based on success." (Mot. 11 (alterations added)). This confusing assertion suffers from two flaws. First, it is belied by Plaintiff's own allegations; as already noted, Plaintiff sough to invest in Defendants' auto loan business and make a profit off its investment. (*See, e.g.*, Compl. ¶¶ 35, 92).

Second, the frankly unbelievable claim that "Plaintiff was not interested" in profit from the Notes (Mot. 11), relies on a strained definition of "profit." Defendants argue that the Notes supply

11

"a fixed and flat rate return of interest for the lender, not variable, which is not consistent with the definition of profit as defined by Black's Dictionary." (*Id.* 12; *see also* Reply 6 n.2). Indeed?

For one thing, the Court fails to see how the interest from Plaintiff's investment into Defendants' business would not be encompassed by Black's Dictionary's myriad definitions of "profit." *See generally Profit*, Black's Law Dictionary (11th ed. 2019). Regardless, there is no need to look to treatises to determine whether the rewards of Plaintiff's investment — even if characterized as a fixed-rate interest on loans — might serve as "profit" under the *Reves* test. In *Reves* itself, the Supreme Court "emphasize[d] that [] 'profit' in the context of notes[] [] mean[s] 'a valuable return on an investment,' *which undoubtedly includes interest*." 494 U.S. at 68 n.4 (alterations and emphasis added). Considering these clear instructions, the Court rejects Defendants' assertion — not supported by the Complaint in any event — that Plaintiff was not interested in "profit."

At bottom, "[t]he reality of the transaction" — as alleged by Plaintiff — "was that new investor funds derived from [the Notes] were used to almost wholly support [Defendants'] business operations[.]" *Honig*, 339 F. Supp. 3d at 1336 (alterations added; citation omitted)). Plaintiff's desire for a "a high fixed interest rate" — and "no other benefit" — in transacting for the Notes reflects Plaintiff's desire to seek a profit from its investment with a security. *Levin*, 2014 WL 11878357, at *9. Under these circumstances, the first factor of the *Reves* test clearly weighs toward the Notes being deemed securities. *See Reves*, 494 U.S. at 66–67; *see also Levin*, 2014 WL 11878357, at *9.

2. Reves *Factor Two.*

With the first factor determined in favor of Plaintiff, the remaining three quickly follow suit. Under the second factor of the *Reves* test, "the distribution plan of the instrument is examined

to determine whether it is an instrument in which there is common trading for speculation or investment." *Honig*, 339 F. Supp. 3d at 1335 (quotation marks omitted; quoting *Reves*, 494 U.S. at 66). All that is necessary "to establish the requisite 'common trading' in an instrument" is that the Notes have been "offered and sold to a broad segment of the public[.]" *Reves*, 494 U.S. at 68 (alteration added; citations omitted).

Defendants omit any reference to this standard. Frankly, the Court can make little sense of Defendants' arguments regarding the second factor of the *Reves* test. (*See* Mot. 13; Reply 9). Regardless, the second factor is plainly met here.

According to Plaintiff, Defendants solicited the investments of over 150 individuals in the United States and foreign countries. (*See* Compl. ¶¶ 11). Further, "Defendants promoted the investment opportunity largely through word-of-mouth, referrals from other prior investors, and through relationships with members of the Argentine American community, as well as investors from Argentina and other South American countries." (*Id.* ¶ 18). Ultimately, Defendants raised over 35 million dollars. (*See id.* ¶ 14). These allegations are sufficient. *See, e.g.*, *Levin*, 2014 WL 11878357, at *10 (second factor satisfied when the notes "were sold to at least 83 different investors in at least 6 different states"); *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1128 (9th Cir. 1991) (second factor satisfied when the notes were sold to "at least 148 investors in several states"); *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1326.

    3.    Reves *Factor Three.*

Under the third factor of the *Reves* test, courts "will consider instruments to be securities on the basis of the reasonable expectations of the investing public, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not securities as used in that transaction." *Honig*, 339 F. Supp. 3d at 1335 (quotation marks

omitted; quoting *Reves*, 494 U.S. at 66). Further, courts in this jurisdiction and others have found that "investors sending money . . . to fund [a] business in exchange for a high single-or low double-digit rate of return would reasonably expect that they were making an investment." *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1326 (alterations added; citations omitted).

