UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 23-21512-CIV-ALTONAGA/Damian

LIDIA NOEMI ZALAZAR, an individual,
    Plaintiff,
    -vs-
CAPITAL FORCE LLC, a Delaware limited
liability company; CAPITAL FORCE F1 LLC,
a Delaware limited liability; MATIAS
COSTANTINI, an individual; JUAN CRUZ
TALIA BROWN, an individual; JONATHAN
CULLEY, an individual,

    Defendants.

_____/

Duane Morris LLP
201 South Biscayne Boulevard, Suite 3400
Miami, Florida 33131
Wednesday, June 26, 2024
1:09 P.M. to 4:15 P.M.

DEPOSITION OF
ANDRES INI
CORPORATE REPRESENTATIVE FOR
MELTORME, LLC
    Taken before Jasmine Mercedes, Court Reporter,
a Notary Public for the State of Florida at Large,
pursuant to Notice of Taking Deposition filed in the
above-styled cause.



Page 2

```
 1                    APPEARANCES:
 2    On Behalf of the Witness, Andres Ini, Corporate
 3    Representative for Meltorme, LLC:
 4    VAZQUEZ & ASSOCIATES
 5    1111 Brickell Avenue
 6    Suite 1550
 7    Miami, Florida 33131
 8    305-371-8064
 9    gv@gvazquez.com
10    BY:  GERARDO ALVARO VAZQUEZ, ESQ.
11
12    On Behalf of the Defendants, Matias Costantini,
13    Juan Cruz Talia Brown, and Jonathan Culley:
14    DUANNE MORRIS LLP
15    201 South Biscayne Boulevard
16    Suite 3400
17    Miami, Florida 33131
18    305-960-2273
19    pmhudson@duanemorris.com
20    BY:  PHILLIP M. HUDSON, III, ESQ.
21
22    Also Present:
23    Javier Aparisi-Winthuysen, Spanish Interpretor
24
25
```



Page 3

1                           INDEX

2       TESTIMONY OF ANDRES INI

3                                                   PAGE

4       Direct Examination by Mr. Hudson            5

5       Certificate of Oath                         70

6       Certificate of Reporter                     71

7

8

9

10

11                  INDEX OF EXHIBITS

12              DEFENDANTS' EXHIBITS MARKED

13      NUMBER             DESCRIPTION              PAGE

14      Exhibit 1       Copy of Lawsuit             13

15

16

17

18

19          (Exhibits were retained by Mr. Hudson.)

20

21

22

23

24

25



Page 4

1    THEREUPON:

2         COURT REPORTER:  Good afternoon, everyone.  It

3    is now 1:09 p.m.  We are on the record.

4         And, sir, Interpreter, I'm going to swear you

5    in first.

6              JAVIER APARISI-WINTHUYSEN,

7         was duly sworn to truly and accurately

8    translate the testimony from English to Spanish and

9    Spanish to English.

10        COURT REPORTER:  And for the record, I've

11   already identified the witness for this deposition

12   today, and I will swear in the witness.

13                  ANDRES INI,

14        having been first duly sworn and responding,

15   "Yes, I swear," was examined and testified as

16   follows:

17        MR. VAZQUEZ:  Okay.  Mr. Ini --

18        COURT REPORTER:  Thank you.

19        MR. VAZQUEZ:  -- let me -- let's set up

20   something procedurally.  Since we have an

21   interpreter, and I -- listen to me one second --

22   and I know that you understand some English, okay.

23   We're either doing it in English, or we're doing it

24   in Spanish.  We're going to do it in Spanish.

25        THE WITNESS:  In Spanish.



Page 5

1          MR. VAZQUEZ:  So even if you understand,
2     please wait for the interpreter --
3          THE WITNESS:  Perfect, perfect.
4          MR. VAZQUEZ:  -- to provide -- okay.
5          THE WITNESS:  Perfect.
6          MR. VAZQUEZ:  Interpret what it is, and then
7     respond.
8          THE WITNESS:  Very clear to me.
9          COURT REPORTER:  Okay.  And if Counsel could
10    please state their appearances for the record.
11         MR. VAZQUEZ:  On behalf of Mr. Andres Ini,
12    with the company, Meltorme, Gerardo Vazquez.
13         MR. HUDSON:  Phillip Hudson of Duane Morris
14    for Matias Costantini; Jon Culley, C-U-L-L-E-Y;
15    Juan Cruz Talia Brown.
16         COURT REPORTER:  Thank you.
17         Counsel, whenever you're ready.
18         MR. HUDSON:  Thank you.
19                    DIRECT EXAMINATION
20    BY MR. HUDSON:
21    Q.   Good afternoon, sir.
22    A.   Thank you very much.
23    Q.   So we're going to do this in Spanish, and
24    we're going to use an interpreter.  As your counsel
25    indicated, we need to develop a rhythm where the three



1    of us communicate without speaking over one another.

2         A.    Correct.

3         Q.    This young lady is taking down everything that

4    we say, and she cannot take down multiple people

5    speaking at one time.

6         A.    Correct.

7         Q.    You don't want her mad at you.

8         A.    Okay.

9         Q.    Okay.  Let's go.  Please state, then spell

10   your name.

11        A.    Andres Ini.  Andres, as in A-N-D-R-E-S, and

12   Ini, as in I-N-I.

13        Q.    Is that your legal name?

14        A.    Yes.

15        Q.    Where do you reside?

16        A.    In Buenos Aires, Argentina.

17        Q.    May I have your address, please?

18        A.    Avenida Dorrego, as in A-V-E-N-I-D-A, Dorrego,

19   D-O-R-R-E-G-O, 1869 Segundo, as in number 2 with a

20   little O, P-I-S-O, F, Buenos Aires, Argentina.

21        Q.    Is that a single-family home?

22        A.    I live alone there.

23        Q.    Is it a house or a condominium or an

24   apartment?

25        A.    It's a building that has several apartments,



Page 7

```
 1   and I live in one of the apartments.
 2        Q.   Do you own the apartment?
 3        A.   Yes.
 4        Q.   What is your citizenship status?
 5        A.   In Buenos Aires, legal.
 6        Q.   You're an Argentinian citizen?
 7        A.   Yes.
 8        Q.   Do you carry an Argentinian passport?
 9        A.   Yes.
10        Q.   Do you have any citizenship status or
11   residency status in the United States?
12        A.   No.
13        Q.   Have you ever sought any residency or
14   citizenship status in the United States?
15        A.   No.
16        Q.   Do you have any desire to seek residency or
17   citizenship status in the United States?
18        A.   No.
19        Q.   Do you have any assets in the United States?
20        A.   No.
21        Q.   Have you ever had any assets in the United
22   States?
23        A.   The 01 Visa, the -- the one for talent.
24        Q.   Do you consider that an asset?
25        A.   It's something good for me.
```



Page 8

```
 1        Q.    Okay.  When I asked you, do you have any
 2   assets in the U.S., what I meant was, do you have any
 3   real estate?  Do you own any cars?  That's what I mean
 4   by an asset.
 5        A.    Okay.  Personally?  No.
 6        Q.    In any fashion?  Indirectly?
 7        A.    Through the company?  Yes.
 8        Q.    Okay.  What's the name of the company?
 9        A.    Meltorme, LLC.
10        Q.    And what does Meltorme, LLC, own?
11        A.    It's a one-one.  I think that's what it's
12   called.  It's in a one-one apartment.
13             COURT REPORTER:  May I have the spelling for
14        the apartment?  I mean, for the Tome?  Meltorme.
15             MR. HUDSON:  It's in the notice.
16             MR. VAZQUEZ:  It's on the notice.
17             THE INTERPRETER:  M-E-L-T-O-R-M-E.  It's a
18        famous entertainer.
19             MR. HUDSON:  Well, I'm actually going to ask
20        that question.
21   BY MR. HUDSON:
22        Q.    Where did the name Meltorme come from?
23        A.    My favorite movie.
24        Q.    What's the movie?
25        A.    Top secret.
```



Page 9

1       Q.   Do you know that there's a famous singer in

2   the United States named Mel Torme?

3       A.   Yes.  I am a singer, and that's why I do.

4       Q.   I was right.  The young people don't know who

5   Mel Torme is.

6       A.   I have a -- a very old soul.

7       Q.   Good.  So do I.  Okay.  Who owns Meltorme?

8       A.   My female cousin, Valeria Galante (phonetic).

9   She's American.  She's a citizen.  And I, Andy, or

10  Andres, Ini.

11      Q.   You own 99 percent; she owns 1 percent?

12      A.   Correct.

13      Q.   And you opened that company in about January

14  of 2020?

15      A.   Exactly.  Capital Force -- Capital Force

16  opened it for me.

17      Q.   Okay.  Who at Capital Force opened it for you?

18      A.   An employee by the name of Diego Gomez,

19  together with the attorneys who were working there.

20      Q.   Attorneys working where?

21      A.   Well, according to Diego Gomez, the attorneys

22  either for the company or attorneys who were advising

23  the company were the ones in charge of opening the LLC.

24      Q.   Was that Jennifer Snyder?

25      A.   I don't know that.  I only spoke with Diego



1    Gomez.

2         Q.    Okay.   How did you know Diego Gomez?

3         A.    So that was back in 2016.   When I met Diego, I

4    did a show for his dad in Colonia, C-O-L-O-N-I-A,

5    Uruguay.   And at the time, the dad introduces me to

6    Diego.   He said that was his son who was living in the

7    U.S.   And because I was already set to go on vacation in

8    Miami in January, he put me in contact with his son so I

9    would have a friend here.

10        Q.    The vacation was in 2016?

11        A.    No.   They were in 2017, but I met Diego in

12   2016.

13        Q.    Right.   Did you meet him when you were in

14   Miami on vacation in 2017?

15        A.    I met him in 2016 at the event in Uruguay.

16        Q.    Right.   And then did you come to Miami in 2017

17   on vacation?

18        A.    Correct.

19        Q.    Did you meet Diego in Miami when you were here

20   on vacation?

21        A.    We got together one time to eat something over

22   at a Dennis restaurant.

23             MR. VAZQUEZ:   Was it Denny's or Dennis?

24   BY MR. HUDSON:

25        Q.    Spell it?



Page 11

```
 1       A.   The one that's cheap.  The one that's yellow
 2  and red, the one that gives you cholesterol.
 3            MR. HUDSON:  And I think they have Mel Torme
 4       playing on the sound system.  I told you I was
 5       going to be a comedian.
 6  BY MR. HUDSON:
 7       Q.   When did you first speak to Diego Gomez about
 8  Capital Force?
 9       A.   In 2017, when I asked him what he was doing
10  here in Miami, and he said that he was working for this
11  financial company.
12       Q.   And did he suggest in 2017 that you invest
13  with him?
14       A.   Yes.  He told me to invest with him, but back
15  then at that moment, I did not have money.
16       Q.   Did you ultimately invest with Diego's
17  company?
18            MR. VAZQUEZ:  Okay.  Object as to form of the
19       question.
20            MR. HUDSON:  You can answer.
21            MR. VAZQUEZ:  Once in a while I may object to
22       something.  That does not mean that you don't have
23       to answer.  It just -- you still have to answer the
24       question.
25            THE WITNESS:  Well, what did my attorney just
```



Page 12

```
 1        say to me?  He talked to me in English.

 2             MR. HUDSON:  Okay.  Stop.

 3             MR. VAZQUEZ:  Go ahead.

 4   BY MR. HUDSON:

 5        Q.   I'm going to do some ground rules, so we're

 6   all on the same page.  Okay.  Not your fault.  It's our

 7   fault.

 8        A.   Yes.  Okay.

 9        Q.   Have you ever been deposed before?

10        A.   No.

11        Q.   Okay.  This is a deposition.  This is what we

12   call a deposition.  So you're the witness, and I am

13   deposing you which means I'm asking you questions.  The

14   reason I'm asking you questions is because you have sued

15   my clients alleging that they defrauded you.

16             Are you aware of that?

17        A.   Yes.

18        Q.   Okay.  In front of you have a binder that has

19   a copy of the lawsuit where you are suing my clients.

20   I'd like you to open it up.  You can look through it,

21   and tell me if you've ever seen it before.

22        A.   Yes.  It's in English.

23        Q.   Do you read English?

24        A.   I don't understand English very well.  A few

25   odds and ends that I can read to -- to get by.  Is there
```



```
1   any segment here you'd like me to read?

2        Q.   Not yet.  I just want to know if you recognize

3   that lawsuit that your lawyer filed on your behalf?

4        A.   Of course.

5             MR. HUDSON:  All right.  So let's mark that

6        binder as -- I don't remember what we are calling

7        this.

8             Defendants.  We'll mark them Defendants' with

9        numbers.  We'll mark this as Defendants' 1 for this

10       depo.

11            (Thereupon, Defendants' Exhibit 1 was marked

12   for identification.)

13   BY MR. HUDSON:

14       Q.   Please hand me the binder.  You'll get it

15   back.

16       A.   What is that ticket they're putting on it?

17       Q.   It's so that when we use this -- if we use

18   this deposition in court, we now know what it is you're

19   looking at.

20       A.   Okay.

21       Q.   When this deposition is finished, she will

22   send me, and she'll send your lawyer a copy we can read.

23   And the exhibits will be attached.

24       A.   Yes.

25       Q.   So a deposition is when one of the parties --
```



Page 14

```
 1   any one of the parties can take a deposition.  Asks the
 2   witnesses -- you're a witness.  You're also a party for
 3   any factual information they have to support their
 4   claims in the lawsuit.
 5        A.   Very well.
 6        Q.   There's no judge here.  There's no jury here.
 7   I'm not here to trick you.  I'm not here to try to win
 8   my case today.  I'm just here to get the facts that you
 9   have that support your position.  If I ask you a
10   question you don't understand, tell me you don't
11   understand it, and I will ask it a different way.
12        A.   Okay.  Very well.
13        Q.   I don't want you to guess, and your lawyer
14   doesn't want you to guess.  If you don't know the
15   answer, just say, I don't know.  If you don't remember
16   the answer, just say, I don't remember.  I may be able
17   to show you something that will help your memory, I may
18   not.  You can take a break at any time, but if I have
19   asked you a question, you must answer the question
20   before you take a break.
21        A.   All right.
22        Q.   Because you do speak a little English, if you
23   feel the interpreter has not correctly interpreted your
24   answer, please let us know, and we'll try to work that
25   out.
```



```
 1        A.    Very well.
 2        Q.    Okay.  So let's keep going.  What is your
 3   educational background?
 4        A.    I have an undergraduate degree in social
 5   communication.  I graduated from the University of
 6   Buenos Aires.  And I work in radio, television, and
 7   theater.
 8        Q.    What year were you born?
 9        A.    1979.
10        Q.    So once you graduated, what was your first
11   job?
12        A.    Television script writer.
13        Q.    Okay.  Since your first job, have all of your
14   subsequent jobs been in the entertainment field?
15        A.    No.  I also was selling cloth.  I was a
16   textile salesperson.
17        Q.    The warp and the woof.  Tell me --
18              THE INTERPRETER:  Jennifer is going to have
19        difficulty with that.
20              MR. HUDSON:  There may not be a translation.
21              THE INTERPRETER:  Repeat.
22   BY MR. HUDSON:
23        Q.    Does he know the word warp, W-A-R-P?
24        A.    No.
25        Q.    It's a type of weave for cloth.  One direction
```



```
1    is the warp; one is the woof.  You learn a lot in my

2    business.

3        A.    I was selling just plain cloth for pants and

4    then finer cloth for the polo shirt and so on.

5        Q.    Okay.  How long did you do that?

6        A.    I did it for three years.

7        Q.    And then what did you do after that?

8        A.    I started doing standup and radio.

9        Q.    You think I have a chance?

10       A.    As soon as I saw you, I realized that you

11   would be an excellent partner.

12       Q.    I'm the straight man.

13       A.    I -- so on -- on -- when you have a dual with

14   -- with two comedians, there's always one who's a

15   serious guy and the other one who that -- makes the

16   jokes.

17       Q.    We call it the straight man.  I'm the straight

18   man.

19       A.    If one day you want to leave your profession,

20   I invite you to come to the theater with me.

21       Q.    I'm Dean Martin.  Do you know Dean Martin?

22             Okay.  So once you started the comedy standup

23   three years after the textile business, has every job

24   been in the entertainment field since then?

25       A.    Yes.
```



Page 17

1      Q.   Do you have -- other than this Capital Force

2  transaction, do you have any other types of investments

3  or situations where you have put money into hoping for a

4  positive return?