Admittedly, as Defendants argue (*see* Mot. 13), certain elements of the Notes and the transaction might weigh against the investing public's expectation that the Notes were securities. For example, the Promotional Materials refer to "loans" and "lenders" (Promotional Materials), as do the actual terms of the Notes themselves (*see generally* Notes). Nevertheless, "[i]t is not the moniker or label that is dispositive, but the economic characteristics of the notes." *S.E.C. v. Wallenbrock*, 313 F.3d 532, 538 (9th Cir. 2002) (alteration added; citation omitted).

The weight of Plaintiff's other allegations cut in favor of the Notes being viewed as securities. Defendants specifically targeted unsophisticated investors. (*See, e.g.*, Compl. ¶ 55 ("Costantini knew that Montefiore was not a sophisticated investor and consequently did not have an understanding of financial markets, especially with respect to [c]ar [l]oans[.]" (alterations added)); *see also id.* ¶ 14). And Defendants' solicitations to these investors presented the Notes as "extremely safe and secure investments, capable of generating reliable investment returns of 12% per annum." (*Id.* ¶ 35; *see also id.* ¶ 51 (noting that "Costantini provided a detailed explanation about the investment opportunity")). In other words, despite the fine print of the Promotional Materials and Notes, the solicitations and advertisements for the Notes "characterized them as 'investments[.]'" *Reves*, 494 U.S. at 69 (alteration added; citation omitted).

Taken together, Plaintiff's allegations are sufficient to satisfy the third factor of the *Reves* test. It appears that the investors, including Plaintiff, were "likely motivated to purchase [the Notes] based on (1) the advertised [high-interest] return[s] . . . and (2) representations that the

offerings were 'low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.'" *Honig*, 339 F. Supp. 3d at 1336 (alterations added; citations omitted); *see also Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1326. This factor weighs in Plaintiff's favor.

    4.    Reves *Factor Four.*

Under the fourth and final factor, the Court must "assess whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would 'significantly reduce the risk of the instrument' to the lender, 'thereby rendering application of the [securities laws] unnecessary.'" *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1327 (alteration added; other alteration adopted; quoting *Reves*, 494 U.S. at 67). Defendants do not argue that an alternative regulatory scheme exists here. (*See generally* Mot.; Reply). Rather, Defendants focus on another potential risk-reducing factor: "the presence of actual collateral relayed in the" Notes. (Mot. 14); *see also Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 585 (6th Cir. 2000) (noting that "the existence of collateral is significant as a risk-reducing factor").

Defendants advertised that investors, including Plaintiff, "would have the collateral to every car loan that was being purchased with [their] investment funds[.]" (Compl. ¶ 51 (alterations added)). Yet, according to Plaintiff, these statements were false; Plaintiff "was never a secured party and there was never an identifiable certificate of title and/or Car Loans securing the investment. Rather, all car loans were pooled together, commingled, and dispersed among Capital Force and its affiliated companies." (Resp. 15; *see also* Compl. ¶ 117). In other words, "the so-called collateralization appears to be a fiction." *Wallenbrock*, 313 F.3d at 539.

At most, the false nature of the "collateral" appears to make the fourth factor weigh in Plaintiff's favor; at the least, it is neutral. *See Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at

15

1327 (noting "that risk-reducing factors were neutral in the determination of whether notes were securities where there was collateral but no evidence of insurance or an alternative regulatory scheme" (describing *Aubrey v. Barlin*, 159 F. Supp. 3d 752, 757 (W.D. Tex. 2016))).  Given the overwhelming weight of the other three factors favoring treating the Notes as securities, the Court need go no further.  *See id.*

In sum: considering the presumption that any note is a security, and because at least three factors of the *Reves* test weigh clearly in favor of classifying the Notes as securities — and the fourth is at worst neutral — the Court concludes the Notes are securities under federal and Florida law.  *See Honig*, 339 F. Supp. 3d at 1337; *Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d at 1328.

### B.     Count IV is not Time-Barred.

Defendants' next attack is directed at Count IV.  Count IV asserts a claim under Florida law for the sale of unregistered securities in violation of Florida Statutes section 517.07.  (*See* Compl. ¶¶ 147–54).  Florida law prohibits the sale of securities which are not registered with the appropriate authorities.  *See* Fla. Stat. § 517.07.  Defendants do not dispute that the Notes were unregistered.  (*See generally* Mot.; Reply; *see also* Compl. ¶¶ 15–16).  Rather — and assuming the Notes are securities — Defendants challenge Count IV as untimely under Florida law.  (*See* Mot. 19–20).