5      A.   No.  No.

6      Q.   Do you have a business manager?

7      A.   No.  No.

8      Q.   Do you have an --

9      A.   No.  No.

10     Q.   I'm sorry.  When you talked about Meltorme,

11  did you sell say Meltorme owned a one-bedroom apartment

12  in Miami?

13     A.   Yes.  Because my female cousin does real

14  estate.

15     Q.   Okay.  And that apartment has nothing to do

16  with Capital Force, correct?

17     A.   Nothing.

18     Q.   Do you know who Jonathan Culley is?

19     A.   He -- he worked for Capital Force.

20     Q.   Have you ever met Jonathan Culley?

21     A.   No.  I only got together in person with Matias

22  Costantini.

23     Q.   And so do you know who Juan Cruz Talia Brown

24  is?

25     A.   I know he works over at Capital Force, but he



Page 18

1    wasn't there at that meeting with Matias.

2        Q.   So you've never met him before either,

3    correct?

4        A.   Well, both Juan and Jon, I -- I learned of

5    them through conversations with Diego Gomez, but the

6    only one who I ever met in person was Matias.

7        Q.   Okay.  Do you recall ever communicating in any

8    other fashion, WhatsApp, e-mail, text, with Juan or Jon?

9        A.   Only with Matias.

10       Q.   So tell me when you first met Matias.

11       A.   So I first met Matias in January of 2020 at --

12   at his office on -- in Brickell, the Capital Force

13   offices for Brickell.  And he explained to me the

14   investments, the returns, and the options were

15   investments.

16       Q.   And that's before you invested, correct?

17       A.   At the same time.

18       Q.   Okay.  You should have exhibits toward the end

19   of that document.  It doesn't look like they're tabbed.

20   Maybe your lawyer can help you.

21           MR. HUDSON:  We're looking for Exhibits P, as

22       in Paul, and Q.  They're P and Q.

23           MR. VAZQUEZ:  It's this document here towards

24       the end.

25           THE INTERPRETER:  We have P --



Page 19

```
 1              MR. VAZQUEZ:  And I'm sorry, there's --
 2              MR. HUDSON:  There's two --
 3              MR. VAZQUEZ:  Oh, no.  I apologize.
 4              THE INTERPRETER:  Interpreter has P here.
 5              MR. VAZQUEZ:  P.  Yeah.  Let's start with P.
 6              THE INTERPRETER:  P.  Okay.
 7              MR. VAZQUEZ:  Here, do you want to put some
 8      stickers on those so you can find them easily?
 9              THE INTERPRETER:  I think that -- P.
10  BY MR. HUDSON:
11      Q.   Okay.  So what you're looking at is Exhibit P
12  -- I'm sorry.  Tab P to Exhibit 1 that we've marked in
13  this deposition.  Take a look at that document and tell
14  me if you recognize it.
15      A.   Should I read the whole thing?
16      Q.   Whatever you need to do to recognize the
17  document.
18      A.   What should -- what -- what do I have to do
19  with this?
20      Q.   The first document is called Secured Fixed
21  Interest Only Promissory Note.  Do you agree with that?
22      A.   Oh, a fixed -- a secured fixed interest?
23      Q.   Well, I'm asking you: Do you agree that's what
24  this document says?
25              MR. VAZQUEZ:  Object just to the form of the
```



Page 20

1       question.

2             You can answer.

3             THE WITNESS:  Honestly, my English is not good

4       enough to be able to respond to you, but I -- I can

5       respond to you based on what I spoke with Matias.

6   BY MR. HUDSON:

7       Q.   Okay.  Well, let's keep going.  This document

8   says that Meltorme, LLC, is lending to one of the

9   Capital Force entities, Capital Force, LLC, $180,000.

10  And under section 1, it says that Capital Force is to

11  pay ten percent fixed interest to Meltorme on the loan.

12  And above that, where it talks about Meltorme, it

13  defines Meltorme as "lender".

14            So do you recall lending Capital Force

15  $180,000 in January of 2020?

16      A.   I did not lend it to them, but rather I made

17  an investment.

18      Q.   Okay.  Well, this document says that Meltorme

19  loaned $180,000.  And if you look on Page 5 of that

20  document, Meltorme signed the document, and it appears

21  by Diego Gomez.

22            Do you see that?

23      A.   Diego Gomez was their employee.

24      Q.   I understand.  The corporate records of the

25  state of Florida show that Diego Gomez was a manager of



Page 21

1   Meltorme.  Do you know what that means?

2       A.   From what I gather, he was on both sides of

3   the counter.

4       Q.   Do you dispute that Diego Gomez was a manager

5   for Meltorme in January of 2020?

6       A.   Well, he's the one who set up the company, and

7   he put himself as a manager.  But we never talked about

8   a loan, but -- always of an investment.

9       Q.   Okay.  How many meetings did you have with

10  Matias?

11      A.   In person, I had one.  Like I said before,

12  around this time in January of 2020.

13      Q.   Who else was in that meeting?

14      A.   My girlfriend at the time.

15      Q.   Anybody else?

16      A.   Honestly, I don't remember whether or not

17  Diego Gomez was there.  I don't remember.  He might have

18  been.

19      Q.   Did Diego Gomez give you any information about

20  this opportunity?

21      A.   Both Diego and Matias Costantini showed me a

22  giant screen with a PowerPoint.

23      Q.   This promissory note that we're looking at is

24  attached to your lawsuit and is the basis for your

25  lawsuit.  So if you have any concerns with this



Page 22

1   promissory note, whether it wasn't signed appropriately,

2   you need to tell me what those concerns are today.

3        A.   I don't understand the question.

4        Q.   Okay.  Your lawyer, by attaching this to your

5   complaint, has taken the position that you're owed money

6   consistent with this document, this note.

7        A.   That's right.

8        Q.   Okay.  So you agree that this note is

9   enforceable against Meltorme?

10            MR. VAZQUEZ:  Object to the form of the

11       question.

12  BY MR. HUDSON:

13       Q.   You can answer.

14       A.   I don't understand the question.

15       Q.   Turn to the next Exhibit Q.  This is a second

16  secured fixed interest only promissory note.  It's for

17  $150,000.  It's dated January 24th, 2021.  How much was

18  your initial advance to the -- to Capital Force?

19       A.   The previous one?

20       Q.   180,000.

21       A.   Yes.  But can I add something?

22       Q.   You can ask.  I may not answer it, but go

23  ahead.

24       A.   The first time I got together with Matias, he

25  told me that the interest that I was going to get out of



Page 23

1  my investment was going to be ten percent.  I asked him,
2  could it be 12 percent?
3          He told me that the only way to get a higher
4  interest in, for example, 20 percent, was if I
5  participated in the greatest -- greater profits and also
6  the greater losses.  And because I did not want to
7  participate in the losses, I chose to go the safe route.
8          And that would've been ten percent without
9  risk, according to Matias' words, nevertheless.
10 Nevertheless, they lowered the interest rate to six
11 percent, and then to eight percent.  They never really
12 fulfilled the set interest rate.  All of only -- there
13 were only two months when they were paying ten percent.
14     Q.   Was there a time when you were given 30 -- you
15 asked for and were given $30,000 of your 180,000 back?
16     A.   I wanted everything back.  But what Diego
17 Gomez told me, he -- he said that you had to follow the
18 company and the capital of the investment that was made
19 by the investors there so that it would not be lost to
20 support the company, and that way we don't --would all
21 be safe.  And then that the main capital would not be
22 lost.  And for that reason, they could give me 30,000,
23 and for me to keep on waiting and trusting that
24 everything was going to turn out better.
25     Q.   Okay.  So you did receive 180, I'm sorry.  You



Page 24

1    did receive $30,000 back, correct?

2         A.    It was.  And -- and they ended up owing me

3    $150,000?

4         Q.    Correct.  And that's probably why this second

5    note was created, Exhibit Q.

6         A.    That is what I'm claiming.

7              MR. HUDSON:  Okay.  Yeah.

8              MR. VAZQUEZ:  Give me just a one-minute break.

9         I'm going to go to the restroom.

10             THE WITNESS:  Yeah.  Yes, I am tired.

11             COURT REPORTER:  Okay.  Off the record.  1:57

12        p.m.

13             (Off Record.)

14             COURT REPORTER:  It is 2:06 p.m.  We are back

15        on the record.

16   BY MR. HUDSON:

17        Q.    So according to your lawsuit, you borrowed,

18   I'm sorry, you loaned Capital Force $180,000, were

19   repaid 30, and now you are owed $150,000.  Do you

20   dispute that?

21        A.    I'm going to make it more exact.  In June of

22   2022, when they said that they were going to be paying

23   everything back little by little, I received a payment

24   of $1,500.  That -- and then that wasn't interest, but

25   rather part of the capital, according to them.  So the



Page 25

1   exact amount would be 148,500 to make everything very

2   clear.

3       Q.   Okay.

4       A.   Yeah.

5       Q.   The two promissory notes show that Capital

6   Force, LLC, owes the money to Meltorme.  Do you disagree

7   with that?

8       A.   They owe me money, correct.

9       Q.   Capital Force, LLC, does?

10      A.   They owe me money.  148,500, without taking

11  into account the interest from January of 2022 to the

12  present date.

13      Q.   But my point is, you advanced money from and

14  got an agreement to repay that money from Capital Force,

15  not my three individual clients, correct?

16      A.   There wasn't any repayment settlement.  There

17  wasn't any -- any proposal.

18      Q.   Did Matias Costantini ever personally agree to

19  repay you any money?

20      A.   No.

21      Q.   Did Juan Cruz Talia Brown ever agree to repay

22  you any money?

23      A.   I never actually spoke with Juan Cruz or Jon,

24  but Matias in 2022 said that he was going to pay

25  everyone.  He wasn't going to leave anyone hanging.



Page 26

1      Q.   Do you believe that was Matias Costantini

2  agreeing to pay you personally from his assets or to pay

3  you back from Capital Force?

4      A.   In the first meeting I had -- so -- so the --

5  the first meeting, we had -- 80 percent of the time he

6  spent the whole time saying -- showing off how rich he

7  was.  You know, he was one of the richest guys in

8  Argentina.  You know, they had a place in Key Biscayne,

9  had a Ferrari, a yacht.  And it was, you know, a wealthy

10  family, a very well-known family name.  And that family

11  name was a guarantee.

12     Q.   Okay.  Let's do it this way.  I need you to

13  answer the next question yes or no.  No explanation.

14  Once you answer yes or no, then you can explain if you

15  feel the need to explain.

16     A.   Yes.

17     Q.   Did Matias Costantini ever personally agree to

18  repay you personally, the money that you loan to Capital

19  Force, LLC?

20     A.   He did not use the word "personally."  The

21  only thing he said was he was going to pay.

22     Q.   I need you to answer the question yes or no.

23          MR. VAZQUEZ:  Object to the form of the

24          question.

25  BY MR. HUDSON:



Page 27

1      Q.   You can answer.

2           MR. HUDSON:  That doesn't sound like a yes or

3      no.

4           THE INTERPRETER:  During 2022, he said he was

5      going to pay.

6           MR. HUDSON:  Ms. Reporter, could you read the

7      question back again.

8           COURT REPORTER:  Read back the question?

9      Sure.  Give me one second.

10          (Thereupon, the reporter read the record as

11     requested.)

12     BY MR. HUDSON:

13          Q.   Yes or no?

14          A.   I don't know.

15          Q.   Do you have any evidence that Mr. Costantini

16     agreed to personally repay you the money that you loaned

17     to Capital Force?

18          THE INTERPRETER:  You want yes or no response,

19     or how do you want it?

20          MR. HUDSON:  However you want to give it.

21          THE WITNESS:  The -- the thing that happened

22     when I stopped receiving the money, or I was not

23     able to withdraw the money, I had a health problem

24     that I had a panic attack and a loss of hearing.

25     And because of that, my dad called Matias on the



Page 28

1          phone.  They spoke twice for a long time.  And

2          Matias always responded with tranquility that

3          everything had already been thought of, and

4          everything was going to be paid.  It was

5          transmitting tranquility.

6    BY MR. HUDSON:

7          Q.   Did Juan -- I need you to answer this question

8    yes or no.  Did Juan Cruz Talia Brown ever promise to

9    personally repay you the money you loaned to Capital

10   Force?

11         A.   No.

12         Q.   I need you to answer this question yes or no.

13   Did Jonathan Culley ever personally agree to repay you

14   any of the money that your company loaned to Capital

15   Force?

16         A.   No.

17         Q.   I need you to answer this question yes or no.

18   Did Juan Cruz Talia Brown ever make any representations

19   to you of any kind about the deal Where Meltorme loaned

20   Capital Force $180,000?  Cruz Talia Brown?

21         A.   Juan Cruz, no.

22         Q.   Did Jonathan Culley ever make any

23   representations to you about Meltorme's loan to Capital

24   Force; yes or no?

25         A.   No.



Page 29

1       Q.   Other than the presentation that Matias made

2   to you in the Brickell office when you met him in

3   person, did you rely on anything else when deciding to

4   make your loan to Capital Force?

5            MR. VAZQUEZ:  Object to the form of the

6       question.

7   BY MR. HUDSON:

8       Q.   You can answer.

9       A.   I did not understand the question well, but I

10  would like to add something.

11      Q.   No.

12           MR. VAZQUEZ:  No.  Just please answer the --

13      let him rephrase the question and answer.

14  BY MR. HUDSON:

15      Q.   At the meeting with Matias, you said they

16  showed you information on a screen, correct?

17      A.   Yes.

18      Q.   Were you given that information in any form

19  other than being shown it on a screen?

20      A.   I don't remember.

21      Q.   Okay.  What were you shown on the screen?

22      A.   That I was investing in an incredible business

23  with zero risk.

24      Q.   Do you recall what the prevailing

25  international interest rates were in January of 2020?



Page 30

```
 1            MR. VAZQUEZ:  Object to the form of the
 2      question.
 3            THE WITNESS:  I don't remember.
 4  BY MR. HUDSON:
 5      Q.   You know what the prime rate is?
 6      A.   I don't understand the question.
 7      Q.   You've never heard of the expression, "the
 8  prime rate of interest"?
 9      A.   I don't know the question.
10      Q.   Do you know what Treasury bills are?
11            MR. VAZQUEZ:  Object to the form of the
12      question.
13  BY MR. HUDSON:
14      Q.   Yes or no.  Do you know what Treasury bills
15  are?
16            MR. VAZQUEZ:  And for the record, U.S.
17      Treasury bills?
18            THE WITNESS:  If you want to explain to me
19      what that is, nope.
20  BY MR. HUDSON:
21      Q.   I just want to know if you know what it is.
22  Do banks in Argentina pay interest on accounts?
23      A.   Fixed term or buying bonds?
24      Q.   Well, bonds typically have a fixed term.  But
25  on an account, on a general savings account or checking
```



Page 31

1    account in Argentina, what would the rate have been that

2    bank would have paid you on that money in January of

3    2020?

4         A.   Argentina was never a secure country.  That's

5    why I invested in the U.S.

6         Q.   Well, to cut this short, the prevailing rate

7    of interest on a safe investment in January of 2022, for

8    instance, a Treasury, a United States Treasury bill,

9    which is guaranteed by the federal government, was two

10   percent.  And typically, as interest rates go up, they

11   go up because there's additional risk.  So the interest

12   rate that you were promised, ten percent, was five times

13   what the world believes would have been the return on a,

14   quote, "safe investment."