Florida Statutes section 95.11(4)(f) states that any claims for violations of section 517 are subject to a two-year statute of limitations, "with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, but not more than 5 years from the date such violation occurred."  *Id.*  Defendants' argument is simple: if the Notes are in fact securities, then Plaintiff could have (or should have) been able to discover they were unregistered on the day the Notes were finalized — and the

16

securities were thus purchased. (*See* Mot. 19–20 (observing that the Notes were dated September 13, 2019, and December 9, 2019)). Consequently, Defendants assert Plaintiff's claim is barred by the statute of limitations. (*See id.*).

"Dismissal under Federal Rule of Civil Procedure 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005) (citation, footnote call number, and quotation marks omitted), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). Furthermore, "[p]laintiffs do not bear the burden of negating the affirmative defense of the statute of limitations in their complaint." *Bamert v. Pulte Home Corp.*, No. 6:08-cv-2120, 2012 WL 3292875, at *3 (M.D. Fla. Aug. 10, 2012) (alteration added; citing *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 846 (11th Cir. 2004)).

Keeping in mind the general wariness of dismissal under Rule 12(b)(6) on statute-of-limitations grounds, the Court is not persuaded by Defendants' insistence that the Notes themselves, standing alone, conclusively bar Plaintiff's claim in Count IV. Again, the statute of limitations runs "from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence[.]" Fla. Stat. § 95.11(4)(f) (alteration added). Aside from pointing to the dates the Notes were purchased, Defendants offer little to explain why Plaintiff, on the face of the Complaint, otherwise failed to exercise due diligence. (*See generally* Mot.; Reply). This lack of additional support is particularly notable as Defendants — according to Plaintiff — specifically targeted unsophisticated investors with little understanding of financial markets. (*See* Compl. ¶¶ 14, 55).

Defendants rely on *Barnebey v. E.F. Hutton & Co.*, for the proposition that "the trigger for constructive notice, and thus the dates when the statute of limitations begins to run, is 'when the

purchaser contracts to buy the security.'" (Mot. 19–20 (quoting 715 F. Supp. 1512, 1526 (M.D. Fla. 1989))). The Court is not persuaded by this strict interpretation of the "trigger" for the running of the statute of limitations.

In *Barneby*, the court cited *Armbrister v. Roland International Corp.* in support of the court's interpretation of the statute of limitations on Florida securities claims. *See* 715 F. Supp. at 1526 (citing 667 F. Supp. 802, 823 (M.D. Fla. 1987)). But *Armbrister* was a case concerning the statute of limitations on *federal* securities claims. *See* 667 F. Supp. at 823. A claim for the sale of unregistered securities under 15 U.S.C. section 77*l*(a)(1) has a strict statute of limitations; it must be "brought within one year after the violation upon which it is based[,]" 15 U.S.C. § 77m (alteration added). In other words, for a federal claim for the sale of unregistered securities, "the statute of limitations does not depend on the plaintiffs' reasonable discovery that the offerings were unregistered." *Trilogy Props. LLC v. SB Hotel Assocs. LLC*, No. 09-21406-Civ, 2010 WL 7411912, at *11 (S.D. Fla. Dec. 23, 2010). "Unlike the federal statute of limitations," however, the Florida statute of limitations is not so strict. *Id.* at *13 (explaining difference between statute of limitations for a claim of the sale of unregistered securities under federal and Florida laws); *see also* Fla. Stat. § 95.11(4)(f).

At bottom, "[t]he date on which [Plaintiff] should have reasonably discovered that [the Notes] were unregistered [for the purposes of an unregistered securities claim under Florida law] is a question of fact. This is a question best left for summary judgment or trial." *Trilogy Props. LLC*, 2010 WL 7411912, at *13 (alterations added); *see also Bamert*, 2012 WL 3292875, at *3; *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 401 (Fla. 5th DCA 1998).

## IV.  CONCLUSION

In sum, Plaintiff has adequately demonstrated that the Notes are securities, and Count IV is not time-barred.[10]  Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss in **case number 23-22683-CIV [ECF No. 9]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 20th day of October, 2023.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[10] Defendants also urge the Court to decline to exercise supplemental jurisdiction under 28 U.S.C. section 1367 over the state-law claims in Counts III through VI. (*See* Mot. 20–22).  Because the Court does not dismiss the federal law claims in Counts I and II, and Defendants offer no independent reason for dismissal of those Counts, there is no need to address Defendants' arguments concerning the Court's supplemental jurisdiction.