15        MR. VAZQUEZ:  Okay.  If there is a question,

16        I'll object to the form.

17   BY MR. HUDSON:

18        Q.   So did you really believe that you were

19   getting five times the market rate interest on a risk-

20   free investment?

21        A.   Well, that's what Matias Costantini explained

22   to me, looking straight into my eyes, that this was the

23   rate that he was going to pay and without any risk.  And

24   had it been otherwise, I would not have gotten -- paid

25   the investment.



Page 32

```
 1      Q.   How do you think COVID impacted businesses
 2  around the world?
 3          MR. VAZQUEZ:  Object to the form of the
 4      question.
 5          THE WITNESS:  Looking at -- looking at this
 6      from the standpoint of my investment -- so the car
 7      --
 8          THE INTERPRETER:  Interpreter needs
 9      clarification.  Okay.
10          THE WITNESS:  So -- so the -- the cars that
11      were a guarantee, they went up exponentially and
12      beyond that, the U.S.  Government -- Capital Force
13      for the context.  The U.S.  Government would
14      provide companies with money such as Capital Force
15      because of that international context.
16  BY MR. HUDSON:
17      Q.   How much money did the United States
18  government give Capital Force?
19          MR. VAZQUEZ:  Object to the form of the
20      question.
21          MR. HUDSON:  What's wrong with that?
22          MR. VAZQUEZ:  Which entity within the Capital
23      Force Group?
24          THE WITNESS:  Well, I don't know how much that
25      might -- might have been, but they were saying
```



```
 1        everything is going well, you know, everything is
 2        going well.  And that's what they would relay to
 3        me.
 4   BY MR. HUDSON:
 5        Q.    Tell me what it was Capital Force was using
 6   the money for?
 7        A.    In real terms, I don't know what they might
 8   have used the money for, but what they were saying is
 9   that they were going to use the money to loan to
10   individuals so they could buy a car.
11        Q.    And did you understand those individuals to be
12   lower income individuals with questionable credit
13   ratings?
14        A.    I don't know that, but what really draws my
15   attention is, why didn't they stop their operations
16   before if that was the case and because of -- they ended
17   up using all the capital.
18        Q.    Do you understand that the operations
19   regarding the actual loans were run by a company called
20   VSC and not Capital Force?
21        A.    They never let me know that.
22        Q.    Okay.  Well, that was in all of the materials
23   that they provided to anybody.  So you must not have
24   received those materials, correct?
25             MR. VAZQUEZ:  Object to the form of the
```



Page 34

1      question.

2  BY MR. HUDSON:

3      Q.   You can answer.

4      A.   I only based myself on what Matias said to me.

5      Q.   Okay.  And did Matias tell you that he was the

6  expert in subprime automobile lending?

7      A.   He told me he was an expert in finances who

8  had worked for Merrill Lynch.  And that to me said that

9  he would be good at managing the money.  He wasn't going

10  to do it badly.

11      Q.   Okay.  So let's be clear, all of the materials

12  that any, what you would call investor, including you

13  were given contained information that said that a

14  different company was running all of the day-to-day

15  operations of the automobile financing operation.

16          Earlier you testified that you didn't recall

17  if you received any of the materials that you were shown

18  on the screen.  Now that I've informed you of some of

19  the information that was in some of that, some of those

20  materials, does it help you remember whether you ever

21  received those materials or not?

22      A.   I gave the money to Capital Force, never to

23  Vehicle --

24      Q.   Solutions.

25      A.   Solutions.  And that -- that's what was



Page 35

1    mentioned when I spoke with Matias.

2        Q.   Okay.  Yeah.  Did you ever -- do you have any

3    recollection of ever receiving any written materials

4    from anybody about this investment?

5        A.   No.

6        Q.   So the only thing that you relied on -- I need

7    you to answer this, yes or no.  The only thing that you

8    relied on were the representations made by Matias

9    Costantini, correct?

10       A.   Yes.

11       Q.   Did you ever hire a lawyer to help you with

12   this transaction?

13       A.   Well, when they did not fulfill the terms.

14       Q.   No.  Before the notes were signed and before

15   the money was advanced, did you hire a lawyer to help

16   you with this?

17       A.   No.

18       Q.   So now, the only representations that you

19   relied on were the verbal representations of Mr.

20   Costantini.  So now we have a baseline, agreed?

21           MR. VAZQUEZ:  Object to the form of the

22       question.

23           You can answer, sir.

24           THE WITNESS:  So I base myself on the

25       conversation with Matias Costantini.  You know, we



Page 36

```
 1        had a talk, we got together, and we had a talk and
 2        there it was said that there was going to be there
 3        was not going to be any risk.  And additionally,
 4        also with what Diego Gomez said about investing
 5        there.
 6   BY MR. HUDSON:
 7        Q.   Why didn't you sue Diego Gomez?
 8        A.   They -- he was fired.
 9        Q.   Doesn't mean you can't sue him.  Do you know
10   what fraud is?
11        A.    It -- it sounds to me as if it's tricking
12   someone and diverting other funds that belong to
13   somebody else.
14        Q.   You are suing my three clients for fraud.
15             MR. VAZQUEZ:  Object to the form of the
16        question.
17   BY MR. HUDSON:
18        Q.   In the United States, that means that they
19   told you something that they knew when they told you was
20   untrue that caused you to give them money, and you lost
21   that money?
22        A.   Yes.  And I'm not the only one.  Several other
23   individuals went through the same thing.
24        Q.   Actually, I've taken the deposition of every
25   other Plaintiff, except you, and not one has had any
```



Page 37

```
 1   evidence of fraud so far.

 2           MR. VAZQUEZ:  If that's a question, I'll

 3       object to the form.

 4   BY MR. HUDSON:

 5       Q.   So let's find out what statements Matias

 6   Costantini made to you that --

 7           MR. VAZQUEZ:  I truly apologize to interrupt

 8       you.  I really have to go to the restroom and just

 9       give me 30 seconds.  I've been waiting --

10           MR. HUDSON:  --

11           MR. VAZQUEZ:  -- okay?  It's not in the middle

12       of an answer, so --

13           COURT REPORTER:  Okay.  Off the record.  2:39

14       p.m.

15           (Off Record.)

16           COURT REPORTER:  2:42 p.m.  We're back on the

17       record.

18   BY MR. HUDSON:

19       Q.   Do you know what a Ponzi scheme is?

20       A.   Yes.

21       Q.   What is it?

22       A.   To pay interest to the investments from money

23   paid by other investors rather than from money made out

24   of genuine investments.

25       Q.   Okay.  And what evidence do you have that any
```



Page 38

1   of the Capital Force Group did that?

2       A.   They were taking in money, right to the very

3   end, even when the business was going badly, and they

4   knew they were not going to be able to return that.

5       Q.   That wasn't my question.  My question is: What

6   evidence do you have that they were taking money from

7   one creditor and using it to pay another creditor?

8       A.   That's in the investigations.

9       Q.   Okay.  What investigations?

10      A.   The ones that we did collectively, all of the

11  affected parties, with the attorney.

12      Q.   What does that mean?

13      A.   When -- when the moment comes, the evidence

14  will be shown.

15      Q.   No.  I'm entitled to the evidence today.  Tell

16  me specifically what evidence you have seen or have that

17  my clients paid creditors with money from other

18  creditors?

19      A.   Well, how did they ever -- how were they ever

20  able to pay interest between 2020 and 2021 if the

21  business was already going badly, if not by taking money

22  from one investor and take -- paying it to another?

23      Q.   Answer the following question yes or no: Do

24  you personally have any evidence that my clients --

25  strike that.



Page 39

1          Do you personally have any evidence that
2   Capital Force or any of the Capital Force entities use
3   creditor money to pay other creditors?
4          MR. VAZQUEZ:  Object to form.
5          THE WITNESS:  I cannot respond yes or no
6      because I don't know.
7   BY MR. HUDSON:
8      Q.   So as we sit here today, you have no evidence
9   that my clients, or I'm sorry, that Capital Force used
10  money from one creditor to pay another.  You personally
11  have no such evidence, correct?  Yes or no?
12         MR. VAZQUEZ:  Object to form.
13  BY MR. HUDSON:
14     Q.   You're under oath.
15     A.   There's an article published in a Chilean
16  outlet that a Chilean fund was paid everything that was
17  owed to it.  How did they ever -- were they ever able --
18  what did -- what did they do to be able to pay for that?
19  And simultaneously, all guaranteed collateral and all
20  the money disappeared?
21     Q.   I'm going to move the strike that is
22  unresponsive.
23         So I want to ask you one more time.  I don't
24  want to have to go to the Judge and ask the Judge to ask
25  you.  So --



Page 40

```
 1            MR. VAZQUEZ:  I'm going to object to this last
 2       --
 3  BY MR. HUDSON:
 4       Q.   So --
 5            MR. HUDSON:  You're just making it worse.
 6            MR. VAZQUEZ:  I'm telling him to answer.  How
 7       am I making it worse?
 8  BY MR. HUDSON:
 9       Q.   So please answer my question simply yes or no.
10  As we sit here today --
11            MR. HUDSON:  Go ahead.
12  BY MR. HUDSON:
13       Q.   -- do you have any evidence other than the
14  article you just referenced that any of the Capital
15  Force entities used creditor money to pay other
16  creditors?
17            MR. VAZQUEZ:  Object to form.
18            Please answer the question.
19  BY MR. HUDSON:
20       Q.   Yes or no?  Yes, you have evidence?  Your
21  answer is yes?
22            MR. VAZQUEZ:  Object to the form.
23  BY MR. HUDSON:
24       Q.   Was your answer yes?
25            MR. VAZQUEZ:  Object to form.
```



Page 41

1           THE WITNESS:  I don't know.

2    BY MR. HUDSON:

3        Q.   So I've given you two choices: yes or no.  And

4    your answer is: I don't know, correct?

5        A.   I don't understand the question.  I don't know

6    what -- I don't understand what's happening.

7           MR. HUDSON:  Put a motion to compel here as

8           part of the transcript.

9    BY MR. HUDSON:

10       Q.   We're going to ask the Judge at some point to

11   compel you to answer the question directly.  And we will

12   not be able to finish your deposition today because of

13   that.  So you may get to come back to Miami for vacation

14   in the near future.

15       A.   Well, if you can repeat the question, because

16   I did not understand it --

17          MR. VAZQUEZ:  And hold on one second.  Note my

18          objection, okay?  That he answered -- my client,

19          Mr. Ini, on behalf of Meltorme, answered the

20          question the best he could.  And he's now asking to

21          rephrase the question he didn't understand.

22          MR. HUDSON:  I've asked it three times, and

23          he's avoided me three times.  I believe he's

24          intentionally avoiding the answer, so we'll let the

25          Judge deal with it.



Page 42

```
 1              MR. VAZQUEZ:  Okay.  Note for the record that
 2          I'm requesting that you call the Judge, if we can
 3          at this point, the magistrate, okay?  And we take
 4          it up with the magistrate now, considering that he
 5          traveled all the way from Argentina for the second
 6          time.
 7              And that the discovery deadline is presently
 8          set for July 1st, and that Plaintiff's Counsel does
 9          not agree to any further extensions of discovery at
10          this point for any of the parts.
11  BY MR. HUDSON:
12      Q.   So earlier we've discussed --
13              MR. VAZQUEZ:  Are we calling it off, or are we
14          going forward?
15              MR. HUDSON:  No, we're going forward.
16              MR. VAZQUEZ:  Okay.
17              MR. HUDSON:  I'm going to get as much as I can
18          because I may not get another shot at him.
19  BY MR. HUDSON:
20      Q.   So we -- earlier we talked about what fraud
21  is, and we generally agreed that fraud was an
22  intentional misrepresentation that harmed you.  So what
23  we need to do now is to go through each and every
24  representation that Matias made to you that you
25  considered to have been fraudulent when he made it at
```



Page 43

1    that meeting in Brickell.

2            So tell me -- start with whichever one you

3    want.

4        A.   The option he gave me of investing and getting

5    a ten percent return -- interest, that was the option

6    with no risk.  If I wanted to earn more money, for

7    example, an approximately 20 percent, that would be to

8    go in as a partner, both in losses or in further gains.

9            So I opted for the option without risk.

10   Nevertheless -- nevertheless, I only got ten percent

11   interest for two months, then they reduced it to six,

12   and then to eight.  But if I wanted to earn more, we

13   also had the option to bring in more investments who

14   would provide them with more money.  And then there he

15   would give me one -- he could give me one point for each

16   investor, but I never took anyone.

17       Q.   So he gave you a fixed interest option or a

18   profit option that had a higher rate of return, correct?

19       A.   I chose the one that was fixed and without

20   risk.

21       Q.   Understood.  And the other option was a profit

22   option.  You would have to share in the profits, but the

23   profit option had risk, correct?

24       A.   That -- that option would've been a greater

25   profit, but with risk.  And I said no to that.



Page 44

```
 1      Q.   You agree that under the option that you

 2 chose, you were never entitled to any profit of Capital

 3 Force, correct, simply a fixed return?

 4      A.   Force?

 5           MR. VAZQUEZ:  Object to the form.

 6 BY MR. HUDSON:

 7      Q.   Did he answer?

 8      A.   Well, the option was to get a fixed rate.  But

 9 nevertheless, they unilaterally lowered it.

10           MR. HUDSON:  Motion to strike.  Unresponsive.

11           MR. VAZQUEZ:  What was the question?

12 BY MR. HUDSON:

13      Q.   Listen to my question and answer it.  Under

14 the option you selected, you would agree with me that

15 you were not entitled to any profits of Capital Force,

16 correct?  Answer yes or no.

17      A.   Interests or profit?

18      Q.   Read the --

19           MR. VAZQUEZ:  I'm going to object to the form

20      of the question.

21           MR. HUDSON:  Ms. Reporter, read it back to

22      him.

23           (Thereupon, the reporter read the record as

24 requested.)

25           THE WITNESS:  I don't understand the question.
```



Page 45

1       They were going to give you ten percent in

2       interest.

3   BY MR. HUDSON:

4       Q.   Which means you're not entitled to any profit,

5   right?  You're only entitled to interest, correct?  Yes

6   or no?

7            MR. VAZQUEZ:  I'm going to object -- give me

8       one second.

9            Did you note my objection?

10           COURT REPORTER:  I'm sorry.

11           MR. VAZQUEZ:  My objection is that I object as

12      to the way the question is being asked to -- please

13      note that I believe Mr. Hudson is raising his

14      voice, and I ask that he please not do so.

15           MR. HUDSON:  And I believe the witness is

16      being coached and every time the form objection is

17      made, he's changing his response and his answer.  I

18      also believe that he's being intentionally evasive

19      and refusing to answer very simple questions.

20      Magistrate Judge will ultimately make that

21      decision.

22           Ms. Reporter, read the question back again,

23      please.

24           MR. VAZQUEZ:  Ms. Reporter, for the record --

25      okay.  Let it be noted that the only objections



Page 46

1         that Gerardo Vazquez as Plaintiff's counsel has

2         raised have been objections strictly related to the

3         form of the question.

4                  COURT REPORTER:  Okay.  I'm going to read

5         back.

6                  (Thereupon, the reporter read the record as

7    requested.)

8                  THE WITNESS:  Interest.

9    BY MR. HUDSON:

10        Q.    That's not yes or no.

11        A.    Have them explain to me what's the difference

12   between interest and profits.

13        Q.    Okay.  Let's add that to the motion to compel.

14   On Page 7 of the complaint in front of you, it's -- no.

15   It's way in the beginning.  You got to go to the

16   beginning.

17        A.    Oh, the beginning.

18        Q.    In the lawsuit.  Those are exhibits.

19        A.    Right.  Right.  Right.  Right.  Okay.  So

20   we're going to Page 7 of the --

21        Q.    Yeah.  There's pages on the bottom -- page

22   numbers on the bottom.

23        A.    Yeah.  Okay.  7.  All right.  Very good.  6.

24   7.  There you go.

25        Q.    You don't read English, correct, sir?



Page 47

1       A.    Correct.

2       Q.    Okay.  In Paragraph number 24, there's an

3    allegation that the Capital Force entities tricked you

4    somehow.  One of the ways it says they tricked you was

5    telling you that the money was only going to be used for

6    purchasing car loans.

7            Do you believe that's one of the ways you were

8    tricked?

9       A.    One of the ways.

10      Q.    Okay.  And what evidence do you have today

11   that they used any of your money for buying anything

12   other than car loans?

13      A.    Through the bank statements and the financial

14   transactions -- banking financial transactions that my

15   attorney was able to get.

16      Q.    So you've never seen those bank statements or

17   other documents that you're referencing, correct?

18      A.    No.  My attorney.

19      Q.    On the next page, Paragraph 28.  In 28, you

20   allege, through your lawyer, that my clients concealed

21   material facts.

22            As you sit here today, what material facts did

23   they conceal from you before you funded your $180,000?

24      A.    That the business was not secure, and it was

25   doing badly.



Page 48

```
 1        Q.    What evidence do you have that the business
 2   was doing badly in January of 2020?
 3        A.    Telephone conversations that my dad had with
 4   Matias.
 5        Q.    You said the telephone conversations were much
 6   later when they didn't pay you back?
 7        A.    Yes.
 8        Q.    I'm asking you: Before you put the original
 9   money in, what material facts did they admit --
10        A.    No.  Back then it was going fantastically.
11        Q.    Okay.  So in January 20 of '20, the business
12   were doing okay, right?
13        A.    Yeah.  According to Matias and Diego,
14   excellent.
15        Q.    Would it surprise you that the tax returns for
16   2019 show that Capital Force entities were very
17   profitable?
18              MR. VAZQUEZ:  I'm going to object to the form
19        of the question.
20   BY MR. HUDSON:
21        Q.    You can answer.
22        A.    If it would surprise me?  That is an emotion.
23   No.  No.  That's what they said.  That would not
24   surprise me.
25        Q.    When do you think the companies began to have
```



Page 49

1    financial trouble?

2        A.   I don't know.  But if they're having financial

3    problems, you know, they -- they stop the ball, and they

4    talk with the investors.  The money doesn't disappear

5    out of the blue.

6            MR. VAZQUEZ:  Can we go off the record one

7        second?  And what -- I'm going to just tell him to

8        refocus a little bit on trying to listen to the

9        question, ask and answer the question.

10           MR. HUDSON:  Okay.

11           MR. VAZQUEZ:  Because I understand --

12           MR. HUDSON:  Why don't you take him outside

13       and have a conversation?

14           MR. VAZQUEZ:  I don't mind saying it here.

15           MR. HUDSON:  Okay.

16           MR. VAZQUEZ:  Whatever --

17           COURT REPORTER:  So let me go off record.

18           THE INTERPRETER:  Yeah.  We're off the record.

19           MR. VAZQUEZ:  --

20           COURT REPORTER:  Off the record.

21           (Off Record.)

22           COURT REPORTER:  Back on the record.  3:13

23       p.m.

24    BY MR. HUDSON:

25        Q.   Okay.  So back to Paragraph 28 of Exhibit 1.



Page 50

```
 1   Are you alleging that my clients concealed material

 2   facts from you about the financial condition of the

 3   company prior to your investment?

 4        A.   No.

 5        Q.   Okay.  Where did you -- strike that.

 6             Do you know where you wired the $180,000?

 7        A.   To the escrow account that they provided me

 8   with.

 9        Q.   And that was an attorney's escrow account,

10   correct?

11        A.   Yes.

12        Q.   Did you ever meet that lawyer?

13        A.   No.

14        Q.   Did you ever communicate with that lawyer in

15   any fashion?

16        A.   No.

17        Q.   Did you ever pay that lawyer any money?

18        A.   No.

19        Q.   What other misrepresentations do you believe

20   Matias Costantini made to you prior to your advancing

21   your $180,000 loan through Meltorme?

22        A.   I don't recall.

23        Q.   Turn to Page 13.  Have you ever seen that flow

24   chart before?

25        A.   I think the day that I got together with
```



Page 51

1    Matias, this is what they put on the screen.  You know,

2    I'm not sure, but I think this is the one.

3         Q.   That's one of the pages of the PowerPoint you

4    were seen shown, correct?

5         A.   Among many -- many pages.  I think this was

6    one of them because of the format.  It has.

7         Q.   If you look at this flow chart, you'll see

8    three blue balloons on the left and three blue balloons

9    toward the right.  I just pointed to them.

10            Do you see those?

11        A.   Yes.

12        Q.   Okay.  Underneath the three on the right, it

13   says, quote, "VSC acquires notes originated according to

14   VSC and CFF's underwriting policies," close quote.  See

15   that?

16            And below that in a rectangle, there are the

17   words, quote, "Vehicle Solutions Corporation" and below

18   that, "VSC," in parentheses.

19            Do you know what any of that means?

20        A.   I suppose this might be -- be the partner that

21   Capital Force had.

22        Q.   Did you ask any questions about that when you

23   were shown this flow chart?

24        A.   No.  I only based myself on Capital Force.

25        Q.   But you were aware then prior to your



Page 52

1    investment that it had a partner VSC, correct?

2         A.    That was not focused on.

3         Q.    By you?

4         A.    The party?  No.  No.

5         Q.    Next page, Page 51 -- I'm sorry.  Paragraph

6    51, Page 14.  The last sentence in Paragraph 51 says,

7    "In reality, the actual default rate was actually close

8    to 30 percent."

9              As you sit here today, do you have any

10   information or evidence to support that statement?

11        A.    No.  No.

12        Q.    Go to Paragraph 54 on that same page.  I am

13   going to read it.  Quote, "Costantini and Brown also

14   represented to investors that their principle and

15   interest payments were safe, guaranteed, and protected

16   by the profit Capital Force generated from high interest

17   rates," parenthesis, "in excess of 20 percent," close

18   parenthesis, "Capital Force charged car loan borrowers."

19        A.    Yes.

20        Q.    As you sit here today, do you have any

21   evidence that statement is untrue?

22        A.    No.  No.

23        Q.    As you sit here today, do you have any

24   evidence that Capital Force used the money from

25   creditors to fund luxury vacations, ski trips, buying



Page 53

```
 1  boats, or exotic luxury cars?
 2       A.   Because the -- no.  I don't have that
 3  information.  I don't have that now.
 4       Q.   Have you ever personally seen any such
 5  information?
 6       A.   No.  No.
 7       Q.   Other than the article that you referenced in,
 8  I believe it was either an Argentinian or Chilean paper,
 9  do you have any evidence that Capital Force F1 or the
10  Chileans were paid 100 percent of their investment?
11       A.   Any other evidence, no.
12       Q.   Okay.  Do you know what the term collateral
13  means?
14       A.   Could that be just, like, a backing and a
15  guarantee.
16       Q.   That's one way to look at it.  Were you
17  promised collateral for your loan from Meltorme?
18       A.   Cars.
19       Q.   Okay.  Were you given that collateral?
20       A.   I asked for it, but no.
21       Q.   Did they tell you why they didn't give it to
22  you?
23       A.   No.  No.
24       Q.   One of the allegations in your lawsuit is that
25  Capital Force used your collateral to pay off other
```



Page 54

1   creditors.  Do you have any evidence of that as you sit

2   here today?

3        A.   Not here.

4        Q.   Anywhere?

5        A.   No.  More than the notes that I mentioned

6   before, no.

7        Q.   Have you personally ever seen any evidence

8   that my clients or Capital Force sold any collateral

9   that belonged to you to anybody else?

10       A.   No.  No evidence.

11       Q.   You were in Argentina when COVID began,

12  correct?

13       A.   In March, I was in Argentina.

14       Q.   Okay.  And did you leave Argentina from the

15  beginning of March of 2020 to the end of 2020?

16       A.   That was prohibited.  No.

17       Q.   Right.  And were people in Argentina prevented

18  from going to work for most of 2020?

19       A.   Home office.

20       Q.   Most people worked from home, correct?  Do you

21  think it was any different in the United States?

22       A.   The lockdown in the U.S. lasted a lot less

23  than in Argentina.

24       Q.   When do you recall the lockdown began in the

25  United States?



Page 55

```
 1        A.    They delayed it as long as possible, and they
 2   lifted it as soon as possible, but I don't recall the
 3   dates.
 4        Q.    Okay.  Would you agree it was several months?
 5              MR. VAZQUEZ:  Object to the form.
 6              THE WITNESS:  I don't know what several months
 7        are.
 8   BY MR. HUDSON:
 9        Q.    Okay.
10        A.    Yeah.
11        Q.    Would you agree that people couldn't go to
12   work in the United States because they couldn't use
13   their cars to go to work in the United States, at least
14   at some point during 2020?
15        A.    At some point, I suppose, yes, but I don't
16   know for how long.
17        Q.    Okay.  And if the people that were buying
18   these car loans were lower income folks, do you think
19   they would spend money on buying food or paying their
20   car loan?
21        A.    Well, that depends on each person.
22        Q.    So there's a circumstance that if you were a
23   lower income person, that you would make your car
24   payment and not pay for food for your family and your
25   kids?
```



Page 56

1          A.    I can't imagine that because I would never ask

2    for a loan.

3               MR. HUDSON:  Guess I'll have to talk to his

4          girlfriend.

5    BY MR. HUDSON:

6          Q.    And do you think that the demand for cars

7    increased or decreased at the beginning of COVID?

8          A.    Well, I imagine that in 2020 it went down, and

9    then they went back up in 2021 because they had stopped

10   making cars in 2020.

11         Q.    I would agree with you.  That's inconsistent

12   with something you said earlier, though.  Right.  Turn

13   to Page 45.  On Page 45, beginning at the bottom and

14   going over to the next page is a discussion about a

15   phone call that you had with Costantini in December of

16   2019.  And the next page, Paragraph 183, has a list of

17   representations that you say were made during that phone

18   call.  So let's go through them briefly.

19               183A, "Capital Force had a longstanding track

20   record of being extremely profitable and maintained

21   ample reserves in the extremely unlikely event of any

22   short falls."

23               You understand that?

24         A.    Yes.

25         Q.    Okay.  And I think we talked about, maybe 20



Page 57

1  minutes ago, that you believe that Capital Force was

2  profitable at least through early 2020, correct?

3       A.   Based on this conversation, yes.

4       Q.   Right.  And you have no evidence to show that

5  it wasn't profitable in either December of 2019 or

6  January 2020, correct?

7       A.   Of course I don't have any evidence.

8       Q.   Okay.  The next statement is, "Meltorme's

9  investment would be used exclusively to purchase car

10 loans, which would be acquired by Capital Force, and

11 thereafter, pledged in favor of Meltorme as collateral

12 for Meltorme's investment."

13           Understand that?

14      A.   Yes.

15      Q.   And we've talked a little bit about that

16 already today as well, correct?

17      A.   Yes.

18      Q.   And as you sit here today, you have no

19 evidence that that statement was untrue when made,

20 correct?

21      A.   I have no evidence.

22      Q.   Do you know what negligence is?

23      A.   Yes.

24      Q.   What is it?

25      A.   Negligence, I suppose, is to do something bad



Page 58

1  without the intent of doing so or because of incapacity.

2      Q.   Okay.  That's fair.  Do you think it's more

3  likely that my clients were negligent than intentionally

4  defrauded you?

5      A.   I don't have any evidence of that.

6          MR. VAZQUEZ:  That was -- I don't know.  Let's

7      rephrase the question.  Okay.  Just to make sure --

8  BY MR. HUDSON:

9      Q.   Looking back two or three years later today,

10  isn't it more likely that my clients may have ultimately

11  run the companies poorly because of COVID as opposed to

12  intentionally defrauding the creditors?

13          MR. VAZQUEZ:  I'm going to object to the form

14      of the question.

15          Please answer.

16          THE WITNESS:  I don't know.

17          MR. HUDSON:  All right.  Mr. Interpreter,

18      we're going to try to speed this up.  Instead of me

19      reading this into the record, I'm just going to ask

20      you to read to him 183C, as in Charlie.  Tell me

21      when you're done.

22          THE INTERPRETER:  Okay.  Interpreter will read

23      it into Spanish, 183C.

24          MR. HUDSON:  Yes.  Yes.

25  BY MR. HUDSON:



Page 59

1      Q.    You understand that?

2      A.    So before doing any kind of operation, they --

3  they would really take -- take a lot of care.

4      Q.    Do you have any evidence, as you sit here

5  today, that they -- that this statement was untrue when

6  made at the end of '19 or the beginning of 2020?

7      A.    No.  Because I wasn't in the business.  I

8  don't know that.

9      Q.    Okay.  So 183D, as in David, "They represented

10 that they had over 20 years of experience in the auto

11 finance industry."  Was that representation made to you?

12     A.    I -- I don't remember, but that -- that they

13 were experts in finances.  I don't know if it was

14 automobiles or something else.

15     Q.    Okay.

16     A.    Yeah.

17         MR. HUDSON:  The next one.  Go ahead.

18         THE INTERPRETER:  Interpreter will read 183D -

19 - E. E. E.

20 BY MR. HUDSON:

21     Q.    E. E.

22     A.    Yes.

23     Q.    Do you remember that representation being

24 made?

25     A.    Yes.



Page 60

```
 1        Q.    Do you have any evidence that it was untrue?
 2        A.    No.
 3              MR. HUDSON:   Next page.   Please read him
 4        number F.
 5   BY MR. HUDSON:
 6        Q.    Was that representation made to you by Matias
 7   before you funded?
 8        A.    I don't remember.
 9        Q.    Okay.   Do you have any evidence that that
10   statement was untrue, when made?
11        A.    No.
12              MR. HUDSON:   Okay.   Please read him -- or
13        translate G.
14   BY MR. HUDSON:
15        Q.    Do you ever recall that representation being
16   made?
17        A.    No.
18        Q.    The information that you were shown on the
19   screen in Miami in January of 2020, was it in English,
20   or Spanish?
21        A.    It was in English.
22        Q.    So you were less comfortable with that than
23   what -- it had been in Spanish, correct?
24        A.    Matias's personality convinced me.
25        Q.    No.   I think you've been pretty consistent in
```



Page 61

```
 1    saying, essentially, you relied on what Matias told you,
 2    verbally, on that phone call, and in that meeting, as
 3    opposed to anything else.
 4              Is that a fair statement?
 5         A.   Yes.  I trusted him.
 6         Q.   Do you understand that a representation made
 7    after you funded cannot be a basis for fraud?
 8         A.   What was that?
 9              MR. HUDSON:  Ms. Reporter?  We're on --
10              (Thereupon, the reporter read the record as
11    requested.)
12              THE WITNESS:  I didn't know that.
13    BY MR. HUDSON:
14         Q.   Well, think about it.  If you've already given
15    the money to me, I can't harm you anymore because you've
16    already lost your money -- this is why I think
17    negligence is more likely to be the explanation, here.
18    Fraud requires the misrepresentation to be the cause of
19    you giving me the money.
20         A.   But at that time, I was trusting.  In 2020,
21    there wasn't any problem.  And that's why, in 2021, I
22    renewed, after all of the talks.
23         Q.   But you had already funded the money.  The
24    renewal is meaningless because you'd already funded the
25    money.
```



Page 62

```
1        A.    I left it there so that they could continue
2   paying me interest.
3        Q.    So did everybody else.  And by the way, the
4   Chileans only received about 60 percent of their money
5   back, and they spent two years doing due diligence on
6   the company.
7        A.    The problem was in 2022, when everything
8   became known at.
9        Q.    We agree.  You're aware that we're suing our
10  partner for fraud, correct?
11       A.    Yes.
12       Q.    Do you know what the ABCs are?  ABC.  When we
13  talk about the ABCs, you know what they -- what that
14  means?
15       A.    I believe it's -- that would be a -- a third,
16  indirect company that deals with liquidating companies.
17       Q.    Close.  In 2020 -- late 2021, or early 2022,
18  my clients became concerned with the truthfulness of the
19  information they were getting from their partners.  The
20  partner handled all the money and all the cars, and we
21  would get reports.  In April of 2020, we were told there
22  were $16 million worth of assets remaining.
23       A.    How much?
24       Q.    16 million.  In the late summer of 2022,
25  because my clients were concerned, they decided to file
```



Page 63

1    the ABC proceedings.  They did so because they wanted

2    the creditors, including you, to feel that there was a

3    third-party professional trying to get as much money --

4    to pay everybody back.

5           In September of 2022, when we filed the ABCs,

6    our partner told us the assets were now only $3 million.

7    The person in charge of the ABCs said there were zero

8    assets left when we filed the ABC.  Obviously, somebody

9    was lying.  We have concerns the ABC did not do its job,

10   and we have concerns that our client, our partner,

11   defrauded us, and that's why we are suing them.

12          Are you aware of any of that?

13     A.   Well, whatever is done to recover the money,

14   that would be well done.

15     Q.   We agree.

16          MR. HUDSON:  I am not going to bother with the

17        admissions.

18          MR. VAZQUEZ:  One minute to go to the

19        restroom?

20          MR. HUDSON:  Yeah.  Let's take a few minutes.

21        I'm almost done.

22          COURT REPORTER:  Off the record.  3:36 p.m.

23          (Off record.)

24          COURT REPORTER:  4:03 p.m.  We're back on the

25        record.



Page 64

1          MR. HUDSON:  Did you tell him, or do I need to
2      say it again?
3          Subject to the questions and the motion to
4      Compel, we're done for the day.
5          MR. VAZQUEZ:  Okay.  And for the record, once
6      again, my client has traveled from Argentina for
7      the second time.  He was the corporate
8      representative for the plaintiff, Meltorme, and it
9      is now 4:04 p.m. in the afternoon.  And Mr. Ini is
10     available until 5:00 to answer any questions or
11     have any questions asked again on behalf of
12     individual defendants.  So if Mr. Hudson is taking
13     a position that certain questions were not answered
14     by Mr. Ini, I encourage Mr. Hudson to re-ask those
15     questions at this moment.
16         MR. HUDSON:  Ms. Reporter, I asked you to mark
17     those.  Can you find them?
18         (Thereupon, the reporter played back the
19  record as requested.)
20         COURT REPORTER:  Is that where we want to
21     start?
22         MR. HUDSON:  Yeah.  Let's do that one.  Ready?
23         COURT REPORTER:  Yes.
24         MR. HUDSON:  Okay.  Go ahead and tell him --
25     read the question, please.  Yeah.  I want you to



Page 65

```
 1        read it not -- to refresh my recollection.  Just
 2        read it from the record so we have the exact
 3        question.
 4               COURT REPORTER:  Okay.  Hold on here.  Okay.
 5               "So as we sit here today, you have no evidence
 6        that Capital Force used money from one creditor to
 7        pay another?  You personally have no such evidence,
 8        correct?"
 9               (Thereupon, the reporter read the record as
10    requested.)
11               THE WITNESS:  No.
12               MR. HUDSON:  One down.
13               COURT REPORTER:  The next one after that, you
14        are asking, "Please answer my question.  Yes or no?
15        As we sit here today, do you have any evidence
16        other than the article that you just referenced,
17        that any of the Capital Force entities use
18        creditors or monies to pay other creditors?"
19               (Thereupon, the reporter read the record as
20    requested.)
21               MR. HUDSON:  I don't think -- no.  There was
22        another --
23               COURT REPORTER:  Another?
24               MR. HUDSON:  I'm okay with that because he's
25        answered that.  There was another one with a
```



Page 66

```
1        different subject matter.

2             THE WITNESS:  Possibly before.

3             COURT REPORTER:  Maybe a little before.

4             MR. HUDSON:  I made a little note.  But --

5        you're looking for motion to compel?

6             COURT REPORTER:  Yeah.  Shortly --

7             MR. HUDSON:  That's probably the way -- best -

8        -

9             COURT REPORTER:  But that's within the same

10       line of questioning.

11            MR. HUDSON:  Right.  But there was another one

12       with a different line that I added.  I think that

13       was the first one because I started with the Ponzi

14       scheme earlier.

15            COURT REPORTER:  I'm going to have to play it

16       just so I can.

17            MR. HUDSON:  That's fine.  Or look up "add

18       that" because I remember saying "add that" to the -

19       -

20            THE INTERPRETER:  I wrote down Ponzi here.  I

21       want to find that.

22            (Thereupon, the reporter played back the

23  record as requested.)

24            COURT REPORTER:  I think it was regarding the

25       profits when you started talking about --
```



Page 67

1           MR. HUDSON:  Yes.  That's exactly what it was.

2      All right.  I can try to re-ask it if you can't

3      find it.  I know what it is now.

4           COURT REPORTER:  Can I just read the last?

5           MR. HUDSON:  Yeah.  Go ahead.

6           COURT REPORTER:  It says, "Well, the options

7      was to get a fixed rate, but nevertheless, they

8      were unlikely lowered."  Hold on.  Let me play it.

9           (Thereupon, the reporter read the record as

10  requested.)

11           MR. HUDSON:  I think that's his answer.

12           COURT REPORTER:  Yeah.  That was his answer.

13           MR. HUDSON:  Yeah.

14           COURT REPORTER:  Yeah.  That was the question.

15           MR. HUDSON:  You were never entitled to

16      profit, just fixed rate.  So you want to read it,

17      or do you want me to ask it?

18           COURT REPORTER:  Oh, I'm sorry.  I thought you

19      were just asking.

20           MR. HUDSON:  No.  I'll ask it.  I'll ask it.

21           COURT REPORTER:  Okay.

22           MR. HUDSON:  Let's go.  Ready?

23  BY MR. HUDSON:

24      Q.   You've testified that you were given two

25  options by Mr. Costantini, a ten percent fixed rate or a



Page 68

1   higher rate with more risk, correct?

2       A.   Yes.

3       Q.   And you opted for the fixed rate, correct?

4       A.   Yes.

5       Q.   And therefore, you were not entitled to any

6   profit participation from my clients or CF, correct?

7       A.   Yes.

8            MR. HUDSON:  Okay.  We're done.  You don't

9       want to come back to Miami and see me again in a

10      week?

11           We're off the record.

12           THE WITNESS:  If we do --

13           COURT REPORTER:  Before --

14           THE WITNESS:  -- some show together.

15           COURT REPORTER:  -- I just need to do some

16      housekeeping.

17           This concludes today's deposition.

18           Will the witness read or waive?

19           MR. VAZQUEZ:  Waive.

20           COURT REPORTER:  And will there be any orders

21      at this time?

22           MR. HUDSON:  Me.

23           COURT REPORTER:  Is standard delivery okay?

24           MR. VAZQUEZ:  No.  I'll give it --

25           MR. HUDSON:  Standard for the moment.  Yeah.



Page 69

```
 1              COURT REPORTER:  And just to --
 2              MR. HUDSON:  We keep the exhibits.
 3              COURT REPORTER:  Okay.
 4              MR. HUDSON:  And we're -- we'll provide you
 5       with a subpoena.
 6              COURT REPORTER:  All right.  And we do have
 7       one --
 8              MR. VAZQUEZ:  You want my binder?
 9              COURT REPORTER:  -- exhibit.  This whole --
10       this is going to be one exhibit?
11              MR. HUDSON:  Yeah.  I think it was just this
12       one.
13              COURT REPORTER:  Okay.
14              MR. VAZQUEZ:  Phil, you want the binder?
15              MR. HUDSON:  No.  You can take it.
16              MR. VAZQUEZ:  Okay.
17              MR. HUDSON:  It's just Carlos I was giving a
18       hard time.
19              COURT REPORTER:  Okay.  Off the record at 4:14
20       p.m.
21              (Thereupon, the deposition was concluded at
22       4:14 p.m.)
23              (Reading and signing of the deposition
24       transcript was waived.)
25
```



Page 70

1                    CERTIFICATE OF OATH

2       STATE OF FLORIDA

3       COUNTY OF MIAMI-DADE

4

5            I, Jasmine Mercedes, Court Reporter, Notary

6       Public, State of Florida, certify that Andres Ini,

7       personally appeared before me on the 26th day of

8       June 2024, and was duly sworn.

9            Signed this 13th day of July 2024.

10

11

12

13       _____

14       Jasmine Mercedes, Court Reporter

15       Notary Public, State of Florida

16       Commission No.: HH 231847

17       Commission Expires: March 11, 2026

18

19

20

21

22

23

24

25



Page 71

1                    CERTIFICATE OF REPORTER

2          STATE OF FLORIDA

3          COUNTY OF MIAMI-DADE

4

5              I, Jasmine Mercedes, Court Reporter, certify

6          that I was authorized to and did report the

7          Deposition of Andres Ini; that a review of the

8          transcript was waived; and that the transcript is a

9          true and correct record of my notes.

10             I further certify that I am not a relative,

11         employee, attorney, or counsel of any of the

12         parties, nor am I a relative or employee of any of

13         the parties' attorneys or counsel connected with

14         the action, nor am I financially interested in the

15         action.

16             Dated this 13th day of July 2024.

17

18

19         _____

20         Jasmine Mercedes, Court Reporter

21

22

23

24

25



## A

**A-N-D-R-E-S**
6:11
**A-V-E-N-I-D-A**
6:18
**ABC**
62:12 63:1,8,9
**ABCs**
62:12,13 63:5,7
**able**
14:16 20:4 27:23
38:4,20 39:17,18
41:12 47:15
**above-styled**
1:25
**account**
25:11 30:25,25 31:1
50:7,9
**accounts**
30:22
**accurately**
4:7
**acquired**
57:10
**acquires**
51:13
**action**
71:14,15
**actual**
33:19 52:7
**add**
22:21 29:10 46:13
66:17,18
**added**
66:12
**additional**
31:11
**additionally**
36:3
**address**
6:17
**admissions**
63:17
**admit**
48:9

**advance**
22:18
**advanced**
25:13 35:15
**advancing**
50:20
**advising**
9:22
**afternoon**
4:2 5:21 64:9
**ago**
57:1
**agree**
19:21,23 22:8 25:18
25:21 26:17 28:13
42:9 44:1,14 55:4
55:11 56:11 62:9
63:15
**agreed**
27:16 35:20 42:21
**agreeing**
26:2
**agreement**
25:14
**ahead**
12:3 22:23 40:11
59:17 64:24 67:5
**Aires**
6:16,20 7:5 15:6
**allegation**
47:3
**allegations**
53:24
**allege**
47:20
**alleging**
12:15 50:1
**ALVARO**
2:10
**American**
9:9
**amount**
25:1
**ample**
56:21
**Andres**

**1:19 2:2 3:2 4:13**
5:11 6:11,11 9:10
70:6 71:7
**Andy**
9:9
**answer**
11:20,23,23 14:15,16
14:19,24 20:2 22:13
22:22 26:13,14,22
27:1 28:7,12,17
29:8,12,13 34:3
35:7,23 37:12 38:23
40:6,9,18,21,24
41:4,11,24 44:7,13
44:16 45:17,19
48:21 49:9 58:15
64:10 65:14 67:11
67:12
**answered**
41:18,19 64:13 65:25
**anybody**
21:15 33:23 35:4
54:9
**anymore**
61:15
**Aparisi-Winthuysen**
2:23 4:6
**apartment**
6:24 7:2 8:12,14
17:11,15
**apartments**
6:25 7:1
**apologize**
19:3 37:7
**appearances**
2:1 5:10
**appeared**
70:7
**appears**
20:20
**appropriately**
22:1
**approximately**
43:7
**April**
62:21

**Argentina**
6:16,20 26:8 30:22
31:1,4 42:5 54:11
54:13,14,17,23 64:6
**Argentinian**
7:6,8 53:8
**article**
39:15 40:14 53:7
65:16
**asked**
8:1 11:9 14:19 23:1
23:15 41:22 45:12
53:20 64:11,16
**asking**
12:13,14 19:23 41:20
48:8 65:14 67:19
**Asks**
14:1
**asset**
7:24 8:4
**assets**
7:19,21 8:2 26:2
62:22 63:6,8
**ASSOCIATES**
2:4
**attached**
13:23 21:24
**attaching**
22:4
**attack**
27:24
**attention**
33:15
**attorney**
11:25 38:11 47:15,18
71:11
**attorney's**
50:9
**attorneys**
9:19,20,21,22 71:13
**authorized**
71:6
**auto**
59:10
**automobile**
34:6,15



automobiles
59:14
available
64:10
Avenida
6:18
Avenue
2:5
avoided
41:23
avoiding
41:24
aware
12:16 51:25 62:9
    63:12

**B**

back
10:3 11:14 13:15
    23:15,16 24:1,14,23
    26:3 27:7,8 37:16
    41:13 44:21 45:22
    46:5 48:6,10 49:22
    49:25 56:9 58:9
    62:5 63:4,24 64:18
    66:22 68:9
background
15:3
backing
53:14
bad
57:25
badly
34:10 38:3,21 47:25
    48:2
ball
49:3
balloons
51:8,8
bank
31:2 47:13,16
banking
47:14
banks
30:22
base

35:24
based
20:5 34:4 51:24 57:3
baseline
35:20
basis
21:24 61:7
began
48:25 54:11,24
beginning
46:15,16,17 54:15
    56:7,13 59:6
behalf
2:2,12 5:11 13:3
    41:19 64:11
believe
26:1 31:18 41:23
    45:13,15,18 47:7
    50:19 53:8 57:1
    62:15
believes
31:13
belong
36:12
belonged
54:9
best
41:20 66:7
better
23:24
beyond
32:12
bill
31:8
bills
30:10,14,17
binder
12:18 13:6,14 69:8
    69:14
Biscayne
1:14 2:15 26:8
bit
49:8 57:15
blue
49:5 51:8,8
boats

53:1
bonds
30:23,24
born
15:8
borrowed
24:17
borrowers
52:18
bother
63:16
bottom
46:21,22 56:13
Boulevard
1:14 2:15
break
14:18,20 24:8
Brickell
2:5 18:12,13 29:2
    43:1
briefly
56:18
bring
43:13
Brown
1:10 2:13 5:15 17:23
    25:21 28:8,18,20
    52:13
Buenos
6:16,20 7:5 15:6
building
6:25
business
16:2,23 17:6 29:22
    38:3,21 47:24 48:1
    48:11 59:7
businesses
32:1
buy
33:10
buying
30:23 47:11 52:25
    55:17,19

**C**

C-O-L-O-N-I-A

10:4
C-U-L-L-E-Y
5:14
call
12:12 16:17 34:12
    42:2 56:15,18 61:2
called
8:12 19:20 27:25
    33:19
calling
13:6 42:13
capital
1:8,8 9:15,15,17 11:8
    17:1,16,19,25 18:12
    20:9,9,10,14 22:18
    23:18,21 24:18,25
    25:5,9,14 26:3,18
    27:17 28:9,14,20,23
    29:4 32:12,14,18,22
    33:5,17,20 34:22
    38:1 39:2,2,9 40:14
    44:2,15 47:3 48:16
    51:21,24 52:16,18
    52:24 53:9,25 54:8
    56:19 57:1,10 65:6
    65:17
car
32:6 33:10 47:6,12
    52:18 55:18,20,23
    57:9
care
59:3
Carlos
69:17
carry
7:8
cars
8:3 32:10 53:1,18
    55:13 56:6,10 62:20
case
1:3 14:8 33:16
cause
1:25 61:18
caused
36:20
certain



64:13
**Certificate**
3:5,6 70:1 71:1
**certify**
70:6 71:5,10
**CF**
68:6
**CFF's**
51:14
**chance**
16:9
**changing**
45:17
**charge**
9:23 63:7
**charged**
52:18
**Charlie**
58:20
**chart**
50:24 51:7,23
**cheap**
11:1
**checking**
30:25
**Chilean**
39:15,16 53:8
**Chileans**
53:10 62:4
**choices**
41:3
**cholesterol**
11:2
**chose**
23:7 43:19 44:2
**circumstance**
55:22
**citizen**
7:6 9:9
**citizenship**
7:4,10,14,17
**claiming**
24:6
**claims**
14:4
**clarification**

32:9
**clear**
5:8 25:2 34:11
**client**
41:18 63:10 64:6
**clients**
12:15,19 25:15 36:14
38:17,24 39:9 47:20
50:1 54:8 58:3,10
62:18,25 68:6
**close**
51:14 52:7,17 62:17
**cloth**
15:15,25 16:3,4
**coached**
45:16
**collateral**
39:19 53:12,17,19,25
54:8 57:11
**collectively**
38:10
**Colonia**
10:4
**come**
8:22 10:16 16:20
41:13 68:9
**comedian**
11:5
**comedians**
16:14
**comedy**
16:22
**comes**
38:13
**comfortable**
60:22
**Commission**
70:16,17
**communicate**
6:1 50:14
**communicating**
18:7
**communication**
15:5
**companies**
32:14 48:25 58:11

62:16
**company**
1:8 5:12 8:7,8 9:13
9:22,23 11:11,17
21:6 23:18,20 28:14
33:19 34:14 50:3
62:6,16
**compel**
41:7,11 46:13 64:4
66:5
**complaint**
22:5 46:14
**conceal**
47:23
**concealed**
47:20 50:1
**concerned**
62:18,25
**concerns**
21:25 22:2 63:9,10
**concluded**
69:21
**concludes**
68:17
**condition**
50:2
**condominium**
6:23
**connected**
71:13
**consider**
7:24
**considered**
42:25
**considering**
42:4
**consistent**
22:6 60:25
**contact**
10:8
**contained**
34:13
**context**
32:13,15
**continue**
62:1

**conversation**
35:25 49:13 57:3
**conversations**
18:5 48:3,5
**convinced**
60:24
**copy**
3:14 12:19 13:22
**corporate**
1:20 2:2 20:24 64:7
**Corporation**
51:17
**correct**
6:2,6 9:12 10:18
17:16 18:3,16 24:1
24:4 25:8,15 29:16
33:24 35:9 39:11
41:4 43:18,23 44:3
44:16 45:5 46:25
47:1,17 50:10 51:4
52:1 54:12,20 57:2
57:6,16,20 60:23
62:10 65:8 68:1,3,6
71:9
**correctly**
14:23
**Costantini**
1:9 2:12 5:14 17:22
21:21 25:18 26:1,17
27:15 31:21 35:9,20
35:25 37:6 50:20
52:13 56:15 67:25
**counsel**
5:9,17,24 42:8 46:1
71:11,13
**counter**
21:3
**country**
31:4
**COUNTY**
70:3 71:3
**course**
13:4 57:7
**court**
1:1,22 4:2,10,18 5:9
5:16 8:13 13:18



24:11,14 27:8 37:13
37:16 45:10 46:4
49:17,20,22 63:22
63:24 64:20,23 65:4
65:13,23 66:3,6,9
66:15,24 67:4,6,12
67:14,18,21 68:13
68:15,20,23 69:1,3
69:6,9,13,19 70:5
70:14 71:5,20
**cousin**
9:8 17:13
**COVID**
32:1 54:11 56:7
58:11
**created**
24:5
**credit**
33:12
**creditor**
38:7,7 39:3,10 40:15
65:6
**creditors**
38:17,18 39:3 40:16
52:25 54:1 58:12
63:2 65:18,18
**Cruz**
1:9 2:13 5:15 17:23
25:21,23 28:8,18,20
28:21
**Culley**
1:10 2:13 5:14 17:18
17:20 28:13,22
**cut**
31:6

——————
**D**
**D-O-R-R-E-G-O**
6:19
**dad**
10:4,5 27:25 48:3
**date**
25:12
**dated**
22:17 71:16
**dates**

55:3
**David**
59:9
**day**
16:19 50:25 64:4
70:7,9 71:16
**day-to-day**
34:14
**deadline**
42:7
**deal**
28:19 41:25
**deals**
62:16
**Dean**
16:21,21
**December**
56:15 57:5
**decided**
62:25
**deciding**
29:3
**decision**
45:21
**decreased**
56:7
**default**
52:7
**defendants**
1:11 2:12 13:8 64:12
**Defendants'**
3:12 13:8,9,11
**defines**
20:13
**defrauded**
12:15 58:4 63:11
**defrauding**
58:12
**degree**
15:4
**Delaware**
1:8,9
**delayed**
55:1
**delivery**
68:23

**demand**
56:6
**Dennis**
10:22,23
**Denny's**
10:23
**depends**
55:21
**depo**
13:10
**deposed**
12:9
**deposing**
12:13
**deposition**
1:18,24 4:11 12:11
12:12 13:18,21,25
14:1 19:13 36:24
41:12 68:17 69:21
69:23 71:7
**DESCRIPTION**
3:13
**desire**
7:16
**develop**
5:25
**Diego**
9:18,21,25 10:2,3,6
10:11,19 11:7 18:5
20:21,23,25 21:4,17
21:19,21 23:16 36:4
36:7 48:13
**Diego's**
11:16
**difference**
46:11
**different**
14:11 34:14 54:21
66:1,12
**difficulty**
15:19
**diligence**
62:5
**Direct**
3:4 5:19
**direction**

15:25
**directly**
41:11
**disagree**
25:6
**disappear**
49:4
**disappeared**
39:20
**discovery**
42:7,9
**discussed**
42:12
**discussion**
56:14
**dispute**
21:4 24:20
**DISTRICT**
1:1,1
**diverting**
36:12
**DIVISION**
1:2
**document**
18:19,23 19:13,17,20
19:24 20:7,18,20,20
22:6
**documents**
47:17
**doing**
4:23,23 11:9 16:8
47:25 48:2,12 58:1
59:2 62:5
**Dorrego**
6:18,18
**draws**
33:14
**dual**
16:13
**Duane**
1:14 5:13
**DUANNE**
2:14
**due**
62:5
**duly**



4:7,14 70:8

**E**

E
59:19,19,19,21,21
**e-mail**
18:8
**earlier**
34:16 42:12,20 56:12
66:14
**early**
57:2 62:17
**earn**
43:6,12
**easily**
19:8
**eat**
10:21
**educational**
15:3
**eight**
23:11 43:12
**either**
4:23 9:22 18:2 53:8
57:5
**emotion**
48:22
**employee**
9:18 20:23 71:11,12
**encourage**
64:14
**ended**
24:2 33:16
**ends**
12:25
**enforceable**
22:9
**English**
4:8,9,22,23 12:1,22
12:23,24 14:22 20:3
46:25 60:19,21
**entertainer**
8:18
**entertainment**
15:14 16:24
**entities**

20:9 39:2 40:15 47:3
48:16 65:17
**entitled**
38:15 44:2,15 45:4,5
67:15 68:5
**entity**
32:22
**escrow**
50:7,9
**ESQ**
2:10,20
**essentially**
61:1
**estate**
8:3 17:14
**evasive**
45:18
**event**
10:15 56:21
**everybody**
62:3 63:4
**evidence**
27:15 37:1,25 38:6
38:13,15,16,24 39:1
39:8,11 40:13,20
47:10 48:1 52:10,21
52:24 53:9,11 54:1
54:7,10 57:4,7,19
57:21 58:5 59:4
60:1,9 65:5,7,15
**exact**
24:21 25:1 65:2
**exactly**
9:15 67:1
**Examination**
3:4 5:19
**examined**
4:15
**example**
23:4 43:7
**excellent**
16:11 48:14
**excess**
52:17
**exclusively**
57:9

**exhibit**
3:14 13:11 19:11,12
22:15 24:5 49:25
69:9,10
**exhibits**
3:11,12,19 13:23
18:18,21 46:18 69:2
**exotic**
53:1
**experience**
59:10
**expert**
34:6,7
**experts**
59:13
**Expires**
70:17
**explain**
26:14,15 30:18 46:11
**explained**
18:13 31:21
**explanation**
26:13 61:17
**exponentially**
32:11
**expression**
30:7
**extensions**
42:9
**extremely**
56:20,21
**eyes**
31:22

**F**

F
6:20 60:4
**F1**
1:8 53:9
**facts**
14:8 47:21,22 48:9
50:2
**factual**
14:3
**fair**
58:2 61:4

**falls**
56:22
**family**
26:10,10,10 55:24
**famous**
8:18 9:1
**fantastically**
48:10
**far**
37:1
**fashion**
8:6 18:8 50:15
**fault**
12:6,7
**favor**
57:11
**favorite**
8:23
**federal**
31:9
**feel**
14:23 26:15 63:2
**female**
9:8 17:13
**Ferrari**
26:9
**field**
15:14 16:24
**file**
62:25
**filed**
1:24 13:3 63:5,8
**finance**
59:11
**finances**
34:7 59:13
**financial**
11:11 47:13,14 49:1
49:2 50:2
**financially**
71:14
**financing**
34:15
**find**
19:8 37:5 64:17
66:21 67:3



fine
66:17
finer
16:4
finish
41:12
finished
13:21
fired
36:8
first
4:5,14 11:7 15:10,13
18:10,11 19:20
22:24 26:4,5 66:13
five
31:12,19
fixed
19:20,22,22 20:11
22:16 30:23,24
43:17,19 44:3,8
67:7,16,25 68:3
Florida
1:1,15,23 2:7,17
20:25 70:2,6,15
71:2
flow
50:23 51:7,23
focused
52:2
folks
55:18
follow
23:17
following
38:23
follows
4:16
food
55:19,24
Force
1:8,8 9:15,15,17 11:8
17:1,16,19,25 18:12
20:9,9,10,14 22:18
24:18 25:6,9,14
26:3,19 27:17 28:10
28:15,20,24 29:4

32:12,14,18,23 33:5
33:20 34:22 38:1
39:2,2,9 40:15 44:3
44:4,15 47:3 48:16
51:21,24 52:16,18
52:24 53:9,25 54:8
56:19 57:1,10 65:6
65:17
form
11:18 19:25 22:10
26:23 29:5,18 30:1
30:11 31:16 32:3,19
33:25 35:21 36:15
37:3 39:4,12 40:17
40:22,25 44:5,19
45:16 46:3 48:18
55:5 58:13
format
51:6
forward
42:14,15
fraud
36:10,14 37:1 42:20
42:21 61:7,18 62:10
fraudulent
42:25
free
31:20
friend
10:9
front
12:18 46:14
fulfill
35:13
fulfilled
23:12
fund
39:16 52:25
funded
47:23 60:7 61:7,23
61:24
funds
36:12
further
42:9 43:8 71:10
future

41:14

---
**G**
---

G
60:13
gains
43:8
Galante
9:8
gather
21:2
general
30:25
generally
42:21
generated
52:16
genuine
37:24
Gerardo
2:10 5:12 46:1
getting
31:19 43:4 62:19
giant
21:22
girlfriend
21:14 56:4
give
21:19 23:22 24:8
27:9,20 32:18 36:20
37:9 43:15,15 45:1
45:7 53:21 68:24
given
23:14,15 29:18 34:13
41:3 53:19 61:14
67:24
gives
11:2
giving
61:19 69:17
go
6:9 10:7 12:3 22:22
23:7 24:9 31:10,11
37:8 39:24 40:11
42:23 43:8 46:15,24
49:6,17 52:12 55:11

55:13 56:18 59:17
63:18 64:24 67:5,22
going
4:4,24 5:23,24 8:19
11:5 12:5 15:2,18
20:7 22:25 23:1,24
24:9,21,22 25:24,25
26:21 27:5 28:4
31:23 33:1,2,9 34:9
36:2,3 38:3,4,21
39:21 40:1 41:10
42:14,15,17 44:19
45:1,7 46:4,20 47:5
48:10,18 49:7 52:13
54:18 56:14 58:13
58:18,19 63:16
66:15 69:10
Gomez
9:18,21 10:1,2 11:7
18:5 20:21,23,25
21:4,17,19 23:17
36:4,7
good
4:2 5:21 7:25 9:7
20:3 34:9 46:23
gotten
31:24
government
31:9 32:12,13,18
graduated
15:5,10
greater
23:5,6 43:24
greatest
23:5
ground
12:5
Group
32:23 38:1
guarantee
26:11 32:11 53:15
guaranteed
31:9 39:19 52:15
guess
14:13,14 56:3
guy



16:15
**guys**
26:7
gv@gvazquez.com
2:9

**H**

**hand**
13:14
**handled**
62:20
**hanging**
25:25
**happened**
27:21
**happening**
41:6
**hard**
69:18
**harm**
61:15
**harmed**
42:22
**health**
27:23
**heard**
30:7
**hearing**
27:24
**help**
14:17 18:20 34:20
35:11,15
**HH**
70:16
**high**
52:16
**higher**
23:3 43:18 68:1
**hire**
35:11,15
**hold**
41:17 65:4 67:8
**home**
6:21 54:19,20
**Honestly**
20:3 21:16

**hoping**
17:3
**house**
6:23
**housekeeping**
68:16
**Hudson**
2:20 3:4,19 5:13,13
5:18,20 8:15,19,21
10:24 11:3,6,20
12:2,4 13:5,13
15:20,22 18:21 19:2
19:10 20:6 22:12
24:7,16 26:25 27:2
27:6,12,20 28:6
29:7,14 30:4,13,20
31:17 32:16,21 33:4
34:2 36:6,17 37:4
37:10,18 39:7,13
40:3,5,8,11,12,19
40:23 41:2,7,9,22
42:11,15,17,19 44:6
44:10,12,21 45:3,13
45:15 46:9 48:20
49:10,12,15,24 55:8
56:3,5 58:8,17,24
58:25 59:17,20 60:3
60:5,12,14 61:9,13
63:16,20 64:1,12,14
64:16,22,24 65:12
65:21,24 66:4,7,11
66:17 67:1,5,11,13
67:15,20,22,23 68:8
68:22,25 69:2,4,11
69:15,17

**I**

**I-N-I**
6:12
**identification**
13:12
**identified**
4:11
**III**
2:20
**imagine**

56:1,8
**impacted**
32:1
**incapacity**
58:1
**including**
34:12 63:2
**income**
33:12 55:18,23
**inconsistent**
56:11
**increased**
56:7
**incredible**
29:22
**INDEX**
3:1,11
**indicated**
5:25
**indirect**
62:16
**Indirectly**
8:6
**individual**
1:5,9,10,10 25:15
64:12
**individuals**
33:10,11,12 36:23
**industry**
59:11
**information**
14:3 21:19 29:16,18
34:13,19 52:10 53:3
53:5 60:18 62:19
**informed**
34:18
**Ini**
1:19 2:2 3:2 4:13,17
5:11 6:11,12 9:10
41:19 64:9,14 70:6
71:7
**initial**
22:18
**instance**
31:8
**intent**

58:1
**intentional**
42:22
**intentionally**
41:24 45:18 58:3,12
**interest**
19:21,22 20:11 22:16
22:25 23:4,10,12
24:24 25:11 29:25
30:8,22 31:7,10,11
31:19 37:22 38:20
43:5,11,17 45:2,5
46:8,12 52:15,16
62:2
**interested**
71:14
**Interests**
44:17
**international**
29:25 32:15
**Interpret**
5:6
**interpreted**
14:23
**interpreter**
4:4,21 5:2,24 8:17
14:23 15:18,21
18:25 19:4,4,6,9
27:4,18 32:8,8
49:18 58:17,22,22
59:18,18 66:20
**Interpretor**
2:23
**interrupt**
37:7
**introduces**
10:5
**invest**
11:12,14,16
**invested**
18:16 31:5
**investigations**
38:8,9
**investing**
29:22 36:4 43:4
**investment**



20:17 21:8 23:1,18
31:7,14,20,25 32:6
35:4 50:3 52:1
53:10 57:9,12
**investments**
17:2 18:14,15 37:22
37:24 43:13
**investor**
34:12 38:22 43:16
**investors**
23:19 37:23 49:4
52:14
**invite**
16:20

---

**J**

**January**
9:13 10:8 18:11
20:15 21:5,12 22:17
25:11 29:25 31:2,7
48:2,11 57:6 60:19
**Jasmine**
1:22 70:5,14 71:5,20
**Javier**
2:23 4:6
**Jennifer**
9:24 15:18
**job**
15:11,13 16:23 63:9
**jobs**
15:14
**jokes**
16:16
**Jon**
5:14 18:4,8 25:23
**Jonathan**
1:10 2:13 17:18,20
28:13,22
**Juan**
1:9 2:13 5:15 17:23
18:4,8 25:21,23
28:7,8,18,21
**judge**
14:6 39:24,24 41:10
41:25 42:2 45:20
**July**

42:8 70:9 71:16
**June**
1:16 24:21 70:8
**jury**
14:6

---

**K**

**keep**
15:2 20:7 23:23 69:2
**Key**
26:8
**kids**
55:25
**kind**
28:19 59:2
**knew**
36:19 38:4
**know**
4:22 9:1,4,25 10:2
13:2,18 14:14,15,24
15:23 16:21 17:18
17:23,25 21:1 26:7
26:8,9 27:14 30:5,9
30:10,14,21,21
32:24 33:1,7,14,21
35:25 36:9 37:19
39:6 41:1,4,5 49:2,3
50:6 51:1,19 53:12
55:6,16 57:22 58:6
58:16 59:8,13 61:12
62:12,13 67:3
**known**
62:8

---

**L**

**lady**
6:3
**Large**
1:23
**lasted**
54:22
**late**
62:17,24
**lawsuit**
3:14 12:19 13:3 14:4
21:24,25 24:17

46:18 53:24
**lawyer**
13:3,22 14:13 18:20
22:4 35:11,15 47:20
50:12,14,17
**learn**
16:1
**learned**
18:4
**leave**
16:19 25:25 54:14
**left**
51:8 62:1 63:8
**legal**
6:13 7:5
**lend**
20:16
**lender**
20:13
**lending**
20:8,14 34:6
**let's**
4:19 6:9 13:5 15:2
19:5 20:7 26:12
34:11 37:5 46:13
56:18 58:6 63:20
64:22 67:22
**liability**
1:8,9
**LIDIA**
1:5
**lifted**
55:2
**limited**
1:8,9
**line**
66:10,12
**liquidating**
62:16
**list**
56:16
**listen**
4:21 44:13 49:8
**little**
6:20 14:22 24:23,23
49:8 57:15 66:3,4

**live**
6:22 7:1
**living**
10:6
**LLC**
1:8,8,21 2:3 8:9,10
9:23 20:8,9 25:6,9
26:19
**LLP**
1:14 2:14
**loan**
20:11 21:8 26:18
28:23 29:4 33:9
50:21 52:18 53:17
55:20 56:2
**loaned**
20:19 24:18 27:16
28:9,14,19
**loans**
33:19 47:6,12 55:18
57:10
**lockdown**
54:22,24
**long**
16:5 28:1 55:1,16
**longstanding**
56:19
**look**
12:20 18:19 19:13
20:19 51:7 53:16
66:17
**looking**
13:19 18:21 19:11
21:23 31:22 32:5,5
58:9 66:5
**loss**
27:24
**losses**
23:6,7 43:8
**lost**
23:19,22 36:20 61:16
**lot**
16:1 54:22 59:3
**lower**
33:12 55:18,23
**lowered**



23:10 44:9 67:8
**luxury**
52:25 53:1
**lying**
63:9
**Lynch**
34:8

_____

**M**

**M**
2:20
**M-E-L-T-O-R-M-E**
8:17
**mad**
6:7
**magistrate**
42:3,4 45:20
**main**
23:21
**maintained**
56:20
**making**
40:5,7 56:10
**man**
16:12,17,18
**manager**
17:6 20:25 21:4,7
**managing**
34:9
**March**
54:13,15 70:17
**mark**
13:5,8,9 64:16
**marked**
3:12 13:11 19:12
**market**
31:19
**Martin**
16:21,21
**material**
47:21,22 48:9 50:1
**materials**
33:22,24 34:11,17,20
34:21 35:3
**Matias**
1:9 2:12 5:14 17:21

18:1,6,9,10,11 20:5
21:10,21 22:24
25:18,24 26:1,17
27:25 28:2 29:1,15
31:21 34:4,5 35:1,8
35:25 37:5 42:24
48:4,13 50:20 51:1
60:6 61:1
**Matias'**
23:9
**Matias's**
60:24
**matter**
66:1
**mean**
8:3,14 11:22 36:9
38:12
**meaningless**
61:24
**means**
12:13 21:1 36:18
45:4 51:19 53:13
62:14
**meant**
8:2
**meet**
10:13,19 50:12
**meeting**
18:1 21:13 26:4,5
29:15 43:1 61:2
**meetings**
21:9
**Mel**
9:2,5 11:3
**Meltorme**
1:21 2:3 5:12 8:9,10
8:14,22 9:7 17:10
17:11 20:8,11,12,13
20:18,20 21:1,5
22:9 25:6 28:19
41:19 50:21 53:17
57:11 64:8
**Meltorme's**
28:23 57:8,12
**memory**
14:17

**mentioned**
35:1 54:5
**Mercedes**
1:22 70:5,14 71:5,20
**Merrill**
34:8
**met**
10:3,11,15 17:20
18:2,6,10,11 29:2
**Miami**
1:2,15 2:7,17 10:8,14
10:16,19 11:10
17:12 41:13 60:19
68:9
**MIAMI-DADE**
70:3 71:3
**middle**
37:11
**million**
62:22,24 63:6
**mind**
49:14
**minute**
63:18
**minutes**
57:1 63:20
**misrepresentation**
42:22 61:18
**misrepresentations**
50:19
**moment**
11:15 38:13 64:15
68:25
**money**
11:15 17:3 22:5 25:6
25:8,10,13,14,19,22
26:18 27:16,22,23
28:9,14 31:2 32:14
32:17 33:6,8,9 34:9
34:22 35:15 36:20
36:21 37:22,23 38:2
38:6,17,21 39:3,10
39:20 40:15 43:6,14
47:5,11 48:9 49:4
50:17 52:24 55:19
61:15,16,19,23,25

62:4,20 63:3,13
65:6
**monies**
65:18
**months**
23:13 43:11 55:4,6
**Morris**
1:14 2:14 5:13
**motion**
41:7 44:10 46:13
64:3 66:5
**move**
39:21
**movie**
8:23,24
**multiple**
6:4

_____

**N**

**name**
6:10,13 8:8,22 9:18
26:10,11
**named**
9:2
**near**
41:14
**need**
5:25 19:16 22:2
26:12,15,22 28:7,12
28:17 35:6 42:23
64:1 68:15
**needs**
32:8
**negligence**
57:22,25 61:17
**negligent**
58:3
**never**
18:2 21:7 23:11
25:23 30:7 31:4
33:21 34:22 43:16
44:2 47:16 56:1
67:15
**nevertheless**
23:9,10 43:10,10
44:9 67:7



**NOEMI**
1:5
**nope**
30:19
**Notary**
1:23 70:5,15
**note**
19:21 21:23 22:1,6,8
22:16 24:5 41:17
42:1 45:9,13 66:4
**noted**
45:25
**notes**
25:5 35:14 51:13
54:5 71:9
**notice**
1:24 8:15,16
**number**
3:13 6:19 47:2 60:4
**numbers**
13:9 46:22

─────── **O** ───────

**O**
6:20
**oath**
3:5 39:14 70:1
**object**
11:18,21 19:25 22:10
26:23 29:5 30:1,11
31:16 32:3,19 33:25
35:21 36:15 37:3
39:4,12 40:1,17,22
40:25 44:5,19 45:7
45:11 48:18 55:5
58:13
**objection**
41:18 45:9,11,16
**objections**
45:25 46:2
**Obviously**
63:8
**odds**
12:25
**office**
18:12 29:2 54:19

**offices**
18:13
**Oh**
19:3,22 46:17 67:18
**okay**
4:17,22 5:4,9 6:8,9
8:1,5,8 9:7,17 10:2
11:18 12:2,6,8,11
12:18 13:20 14:12
15:2,13 16:5,22
17:15 18:7,18 19:6
19:11 20:7,18 21:9
22:4,8 23:25 24:7
24:11 25:3 26:12
29:21 31:15 32:9
33:22 34:5,11 35:2
37:11,13,25 38:9
41:18 42:1,3,16
45:25 46:4,13,19,23
47:2,10 48:11,12
49:10,15,25 50:5
51:12 53:12,19
54:14 55:4,9,17
56:25 57:8 58:2,7
58:22 59:9,15 60:9
60:12 64:5,24 65:4
65:4,24 67:21 68:8
68:23 69:3,13,16,19
**old**
9:6
**once**
11:21 15:10 16:22
26:14 64:5
**one-bedroom**
17:11
**one-minute**
24:8
**one-one**
8:11,12
**ones**
9:23 38:10
**open**
12:20
**opened**
9:13,16,17
**opening**

9:23
**operation**
34:15 59:2
**operations**
33:15,18 34:15
**opportunity**
21:20
**opposed**
58:11 61:3
**opted**
43:9 68:3
**option**
43:4,5,9,13,17,18,21
43:22,23,24 44:1,8
44:14
**options**
18:14 67:6,25
**orders**
68:20
**original**
48:8
**originated**
51:13
**outlet**
39:16
**outside**
49:12
**owe**
25:8,10
**owed**
22:5 24:19 39:17
**owes**
25:6
**owing**
24:2
**owned**
17:11
**owns**
9:7,11

─────── **P** ───────

**P**
18:21,22,25 19:4,5,5
19:6,9,11,12
**P-I-S-O**
6:20

**p.m**
1:16,16 4:3 24:12,14
37:14,16 49:23
63:22,24 64:9 69:20
69:22
**page**
3:3,13 12:6 20:19
46:14,20,21 47:19
50:23 52:5,5,6,12
56:13,13,14,16 60:3
**pages**
46:21 51:3,5
**paid**
28:4 31:2,24 37:23
38:17 39:16 53:10
**panic**
27:24
**pants**
16:3
**paper**
53:8
**Paragraph**
47:2,19 49:25 52:5,6
52:12 56:16
**parentheses**
51:18
**parenthesis**
52:17,18
**part**
24:25 41:8
**participate**
23:7
**participated**
23:5
**participation**
68:6
**parties**
13:25 14:1 38:11
71:12
**parties'**
71:13
**partner**
16:11 43:8 51:20
52:1 62:10,20 63:6
63:10
**partners**



62:19
**parts**
42:10
**party**
14:2 52:4
**passport**
7:8
**Paul**
18:22
**pay**
20:11 25:24 26:2,2
  26:21 27:5 30:22
  31:23 37:22 38:7,20
  39:3,10,18 40:15
  48:6 50:17 53:25
  55:24 63:4 65:7,18
**paying**
23:13 24:22 38:22
  55:19 62:2
**payment**
24:23 55:24
**payments**
52:15
**people**
6:4 9:4 54:17,20
  55:11,17
**percent**
9:11,11 20:11 23:1,2
  23:4,8,11,11,13
  26:5 31:10,12 43:5
  43:7,10 45:1 52:8
  52:17 53:10 62:4
  67:25
**perfect**
5:3,3,5
**person**
17:21 18:6 21:11
  29:3 55:21,23 63:7
**personality**
60:24
**personally**
8:5 25:18 26:2,17,18
  26:20 27:16 28:9,13
  38:24 39:1,10 53:4
  54:7 65:7 70:7
**Phil**

69:14
**Phillip**
2:20 5:13
**phone**
28:1 56:15,17 61:2
**phonetic**
9:8
**place**
26:8
**plain**
16:3
**plaintiff**
1:6 36:25 64:8
**Plaintiff's**
42:8 46:1
**play**
66:15 67:8
**played**
64:18 66:22
**playing**
11:4
**please**
5:2,10 6:9,17 13:14
  14:24 29:12 40:9,18
  45:12,14,23 58:15
  60:3,12 64:25 65:14
**pledged**
57:11
**pmhudson@duane...**
2:19
**point**
25:13 41:10 42:3,10
  43:15 55:14,15
**pointed**
51:9
**policies**
51:14
**polo**
16:4
**Ponzi**
37:19 66:13,20
**poorly**
58:11
**position**
14:9 22:5 64:13
**positive**

17:4
**possible**
55:1,2
**Possibly**
66:2
**PowerPoint**
21:22 51:3
**present**
2:22 25:12
**presentation**
29:1
**presently**
42:7
**pretty**
60:25
**prevailing**
29:24 31:6
**prevented**
54:17
**previous**
22:19
**prime**
30:5,8
**principle**
52:14
**prior**
50:3,20 51:25
**probably**
24:4 66:7
**problem**
27:23 61:21 62:7
**problems**
49:3
**procedurally**
4:20
**proceedings**
63:1
**profession**
16:19
**professional**
63:3
**profit**
43:18,21,23,25 44:2
  44:17 45:4 52:16
  67:16 68:6
**profitable**

48:17 56:20 57:2,5
**profits**
23:5 43:22 44:15
  46:12 66:25
**prohibited**
54:16
**promise**
28:8
**promised**
31:12 53:17
**promissory**
19:21 21:23 22:1,16
  25:5
**proposal**
25:17
**protected**
52:15
**provide**
5:4 32:14 43:14 69:4
**provided**
33:23 50:7
**Public**
1:23 70:6,15
**published**
39:15
**purchase**
57:9
**purchasing**
47:6
**pursuant**
1:24
**put**
10:8 17:3 19:7 21:7
  41:7 48:8 51:1
**putting**
13:16

---

**Q**

**question**
8:20 11:19,24 14:10
  14:19,19 20:1 22:3
  22:11,14 26:13,22
  26:24 27:7,8 28:7
  28:12,17 29:6,9,13
  30:2,6,9,12 31:15
  32:4,20 34:1 35:22



36:16 37:2 38:5,5
38:23 40:9,18 41:5
41:11,15,20,21
44:11,13,20,25
45:12,22 46:3 48:19
49:9,9 58:7,14
64:25 65:3,14 67:14
**questionable**
33:12
**questioning**
66:10
**questions**
12:13,14 45:19 51:22
64:3,10,11,13,15
**quote**
31:14 51:13,14,17
52:13

**R**

**radio**
15:6 16:8
**raised**
46:2
**raising**
45:13
**rate**
23:10,12 30:5,8 31:1
31:6,12,19,23 43:18
44:8 52:7 67:7,16
67:25 68:1,3
**rates**
29:25 31:10 52:17
**ratings**
33:13
**re-ask**
64:14 67:2
**read**
12:23,25 13:1,22
19:15 27:6,8,10
44:18,21,23 45:22
46:4,6,25 52:13
58:20,22 59:18 60:3
60:12 61:10 64:25
65:1,2,9,19 67:4,9
67:16 68:18
**reading**

58:19 69:23
**ready**
5:17 64:22 67:22
**real**
8:3 17:13 33:7
**reality**
52:7
**realized**
16:10
**really**
23:11 31:18 33:14
37:8 59:3
**reason**
12:14 23:22
**recall**
18:7 20:14 29:24
34:16 50:22 54:24
55:2 60:15
**receive**
23:25 24:1
**received**
24:23 33:24 34:17,21
62:4
**receiving**
27:22 35:3
**recognize**
13:2 19:14,16
**recollection**
35:3 65:1
**record**
4:3,10 5:10 24:11,13
24:15 27:10 30:16
37:13,15,17 42:1
44:23 45:24 46:6
49:6,17,18,20,21,22
56:20 58:19 61:10
63:22,23,25 64:5,19
65:2,9,19 66:23
67:9 68:11 69:19
71:9
**records**
20:24
**recover**
63:13
**rectangle**
51:16

**red**
11:2
**reduced**
43:11
**referenced**
40:14 53:7 65:16
**referencing**
47:17
**refocus**
49:8
**refresh**
65:1
**refusing**
45:19
**regarding**
33:19 66:24
**related**
46:2
**relative**
71:10,12
**relay**
33:2
**relied**
35:6,8,19 61:1
**rely**
29:3
**remaining**
62:22
**remember**
13:6 14:15,16 21:16
21:17 29:20 30:3
34:20 59:12,23 60:8
66:18
**renewal**
61:24
**renewed**
61:22
**repaid**
24:19
**repay**
25:14,19,21 26:18
27:16 28:9,13
**repayment**
25:16
**repeat**
15:21 41:15

**rephrase**
29:13 41:21 58:7
**report**
71:6
**reporter**
1:22 3:6 4:2,10,18
5:9,16 8:13 24:11
24:14 27:6,8,10
37:13,16 44:21,23
45:10,22,24 46:4,6
49:17,20,22 61:9,10
63:22,24 64:16,18
64:20,23 65:4,9,13
65:19,23 66:3,6,9
66:15,22,24 67:4,6
67:9,12,14,18,21
68:13,15,20,23 69:1
69:3,6,9,13,19 70:5
70:14 71:1,5,20
**reports**
62:21
**representation**
42:24 59:11,23 60:6
60:15 61:6
**representations**
28:18,23 35:8,18,19
56:17
**representative**
1:20 2:3 64:8
**represented**
52:14 59:9
**requested**
27:11 44:24 46:7
61:11 64:19 65:10
65:20 66:23 67:10
**requesting**
42:2
**requires**
61:18
**reserves**
56:21
**reside**
6:15
**residency**
7:11,13,16
**respond**



5:7 20:4,5 39:5
**responded**
28:2
**responding**
4:14
**response**
27:18 45:17
**restaurant**
10:22
**restroom**
24:9 37:8 63:19
**retained**
3:19
**return**
17:4 31:13 38:4 43:5
43:18 44:3
**returns**
18:14 48:15
**review**
71:7
**rhythm**
5:25
**rich**
26:6
**richest**
26:7
**right**
9:4 10:13,16 13:5
14:21 22:7 38:2
45:5 46:19,19,19,19
46:23 48:12 51:9,12
54:17 56:12 57:4
58:17 66:11 67:2
69:6
**risk**
23:9 29:23 31:11,23
36:3 43:6,9,20,23
43:25 68:1
**risk-**
31:19
**route**
23:7
**rules**
12:5
**run**
33:19 58:11

**running**
34:14

---
**S**
---

**safe**
23:7,21 31:7,14
52:15
**salesperson**
15:16
**savings**
30:25
**saw**
16:10
**saying**
26:6 32:25 33:8
49:14 61:1 66:18
**says**
19:24 20:8,10,18
47:4 51:13 52:6
67:6
**scheme**
37:19 66:14
**screen**
21:22 29:16,19,21
34:18 51:1 60:19
**script**
15:12
**second**
4:21 22:15 24:4 27:9
41:17 42:5 45:8
49:7 64:7
**seconds**
37:9
**secret**
8:25
**section**
20:10
**secure**
31:4 47:24
**secured**
19:20,22 22:16
**see**
20:22 51:7,10,14
68:9
**seek**
7:16

**seen**
12:21 38:16 47:16
50:23 51:4 53:4
54:7
**segment**
13:1
**Segundo**
6:19
**selected**
44:14
**sell**
17:11
**selling**
15:15 16:3
**send**
13:22,22
**sentence**
52:6
**September**
63:5
**serious**
16:15
**set**
4:19 10:7 21:6 23:12
42:8
**settlement**
25:16
**share**
43:22
**she'll**
13:22
**shirt**
16:4
**short**
31:6 56:22
**Shortly**
66:6
**shot**
42:18
**show**
10:4 14:17 20:25
25:5 48:16 57:4
68:14
**showed**
21:21 29:16
**showing**

26:6
**shown**
29:19,21 34:17 38:14
51:4,23 60:18
**sides**
21:2
**signed**
20:20 22:1 35:14
70:9
**signing**
69:23
**simple**
45:19
**simply**
40:9 44:3
**simultaneously**
39:19
**singer**
9:1,3
**single-family**
6:21
**sir**
4:4 5:21 35:23 46:25
**sit**
39:8 40:10 47:22
52:9,20,23 54:1
57:18 59:4 65:5,15
**situations**
17:3
**six**
23:10 43:11
**ski**
52:25
**Snyder**
9:24
**social**
15:4
**sold**
54:8
**Solutions**
34:24,25 51:17
**somebody**
36:13 63:8
**son**
10:6,8
**soon**



16:10 55:2
**sorry**
17:10 19:1,12 23:25
24:18 39:9 45:10
52:5 67:18
**sought**
7:13
**soul**
9:6
**sound**
11:4 27:2
**sounds**
36:11
**South**
1:14 2:15
**SOUTHERN**
1:1
**Spanish**
2:23 4:8,9,24,24,25
5:23 58:23 60:20,23
**speak**
11:7 14:22
**speaking**
6:1,5
**specifically**
38:16
**speed**
58:18
**spell**
6:9 10:25
**spelling**
8:13
**spend**
55:19
**spent**
26:6 62:5
**spoke**
9:25 20:5 25:23 28:1
35:1
**standard**
68:23,25
**standpoint**
32:6
**standup**
16:8,22
**start**

19:5 43:2 64:21
**started**
16:8,22 66:13,25
**state**
1:23 5:10 6:9 20:25
70:2,6,15 71:2
**statement**
52:10,21 57:8,19
59:5 60:10 61:4
**statements**
37:5 47:13,16
**States**
1:1 7:11,14,17,19,22
9:2 31:8 32:17
36:18 54:21,25
55:12,13
**status**
7:4,10,11,14,17
**stickers**
19:8
**stop**
12:2 33:15 49:3
**stopped**
27:22 56:9
**straight**
16:12,17,17 31:22
**strictly**
46:2
**strike**
38:25 39:21 44:10
50:5
**subject**
64:3 66:1
**subpoena**
69:5
**subprime**
34:6
**subsequent**
15:14
**sue**
36:7,9
**sued**
12:14
**suggest**
11:12
**suing**

12:19 36:14 62:9
63:11
**Suite**
1:14 2:6,16
**summer**
62:24
**support**
14:3,9 23:20 52:10
**suppose**
51:20 55:15 57:25
**sure**
27:9 51:2 58:7
**surprise**
48:15,22,24
**swear**
4:4,12,15
**sworn**
4:7,14 70:8
**system**
11:4

---

**T**

**Tab**
19:12
**tabbed**
18:19
**take**
6:4 14:1,18,20 19:13
38:22 42:3 49:12
59:3,3 63:20 69:15
**taken**
1:22 22:5 36:24
**talent**
7:23
**Talia**
1:10 2:13 5:15 17:23
25:21 28:8,18,20
**talk**
36:1,1 49:4 56:3
62:13
**talked**
12:1 17:10 21:7
42:20 56:25 57:15
**talking**
66:25
**talks**

20:12 61:22
**tax**
48:15
**telephone**
48:3,5
**television**
15:6,12
**tell**
12:21 14:10 15:17
18:10 19:13 22:2
33:5 34:5 38:15
43:2 49:7 53:21
58:20 64:1,24
**telling**
40:6 47:5
**ten**
20:11 23:1,8,13
31:12 43:5,10 45:1
67:25
**term**
30:23,24 53:12
**terms**
33:7 35:13
**testified**
4:15 34:16 67:24
**testimony**
3:2 4:8
**text**
18:8
**textile**
15:16 16:23
**Thank**
4:18 5:16,18,22
**theater**
15:7 16:20
**thing**
19:15 26:21 27:21
35:6,7 36:23
**think**
8:11 11:3 16:9 19:9
32:1 48:25 50:25
51:2,5 54:21 55:18
56:6,25 58:2 60:25
61:14,16 65:21
66:12,24 67:11
69:11



**third**
62:15
**third-party**
63:3
**thought**
28:3 67:18
**three**
5:25 16:6,23 25:15
36:14 41:22,23 51:8
51:8,12 58:9
**ticket**
13:16
**time**
6:5 10:5,21 14:18
18:17 21:12,14
22:24 23:14 26:5,6
28:1 39:23 42:6
45:16 61:20 64:7
68:21 69:18
**times**
31:12,19 41:22,23
**tired**
24:10
**today**
4:12 14:8 22:2 38:15
39:8 40:10 41:12
47:10,22 52:9,20,23
54:2 57:16,18 58:9
59:5 65:5,15
**today's**
68:17
**told**
11:4,14 22:25 23:3
23:17 34:7 36:19,19
61:1 62:21 63:6
**Tome**
8:14
**Top**
8:25
**Torme**
9:2,5 11:3
**track**
56:19
**tranquility**
28:2,5
**transaction**

**third**
17:2 35:12
**transactions**
47:14,14
**transcript**
41:8 69:24 71:8,8
**translate**
4:8 60:13
**translation**
15:20
**transmitting**
28:5
**traveled**
42:5 64:6
**Treasury**
30:10,14,17 31:8,8
**trick**
14:7
**tricked**
47:3,4,8
**tricking**
36:11
**trips**
52:25
**trouble**
49:1
**true**
71:9
**truly**
4:7 37:7
**trusted**
61:5
**trusting**
23:23 61:20
**truthfulness**
62:18
**try**
14:7,24 58:18 67:2
**trying**
49:8 63:3
**turn**
22:15 23:24 50:23
56:12
**twice**
28:1
**two**
16:14 19:2 23:13

25:5 31:9 41:3
43:11 58:9 62:5
67:24
**type**
15:25
**types**
17:2
**typically**
30:24 31:10

---

**U**

**U.S**
8:2 10:7 30:16 31:5
32:12,13 54:22
**ultimately**
11:16 45:20 58:10
**undergraduate**
15:4
**Underneath**
51:12
**understand**
4:22 5:1 12:24 14:10
14:11 20:24 22:3,14
29:9 30:6 33:11,18
41:5,6,16,21 44:25
49:11 56:23 57:13
59:1 61:6
**Understood**
43:21
**underwriting**
51:14
**unilaterally**
44:9
**United**
1:1 7:11,14,17,19,21
9:2 31:8 32:17
36:18 54:21,25
55:12,13
**University**
15:5
**unresponsive**
39:22 44:10
**untrue**
36:20 52:21 57:19
59:5 60:1,10
**Uruguay**

10:5,15
**use**
5:24 13:17,17 26:20
33:9 39:2 55:12
65:17

---

**V**

**vacation**
10:7,10,14,17,20
41:13
**vacations**
52:25
**Valeria**
9:8
**Vazquez**
2:4,10 4:17,19 5:1,4
5:6,11,12 8:16
10:23 11:18,21 12:3
18:23 19:1,3,5,7,25
22:10 24:8 26:23
29:5,12 30:1,11,16
31:15 32:3,19,22
33:25 35:21 36:15
37:2,7,11 39:4,12
40:1,6,17,22,25
41:17 42:1,13,16
44:5,11,19 45:7,11
45:24 46:1 48:18
49:6,11,14,16,19
55:5 58:6,13 63:18
64:5 68:19,24 69:8
69:14,16
**Vehicle**
34:23 51:17
**verbal**
35:19
**verbally**
61:2
**Visa**
7:23
**voice**
45:14
**vs-**
1:7
**VSC**
33:20 51:13,14,18



52:1

**W**

**W-A-R-P**
15:23
**wait**
5:2
**waiting**
23:23 37:9
**waive**
68:18,19
**waived**
69:24 71:8
**want**
6:7 13:2 14:13,14
16:19 19:7 23:6
27:18,19,20 30:18
30:21 39:23,24 43:3
64:20,25 66:21
67:16,17 68:9 69:8
69:14
**wanted**
23:16 43:6,12 63:1
**warp**
15:17,23 16:1
**wasn't**
18:1 22:1 24:24
25:16,17,25 34:9
38:5 57:5 59:7
61:21
**way**
14:11 23:3,20 26:12
42:5 45:12 46:15
53:16 62:3 66:7
**ways**
47:4,7,9
**we'll**
13:8,9 14:24 41:24
69:4
**we're**
4:23,23,24 5:23,24
12:5 18:21 21:23
37:16 41:10 42:15
46:20 49:18 58:18
61:9 62:9 63:24
64:4 68:8,11 69:4

**we've**
19:12 42:12 57:15
**wealthy**
26:9
**weave**
15:25
**Wednesday**
1:16
**week**
68:10
**well-known**
26:10
**went**
32:11 36:23 56:8,9
**WhatsApp**
18:8
**whichever**
43:2
**win**
14:7
**wired**
50:6
**withdraw**
27:23
**witness**
2:2 4:11,12,25 5:3,5
5:8 11:25 12:12
14:2 20:3 24:10
27:21 30:3,18 32:5
32:10,24 35:24 39:5
41:1 44:25 45:15
46:8 55:6 58:16
61:12 65:11 66:2
68:12,14,18
**witnesses**
14:2
**woof**
15:17 16:1
**word**
15:23 26:20
**words**
23:9 51:17
**work**
14:24 15:6 54:18
55:12,13
**worked**

17:19 34:8 54:20
**working**
9:19,20 11:10
**works**
17:25
**world**
31:13 32:2
**worse**
40:5,7
**worth**
62:22
**would've**
23:8 43:24
**writer**
15:12
**written**
35:3
**wrong**
32:21
**wrote**
66:20

**X**

**Y**

**yacht**
26:9
**Yeah**
19:5 24:7,10 25:4
35:2 46:21,23 48:13
49:18 55:10 59:16
63:20 64:22,25 66:6
67:5,12,13,14 68:25
69:11
**year**
15:8
**years**
16:6,23 58:9 59:10
62:5
**yellow**
11:1
**young**
6:3 9:4

**Z**

**ZALAZAR**

1:5
**zero**
29:23 63:7

**0**

**01**
7:23

**1**

**1**
3:14 9:11 13:9,11
19:12 20:10 49:25
**1,500**
24:24
**1:09**
1:16 4:3
**1:57**
24:11
**100**
53:10
**11**
70:17
**1111**
2:5
**12**
23:2
**13**
3:14 50:23
**13th**
70:9 71:16
**14**
52:6
**148,500**
25:1,10
**150,000**
22:17 24:3,19
**1550**
2:6
**16**
62:22,24
**180**
23:25
**180,000**
20:9,15,19 22:20
23:15 24:18 28:20
47:23 50:6,21



**183**
56:16
**183A**
56:19
**183C**
58:20,23
**183D**
59:9,18
**1869**
6:19
**19**
59:6
**1979**
15:9
**1st**
42:8

---
**2**
---

**2**
6:19
**2:06**
24:14
**2:39**
37:13
**2:42**
37:16
**20**
23:4 43:7 48:11,11
  52:17 56:25 59:10
**201**
1:14 2:15
**2016**
10:3,10,12,15
**2017**
10:11,14,16 11:9,12
**2019**
48:16 56:16 57:5
**2020**
9:14 18:11 20:15
  21:5,12 29:25 31:3
  38:20 48:2 54:15,15
  54:18 55:14 56:8,10
  57:2,6 59:6 60:19
  61:20 62:17,21
**2021**
22:17 38:20 56:9

61:21 62:17
**2022**
24:22 25:11,24 27:4
  31:7 62:7,17,24
  63:5
**2024**
1:16 70:8,9 71:16
**2026**
70:17
**23-21512-CIV-AL...**
1:3
**231847**
70:16
**24**
47:2
**24th**
22:17
**26**
1:16
**26th**
70:7
**28**
47:19,19 49:25

---
**3**
---

**3**
63:6
**3:13**
49:22
**3:36**
63:22
**30**
23:14 24:19 37:9
  52:8
**30,000**
23:15,22 24:1
**305-371-8064**
2:8
**305-960-2273**
2:18
**33131**
1:15 2:7,17
**3400**
1:14 2:16

---
**4**
---

**4:03**
63:24
**4:04**
64:9
**4:14**
69:19,22
**4:15**
1:16
**45**
56:13,13

---
**5**
---

**5**
3:4 20:19
**5:00**
64:10
**51**
52:5,6,6
**54**
52:12

---
**6**
---

**6**
46:23
**60**
62:4

---
**7**
---

**7**
46:14,20,23,24
**70**
3:5
**71**
3:6

---
**8**
---

**80**
26:5

---
**9**
---

**99**
9:11

